Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 1 of 48
EXHIBIT A - FAC - P. 1
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 1 of 48

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JANE DOE 1, individually, and on behalf of )
all others similarly situated, JANE DOE 2, )
individually and on behalf of all others )
similarly situated, JANE DOE 3, individually)
and on behalf of all others similarly situated, )
JANE DOE 4, individually and on behalf of )
all others similarly situated, JANE DOE 5, )
individually and on behalf of all others )
similarly situated, and JANE DOE 6, )
individually and on behalf of all others )
similarly situated, )
                PLAINTIFFS, )
                    )
            V. )
             )
GOVERNMENT OF THE UNITED )
STATES VIRGIN ISLANDS, FIRST LADY )
CECILE DE JONGH, GOVERNOR )
KENNETH MAPP, SENATOR CELESTINO)
WHITE, ATTORNEY GENERAL )
VINCENT FRAZER, GOVERNOR JOHN )
DE JONGH, SENATOR CARLTON DOWE,)
DELEGATE STACEY PLASKETT, and )
JOHN DOES 1-100, )
                )
          DEFENDANTS. )

**INDIVIDUAL AND
CLASS ACTION AMENDED
COMPLAINT**

**ACTION FOR DAMAGES**

<u>JURY TRIAL DEMANDED</u>

## AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

1.     Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane

Doe 6, individually and on behalf of all others similarly situated file this Amended Complaint

against the Government of the United States Virgin Islands (hereafter "USVI"), First Lady Cecile

de Jongh, Governor Kenneth Mapp, Senator Celestino White, Attorney General Vincent Frazer,

Governor John de Jongh, Senator Carlton Dowe, Delegate Stacey Plaskett, and John Does 1-100,

for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1591 to 1595, and of negligence, and in support thereof allege as follows:

## I. JURISDICTION, VENUE, AND TIMELINESS

2.     This action is brought pursuant to various federal and U.S. territorial statutes, including the federal Trafficking Victims Protective Act (TVPA), 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6, each individually and on behalf of all others similarly situated, proceed under the federal TVPA statute.

3.     This Court also has supplemental jurisdiction of the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

4.     Venue is proper in the United States District Court of the Southern District of New York, pursuant to 28 USC 1391(b)(2), because substantial activities occurred in this District including, but not limited to, the following:

      i.    Epstein's sex-trafficking operation was based, managed and operated out of New York City, in this District.

      ii.    Defendants, their officers, agencies, agents, servants, and/or employees regularly communicated with Epstein about the formation, operation, and maintenance of Epstein's sex-trafficking ring by electronic means, including voice telephone, text message, video telephone or meeting, while Epstein was in his New York office and/or residence, in this District.

      iii.    Epstein and his co-conspirators, including Defendants, knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through financial and non-financial transactions that originated in this District.

iv.    The commercial acts of sexual abuse, committed by Epstein and certain select friends, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street, New York City (among other locations, including the USVI). Epstein used his New York mansion to harbor his victims and as a base from which to transport them to other locations outside of New York.

v.    Defendants received numerous substantial payments from Epstein's J.P. Morgan Chase New York accounts, as demonstrated below and as set forth in the various filings of both parties in government of the *U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.,* Case No. 1:22-CV-10904-JSR (S.D.N.Y. 2023).

vi.    On at least one occasion, First Lady Cecile de Jongh stayed in one of Epstein's apartments in New York for a month in 2017, nearly a decade after Epstein completed his prison sentence for soliciting minors for prostitution, in order to advise and assist him in securing the USVI's cooperation as a safe harbor for his sex-trafficking ring.

vii.    Stacey Plaskett, delegate to the U.S. House of Representatives from the USVI's at-large district, visited Epstein at his New York mansion to request that he contribute to her political campaigns, and Epstein and his colleagues paid her campaigns $30,000.  Plaskett also visited Epstein at his New York mansion to request a $30,000 contribution to the Democratic National Committee, which was ultimately declined because, Plaskett knew, Epstein failed their vetting.

viii.    The transportation for the Epstein sex-trafficking ring was owned, stored, and maintained in New York State.  In particular, Epstein's private jets and vehicles

which were used to transport victims and Epstein's clients, or purchased, owned, stored, and maintained in New York.

ix.   Many of the trafficked women, including Plaintiffs herein, were solicited by Epstein while he was in New York and then transported from New York to the USVI and held captive and abused in the U.S. Virgin Islands at Epstein's USVI estate.

x.   At the time of the events at issue, plaintiffs resided in New York, New York, in this district.

xi.   Likewise, Epstein solicited many of his co-conspirators for the sex-trafficking ring during meetings held in New York, seeking out their interest in engaging in sex crimes before extending invitations to the island, inclusive of his private transportation to avoid publicity.

xii.   Epstein also facilitated entry into the United States Virgin Islands for the procurement of travel documents while he was in his New York office and/or residence.

5.   All causes of action arose from 2001 and continuing until 2019.

6.   This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a Plaintiffs shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex-trafficking. As the conspiracy continued until 2019, this action is timely.  This action is also timely under New York's Adult Survivor's Act.

4

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 5 of 48
EXHIBIT A - FAC - P. 5
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 5 of 48

7.      Further, Defendants actively and knowingly concealed their tortious actions from Plaintiffs and the public, for many years. It was not until the recent case, *U.S. Virgin Islands v. JPMorgan Chase Bank NA*, U.S. District Court, S.D.N.Y., No. 22-10904, where JPMorgan Chase deposed members of the USVI government, that the Plaintiffs and public learned of the many acts committed by Defendants which contributed to and caused Plaintiffs' injuries under the federal statutes set forth below. *See U.S. Virgin Islands v. JPMorgan Chase Bank NA*, U.S. District Court, S.D.N.Y., No. 22-10904.

8.      In addition, the New York Adult Survivors Act created a one-year window for adult sexual abuse victims to bring their negligence claims making this action timely under CPLR 214-j.

## II.  INTRODUCTION

9.      Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6, on their behalf and on behalf of others similarly situated, file this complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex-trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for aiding and abetting, and negligence.

10.     The suit arises from the USVI's participation and involvement in Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the many individuals and representatives of the government who gave orders to provide preferential treatment to Epstein which allowed, collaborated, and encouraged him to continue his sex-trafficking enterprise, in order to continue to receive the benefits it derived from its relationship with him.

11.     The USVI government's actions actively facilitated Epstein's crimes and misconduct.

Case 1:23-cv-10301-AS    Document 31-4    Filed 01/21/24    Page 6 of 48
EXHIBIT A - FAC - P. 6
Case 1:23-cv-10301-AS    Document 7    Filed 12/13/23    Page 6 of 48

12.     Government officials, including but not limited to Defendants First Lady Cecile de Jhong, Governor Kenneth Mapp, Senator Celestino White, Attorney General Vincent Frazer, Governor John de Jhong, Stacey Plaskett, and Senator Carlton Dowe facilitated Epstein in his ongoing sex-trafficking operation by ensuring that Epstein received preferential treatment and unfettered, unmonitored freedom while in the USVI, and by providing Epstein and/or his companies instruments which further enabled his sex-trafficking ring and related crimes.

13.     Upon information and belief, government employees John Does 1-100, followed the orders of the aforementioned government officials, the USVI, and others, further enabling Epstein in his crimes.

14.     Defendant USVI knew, or should have known, that it was providing Epstein with a safe haven to create, operate, maintain and expand his sex-trafficking ring, the protection of the government to run said operation, and the willful ignorance that such operations were occurring and continuing to occur at the behest of the USVI government.

15.     Government officials and employees were given orders to carry out said government-sanctioned priorities, privileges, and benefits, negligently allowing Epstein to continue with his operations uninterrupted and without fear of police, airport, coast guard, or customs intervention. In exchange, the USVI government leaders, staff, and officials benefitted by receiving generous financial donations, financial advice, support, loans, access to lines of credit from Epstein and his entities, and that crucial financial support allowed Epstein to successfully rape, sexually assault, coercively sex traffic Plaintiffs and numerous other women freely and openly, access to underage and other women, and a haven to act without government scrutiny -- by customs, police, or airport personnel -- or public knowledge.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 7 of 48
EXHIBIT A - FAC - P. 7
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 7 of 48

16.     Other government staff and officials, including John Does 100, followed the orders of these officials, and in turn, maintained their government employment.

### III. PARTIES

17.     Jane Doe is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

18.     Jane Doe 2 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

19.     Jane Doe 3 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

20.     Jane Doe 4 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

21.     Jane Doe 5 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

22.     Jane Doe 6 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

23.     The Jane Doe Plaintiffs are using a pseudonym to protect their identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

24.     The Jane Doe Plaintiffs are also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had-and continue to possess-tremendous wealth and power and have demonstrated a clear ability to cause their serious harm.

25.     The Jane Doe Plaintiffs' safety, right to privacy, and security outweigh the public interest in their identification.

26.    The Jane Doe Plaintiffs' legitimate concerns outweigh any prejudice to Defendants by allowing them to proceed anonymously. Accordingly, the Jane Doe Plaintiffs filed a Motion to Proceed Anonymously that was granted by this Court.

27.    As discussed below, many other women, who are victims and survivors of sexual abuse and trafficking are similarly situated to the Jane Doe Plaintiffs and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendants and will be provided to them as required.

28.    Plaintiffs bring this action against the Attorney General, pursuant to its authority to represent the Government of the United States Virgin Islands.

29.    Plaintiffs bring this action against the Attorney General, as a representative of the USVI, which is vicariously liable for the negligent acts of its employees, including John Does 1-100, pursuant to V.I. Code Ann. tit. 33, § 3411, and § 3414(a).

30.    Defendant First Lady Cecile de Jongh was, at all relevant times, the First Lady of the USVI.

31.    Defendant Governor Kenneth Mapp was, at all relevant times, the governor of USVI.

32.    Defendant Senator Celestino White was, at all relevant times, a senator of USVI.

33.    Defendant Attorney General Vincent Frazer was, at all relevant times, the Attorney General of USVI.

34.    Defendant Governor John de Jongh was, at all relevant times, the governor of USVI.

35.    Defendant Senator Carlton Dowe was, at all relevant times, a Senator of USVI.

36.     Defendant Stacey Plaskett was, at all relevant times, an attorney with Epstein's longtime law firm, Kellerhals Ferguson Kroblin PLLC; the attorney for the USVI's EDC when it approved over $300 million in tax breaks for Epstein's companies, and a delegate to the U.S. House of Representatives from the U.S. Virgin Islands' at-large district.

37.     Defendants John Does 1-10, and 51-100, were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI customs agents and/or officers.

38.     Defendants John Does 11-20, were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI air traffic controllers.

39.     Defendants John Does 21-30, were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI airport baggage check agents.

40.     Defendants John Does 31-40, were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI police officers.

41.     Defendants John Does 41-50, were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI coast guard agents.

42.     The USVI is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this Complaint.

43.    The acts alleged were committed by USVI's officers, directors, employees, and agents were within actual and apparent scope of their employment and with the intention, at least in part, to benefit the USVI.

44.    USVI's governmental activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the airports, ports, and territories.

## IV.  FACTS OF THE CASE

A.  *Epstein's Sex Trafficking Ring and Defendants' Knowledge, Assistance and Facilitation of the Criminal Enterprise.*

45.    The Epstein sex-trafficking venture originated in the early 1990's. From its inception until Jeffrey Epstein's arrest by the FBI for sex-trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the venture operated primarily for the purpose of luring young women and girls, including Plaintiffs, into a position where Jeffrey Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. His venture provided financial and other benefits to those who assisted and enabled the venture.

46.    The Epstein sex-trafficking venture was well-structured and grew increasingly more complex and powerful as it victimized more young women and as its relationships with the USVI and its many government officials grew.

47.    The Epstein sex-trafficking venture's purpose included enticing, obtaining, harboring, and transporting the young victims, including Plaintiffs, to numerous places, including but not limited to USVI, where they would be removed from their families, friends, and loved ones

10

and be completely isolated. The venture had everything a sex-trafficking organization needed—funding, infrastructure, a place to operate said organization openly and without fear of interference or oversight, and complicit laws, employees, and government. It was by many accounts the most powerful and wealthiest sex-trafficking venture ever created. Once in Epstein's clutches, each victim was taught and understood that she must be completely compliant with every demand Epstein or his clients made; otherwise, she would certainly suffer serious reputational, financial, and psychological harm.

48.     In creating and maintaining this network of victims worldwide whom they could force to engage in commercial sex acts, Epstein conspired with others, including Defendants and others who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the USVI. Epstein's victims were young women and girls, like Plaintiffs, who suffered severe abuse as Epstein's sex-trafficking victims and who believed they had to remain loyal to the venture at all costs to survive. Epstein victimized hundreds of young women and girls with the assistance of a wide network of co-conspirators, including the USVI and its many government officials and staff.

49.     The sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause Jane Does 1-6 and many dozens of others similarly situated to engage in commercial sex acts. Epstein fraudulently represented to the victims, including Plaintiffs, that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, select others, as well as to create the opportunity for Epstein to sexually abuse them.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 12 of 48
EXHIBIT A - FAC - P. 12
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 12 of 48

50.     Among other things, Epstein caused his victims to engage in commercial sex acts.

51.     As one means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with their demands that they perform commercial sex acts.

52.     As another means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands.

53.     Epstein and his co-conspirators also caused victims to engage in commercial sex acts, Epstein and his co-conspirators would "gift" his victims money and provide them with living accommodations, clothing, education, or other necessities. Epstein and his co-conspirators would then force them to pay off the "debt" by complying with Epstein's sexual demands.

54.     Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cellular telephones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

55.     Epstein transported his victims in interstate and foreign commerce, including transportation to and from his mansion in this District.

56.     The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, and the USVI and elsewhere.

57.     Epstein did not act alone. He created and maintained his sex-trafficking venture with the assistance of other influential individuals and entities who knew, or should have known, that he was sexually abusing and sexually trafficking young women and girls, but nevertheless

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 13 of 48
EXHIBIT A - FAC - P. 13
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 13 of 48

supported the sex-trafficking enterprise. Epstein's sex-trafficking venture was not possible without the assistance and complicity of Defendants who provided his operation with an appearance of legitimacy and special treatment to the sex-trafficking venture, thereby ensuring its continued operation and sexual abuse and sex-trafficking of young women and girls. Without Defendants' participation, Epstein's sex-trafficking scheme could not have existed nor flourished.

58.     The USVI negligently and/or intentionally provided special treatment to Jeffrey Epstein and the sex-trafficking venture through their territories, laws, employees, staff, airports, ports, and government staff and officials, thereby ensuring Epstein's sex-trafficking venture's continued operation and sexual abuse and sex-trafficking of young women and girls.  Without the USVI government, inclusive of Defendants, Epstein's sex-trafficking scheme could not have existed and flourished, undisturbed in the USVI.

59.     Defendant USVI negligently hired, supervised, and retained Defendants John Does 1-100.

60.     The victims, including Plaintiffs, could not escape from Epstein's enterprise because the Epstein sex-trafficking venture used the USVI laws and agencies, Defendants and others to cause Plaintiffs, and many dozens of others similarly situated women to engage in commercial sex acts and remain in the USVI until Epstein permitted them to leave, as explained herein.

61.     The Epstein sex-trafficking venture operated in and affected interstate and foreign commerce. Epstein recruited, solicited, coerced, harbored, transported, and enticed some of his victims, including Plaintiffs and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York), Florida, and the USVI.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 14 of 48
EXHIBIT A - FAC - P. 14
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 14 of 48

62.     Plaintiffs were injured as a result of the existence and success of the sex-trafficking ring.  For instance, Epstein arranged with defendants and/or their agents, servants and/or employees to allow Jane Doe 2 and Jane Doe 3 into the USVI for the purpose of sexually abusing them even though their visas were expired, which caused them to be sexually trafficked, abused, assaulted and battered by Epstein in the USVI.  Epstein could not and would not have sexually trafficked, abused, assaulted and battered Jane Doe 2 and Jane Doe 3 in the USVI without the unlawful conduct of defendants and/or their agents, servants and/or employees.

63.     In approximately 2003 or 2004, Epstein brought Jane Doe 4 to his office in Red Hook on St. Thomas for the purpose of sexually abusing her.  Epstein's office had two doors- one that led out to an open courtyard- and the other to an area where defendant Cecile de Jongh sat, with her desk positioned adjacent against the exterior wall of Epstein's office. There, Epstein grabbed Jane Doe 4 into his office from the courtyard entrance and raped her over his desk.  The brutal assault lasted about ten minutes. When Epstein was finished, they exited through the other door, where defendant Cecile de Jongh was sitting.  Given her proximity, de Jongh heard the sexual assault, yet she looked at Jane Doe 4, straight into her eyes from her desk and did nothing at that time or at any time afterwards. Given her proximity, it would have been impossible for her to have not heard the sexual assault and yet she did nothing with that information at that time.

64.     In 2002, Epstein took Jane Doe 1 to his office in Red Hook on St. Thomas. When they entered the office, defendant de Jongh was sitting behind the desk.  Epstein said hello to her and immediately took Jane Doe 1 down the short hallway into his office and immediately thrust her against the wall, trapping her.  Epstein aggressively pulled down Jane Doe 1's pants, ripped her panties to the side, and orally copulated her.  In that moment, Jane Doe 1 was petrified, shocked and did not know what to do. The only word that was said was a soft spoken, "No", but that did

not even phase him, as he proceeded to rape her. Knowing there were others in the office nearby, made Jane Doe 1 even more petrified and in shock knowing others could hear what was happening. Defendant de Jongh was in very close proximity during this sexual attack and heard the vicious assault yet did nothing to stop it. Epstein was not fazed in the slightest by de Jongh's close proximity. Jane Doe 1 came out disheveled and was seen by de Jongh. Given that de Jongh was in close physical proximity to the attack, could hear the attack, and did nothing to help Jane Doe 1, Jane Doe 1 felt that she had nowhere to go. After that experience, Jane Doe 1 knew she could not tell anyone as she began to fear this network behind his enterprise. Epstein continued to sexually assault her for years thereafter on the island.

65.     In approximately 2004, even though Epstein knew that Jane Doe 6 did not have a passport, Epstein arranged with Defendants, their agents, servants, and/or employees for Jane Doe 6 to be brought into the USVI and to his USVI island residence for the purpose of sexually abusing her without question or hindrance- an arrangement that was executed successfully solely because of the help provided to Epstein by the Defendants. Soon after Jane Doe 6 arrived on Epstein's private USVI island, he sexually assaulted and raped her in his bed. The next day, he ordered Jane Doe 6 to go with his staff to secure temporary travel documents from USVI officials.

66.     On one occasion, after already in the USVI, Jane Doe 3's travel documents had expired. Epstein ordered Jane Doe 3 to take one of his boats to go to the main USVI island to a specific USVI customs agent who would extend her stay in the USVI. After Jane Doe 3 attempted to obtain travel documents from USVI officials without Epstein present, Jane Doe 3 returned to his estate unsuccessful. Epstein appeared annoyed and angry and escorted her down to the USVI office himself to the same designated USVI official who did not provide the documents requested

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 16 of 48
EXHIBIT A - FAC - P. 16
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 16 of 48

on her earlier attempt. With Epstein present and without Jane Doe saying a word the USVI customs agent quickly provided Jane Doe 3 with the travel documents required.

67.     The responses and reactions by the USVI customs agents indicated that USVI regularly and routinely provided Epstein with visas, passports or other travel documents documents to enable him to traffick his victims internationally, including to the USVI.  Jane Doe 6 was escorted by Epstein's co-conspirators to a government building on the main USVI island, where two USVI customs agents and/or government officials chatted and laughed with the two Epstein associates while Jane Doe 6 stood silent. Without once asking Jane Doe 6 any questions, without Jane Doe 6 providing any documentation supporting her identity or citizenship, without Jane Doe signing anything, and without Jane Doe saying one word, the USVI officials gave Jane Doe 6 documents authorizing her travel back into the U.S. from the USVI.

68.     Epstein could not and would not have sexually trafficked, abused, assaulted, and battered Jane Doe 6 in the USVI without the unlawful conduct of defendants and/or their agents, servants and/or employees.

69.     Epstein could not have sexually trafficked, abused, assaulted, and battered Plaintiffs and other class members in the USVI without the unlawful conduct of defendants and/or their agents, servants and/or employees.

70.     In this complaint, Jane Does 1-6 and other members of the class allege that Defendants acted outrageously and intentionally. But, in addition, wherever Jane Does 1-6 and the other members of the class allege that the Defendants acted with actual knowledge, or in reckless disregard of the fact, that the Epstein sex-trafficking venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 17 of 48
EXHIBIT A - FAC - P. 17
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 17 of 48

commercial sex acts, Jane Does 1-6 and other members of the class also allege that, at a bare minimum, the Defendants should have known that the Epstein sex-trafficking venture had used such means to engage in illegal sex-trafficking in violation of 18 U.S.C. §§ 1591-94-i.e., that they had constructive knowledge of Epstein's sex-trafficking.

### B. *The Payoffs*

71.     To support and expand his sex-trafficking empire, Epstein gave payments, advice, and other benefits to the highest USVI government officials.

72.     Epstein paid hundreds of thousands of dollars to USVI government entities and officials for over two decades, including paying school tuition for Governor de Jongh's children. Many of Epstein's payments to politicians were advised and directed by USVI's First Lady de Jongh, a USVI government official, and bought Epstein "loyalty and access" among USVI politicians.

73.     Governor Kenneth Mapp (USVI's Governor from 2015 to 2019) asked Epstein to advise him on how to increase USVI's business investments and deal with USVI's structural fiscal imbalance. He specifically asked Epstein to "spread the word" that USVI was pushing for business investment and requested Epstein's input on issuing "critically needed bonds" to finance USVI's operations.

74.     Governor Mapp also asked Epstein to assist him in developing a means for Economic Development Commission (hereafter, as "EDC") beneficiaries to repatriate their income to make USVI's EDC program more attractive, and one of Epstein's lawyers drafted proposed legislation for the Governor.  As per USVI's own legislation, the EDC's board is under the "general supervision and direction of the Governor." 29 V.I.C. § ll0l (b). As such, actions of the EDC are done of and by the USVI government.

75.     On one occasion, when the USVI government was desperate for money, USVI officials affirmatively and directly solicited Epstein's assistance. Epstein worked with both a sitting and former USVI Governor on a plan to secure cash by extending it a $50 million loan collateralized by USVI's islands.

76.     First Lady de Jongh suggested that Epstein put Senator Celestino White on a monthly retainer to obtain government loyalty and access.  First Lady de Jongh also directed payments from Epstein's companies to political action committees for Virgin Islands candidates.

77.     Epstein also freely loaned the de Jongh family money.  In 2015, former Gov. de Jongh was arrested on charges of using $500,000 of public money to improve his private home. Former Gov. de Jongh resolved the criminal case by paying a settlement of $380,000 without admitting wrongdoing, by successfully borrowing $215,000 from Epstein to pay the settlement.

78.     Epstein and his colleagues loaned Stacey Plaskett $30,000 to support her political campaign; Plaskett was the attorney for the EDC when it approved the $300,000,000 in tax breaks to Epstein's companies and had worked for Epstein's attorney.

79.     By way of example only, Epstein compensated a USVI customs agent and/or border control worker under the guise of playing Caribbean drums for him on his island.

C.  *The Quid Pro Quo – Defendants Assisted Epstein In Operating And Expanding His Criminal Enterprise.*

80.     In exchange for Epstein's payments to Defendants and various officials and agents within the USVI government, they provided him with special treatment in order to facilitate his crimes.

81.     In exchange for his payoffs, Epstein received (1) influence over the very laws that were supposed to constrain him; (2) waivers of sex offender monitoring requirements; (3) $300 million in subsidies to the allegedly sham companies he used for sex-trafficking; (4) facilitation of

visas, licenses, and/or ignoring requirements for same and other forms of government assistance that enabled his criminal conduct; and (5) immunity from investigation and scrutiny.

i. Epstein Provides Input Into USVI's Proposed Sex Offender Monitoring Legislation And Is Given A Waiver Of Compliance From It.

82.     In 2011, the USVI First Lady solicited Epstein's input on USVI's pending sex offender monitoring legislation and shared draft language from the DOJ with Epstein, writing: "This is the suggested language; will it work for you?" Epstein responded with directions on how to loosen the restrictions.

83.     In particular, Epstein was concerned that the proposed bill included a 21-day notice requirement which would prevent him and others from coming and going as freely as he wanted.

84.     The First Lady responded that, as Attorney General Vincent Frazer had a deadline to submit the legislation, they had to develop the language that would address Epstein's concerns by Thursday because the Governor would be traveling for a week and the Attorney General had to submit the proposed legislation during that time frame.

85.     Epstein and his lawyers continued to stay in touch with USVI Justice Department Attorneys and various senators in order to influence the text of the sex offender monitoring bill.

86.     When Epstein's preferred language was omitted from the final bill, the First Lady assured Epstein that "we will work with Vincent [Frazer, then the Atty. Gen.] to give the discretion for status quo for you "that's the least he can do."

87.     With the assistance of First Lady de Jongh, the Attorney General Vincent Frazer promptly provided Epstein with special treatment; a waiver of the 21-day prior notice requirement for Epstein when traveling out of the Virgin Islands.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 20 of 48
EXHIBIT A - FAC - P. 20
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 20 of 48

88.     After Epstein's attorneys complained again, the Attorney General loosened it further, offering that Epstein be allowed to "notify the [USVI Justice Department] of his intention to travel out of the [USVI] 24 hours prior to his departure."

89.     Epstein was thus allowed to circumvent the recently passed legislation with assistance of Senator Carlton Dowe, Senator Celestino White, and Attorney General Vincent Frazer.

90.     Had this 21-day notice requirement been enforced, Epstein would not have been able to freely sex traffic young women and girls to the USVI as he did for years.

ii.     <u>The USVI Gave Epstein's Enterprise $300 Million In Tax Breaks.</u>

91.     For twenty years, USVI subsidized the operation of Epstein's two USVI-based companies that were fronts for his sex-trafficking enterprise by granting them (and by extension Epstein) between 100% and 90% reductions in income taxes.

92.     The ultimate decision to provide such tax breaks was made by the USVI governor. Plaskett was the attorney on the EDC responsible for, upon information and belief, recommending that the EDC provides these benefits to Epstein and his companies and enterprise.

93.     These tax breaks amounted to $300 million in direct benefits to Epstein and his companies and enterprise.

iii.    <u>Government Officials And Workers Gave Epstein Free Reign In The Country, Bypassing Customs, Law Enforcement, Airport, And Coast Guard Security And Were Instructed To Disregard Any Pleas For Help From The Victims.</u>

94.     With the help of First Lady de Jongh and other government officials and staff, Epstein traveled openly through USVI airports accompanied by young sex trafficked women and girls.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 21 of 48
EXHIBIT A - FAC - P. 21
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 21 of 48

95.     Defendants were responsible for monitoring Epstein's movements after his release from Palm Beach County Jail in 2009 for procuring a minor for prostitution and felony solicitation, but admittedly took no steps to ensure that he was no longer harming minors.

96.     Defendant First Lady de Jongh was an active player in providing Epstein with numerous opportunities to influence government for the benefit of Epstein and his companies. Throughout their relationship, the First Lady often facilitated gifts from Epstein to airport personnel and 78 customs employees.

97.     Despite Epstein's status as a sex offender, U.S. Customs officials on the USVI never examined either the passports or luggage of anyone arriving on Epstein's private jet.  In fact, Epstein, his clients, and the victims were never mandated to enter through customs; they deplaned from the private jet before boarding Epstein's helicopter or boat.

98.     Upon information and belief, Epstein and/or his assistants, agents, and others seized victims' passports with the full knowledge and consent of Defendants who were directed not to assist the victims if they complained of their virtual captivity.

99.     Indeed, Epstein complained by email to First Lady de Jongh in 2010 because a U.S. Customs official caused him "difficulty," and First Lady de Jongh promised that she would ensure this would not happen again by calling the head of customs.

100.    USVI, its officials, and law enforcement, never investigated Epstein, even after Florida law enforcement faxed Epstein's sexual predator registration information to USVI Department of Justice officials in July 2010, with which they included a news article confirming his status as a sex offender.

101.    Upon information and belief, USVI officials directed law enforcement officers, airport personnel, customs officials, and any other government employees to extend any courtesy or assistance to Epstein, and his affluent customers and guests as part of their official duties.

102.    Upon information and belief, USVI officials directed law enforcement officers, airport personnel, customs officials, and any other government employees to disregard or refuse any requests for assistance by any of Epstein's female victims, such as securing a return of the passports from Epstein, and to report any pleas for help directly to Epstein.

iv.    <u>Defendants Secured Visas So That Epstein Could Transport His Victims Into USVI.</u>

103.    First Lady de Jongh, who was employed by Epstein as his office manager, facilitated him in obtaining travel documents, including visas, to bring minor women from other countries to the USVI.  First Lady de Jongh earned $200,000 in annual salary, in addition to the payment of her children's private school and college tuition among other perks.

104.    Upon information and belief, First Lady de Jongh also arranged for three young European women to secure student visas to enroll at the University of the Virgin Islands to attend a custom-tailored class to provide cover for the virtual enslavement of these women.  Epstein's quid pro quo was a $20,000 donation to the University through one of his companies.

105.    Epstein corresponded with First Lady de Jongh and other high-level government officials about securing visas and setting up ESL classes for his many female victims in USVI. On one occasion, when Ms. De Jongh became aware that at least one of Epstein's "young female associates" had only a B-1 temporary business visitor visa, she worked with Epstein to contrive a means for an individual to obtain an I-20 through the University of the Virgin Islands.

106.    The First Lady also frequently assisted on immigration matters related to Epstein's foreign, female associates, by speaking with immigration attorneys on Epstein's behalf and by

coordinating with members of the USVI government for letters of support for visa applications. But for Defendants' above-described negligent and/or reckless acts and/or omissions, Plaintiffs and others similarly situated would not have suffered the mental and physical anguish she endures to date.

## V. CLASS ACTION ALLEGATIONS

107.    Plaintiff Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5 and Jane Doe 6 bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were sexually trafficked to and through the United States Virgin Islands by Jeffrey Epstein between the years 2001 through 2019, both dates inclusive (the "Class Period").

108.    Plaintiffs reserve the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

109.    Numerosity: The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein estate executors and the Defendants, including but not limited to Defendants' and others' records related to Epstein and his sex-trafficking to and through the United States Virgin Islands.

110.    Typicality: Plaintiffs' claims are typical of the claims of the other Class members that they seek to represent. The claims of Plaintiffs and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' participation in and funding of Epstein's sex abuse and Epstein's sex-trafficking venture, as set forth above and otherwise discovered.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 24 of 48
EXHIBIT A - FAC - P. 24
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 24 of 48

111.    Commonality: There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

112.    Common questions of fact and law affecting Class members include, but are not limited to, the following:

a. Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

b. Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

c. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts

d. Whether Defendants knowingly assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

e. Whether Defendants benefited financially or by receiving things of value from its participation in a venture which has engaged in sex-trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

f. Whether Defendants knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a); and

g. Whether Defendants committed negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such persons who were eighteen years of age or older.

113.    Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal

litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

114.    Adequacy: the Jane Doe Plaintiffs will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. The Jane Doe Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and large scale, high profile sexual abuse-related litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class members.

115.    This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendants' records.

116.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

a. Joinder of all Class Members is impracticable;

b. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

c. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d. Absent a class action, Class Members will continue to suffer losses and be aggrieved and Defendants will continue to violate New York and federal law without remedy;

e. Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f. Plaintiff and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g. The forum is desirable because the Defendants conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h. This action presents no difficulty that would impede its management by the Court as a class action.

## VI.  CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AS TO PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF TRAFFICKING VICTIMS PROTECTION ACT UNDER 18 U.S.C. §§ 1591(a)(2), 1595(d)

**(As to All Defendants)**

117.    Plaintiffs incorporate the foregoing paragraphs herein as if set forth at length.

118.    Defendants knowingly and intentionally, through various means, participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

119.    Defendants knowingly benefitted from their participation in Epstein's enterprise.

120.    Defendants knowingly and intentionally, participated in Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

121.    Among other things, Defendants knowingly and intentionally, through various means, recruited, enticed, provided, facilitated, obtained, advertised, and solicited by various means Plaintiffs, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiffs, to engage in commercial sex acts.

122.    Defendants and their officers and employees had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex-trafficking conspiracy to recruit,

solicit, entice, coerce, harbor, transport, facilitate, obtain and provide Plaintiffs into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

123.    Despite such knowledge, Defendants intentionally accepted payment for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Plaintiffs, as well as other young women, to engage in commercial sex acts.

124.    As part of perpetrating TVPA violations, Defendants concealed their extensive involvement and efforts in furtherance of Epstein's sex-trafficking ventures, Epstein, and his associates.

125.    Defendants' conduct was committed knowingly, and in reckless disregard of the facts that Epstein would use said governmental support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Plaintiffs. Defendants' conduct was outrageous and intentional.

126.    Defendants' intentional and/or negligent conduct has caused Plaintiffs, and many other young women serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

127.    Defendants also should have known that they were participating in and facilitating a venture that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

128.     In exchange for facilitating and covering up Epstein's commercial sex trafficking, Defendants received financial benefits therefrom.

129.    Facilitating and covering up Epstein's sexual misconduct was a means of ensuring access to wealth and influence.

130.    Defendants' knowing and intentional conduct has caused Jane Does 1-6 and the other members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

131.    Defendants' knowing and intentional conduct has caused Jane Does 1-6 and the other members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

132.    Defendants' tortious conduct in violating the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious conduct was directed specifically at Jane Does 1-6 and other members of the class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

133.    Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants to profit from Epstein's sex-trafficking enterprise, by gaining access to money and influential people from around the world.

134.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants are liable to Plaintiffs for the damages that they sustained and reasonable attorneys' fees, by virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595.

135.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Jane Doe 1-6 and other members of the class for punitive damages.

136.     The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

137.     This action falls within exceptions to Article 16 of the C.P.L.R.

## AS AND FOR A SECOND CAUSE OF ACTION AS TO AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT UNDER 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595
### (As to All Defendants)

138.     Plaintiffs incorporate the foregoing paragraphs herein as if set forth at length.

139.     Defendants and their officers, agents, and employees aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

140.     Under 18 U.S.C. § 2, Defendants are punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, procured, and induced Epstein's sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women.

141.     Under 18 U.S.C. § 2, Defendants committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, and inducing Epstein's and his conspirators' sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women. As a consequence, Plaintiffs, as well as many other young women, are victims of Defendants' criminally aiding, abetting, and inducing Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2). These actions were in and affecting interstate and foreign commerce.

142.     The crimes that Defendants aided and abetted are (1) Epstein's perpetrating of coercive sex-trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Epstein's co-conspirators'

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 30 of 48
EXHIBIT A - FAC - P. 30
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 30 of 48

knowingly benefitting from coercive sex-trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

143.    Defendants benefited financially and received things of value from their participation in the Epstein sex-trafficking venture, including payments and other compensation from Epstein.

144.    Acting through its officers and employees, the USVI itself perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing a sex-trafficking venture and the sex-trafficking of Plaintiffs, as well as many other young women. Defendants directly violated Chapter 77 by committing and perpetrating these violations.

145.    Among other things, Defendants aided, abetted, facilitated and induced Epstein's sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiffs, as well as many other young women, some of whom were under the age of eighteen, to engage in commercial sex acts.

146.    By aiding, abetting, and inducing Epstein's sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women, Defendants knowingly benefited, both financially and by receiving things of value, from participating in Epstein's sex-trafficking venture.

147.    Defendants and their officers and employees had actual knowledge that they were aiding, abetting, and inducing Epstein's sexual abuse and sex-trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Plaintiffs, as well as many other young

women, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

148.     Defendants knew, and should have known, that Epstein had engaged in acts in violation of the TVPA.

149.     Despite such knowledge, Defendants intentionally aided, abetted, procured, and induced Epstein's and his co-conspirators violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Defendants knew, and acted in reckless disregard of the fact that, Epstein would coerce, defraud, and force Plaintiffs, as well as many other young women, to engage in commercial sex acts.

150.     Defendants' affirmative conduct of aiding, abetting, facilitated, procuring, and inducing Epstein's and his co-conspirators' violations was committed knowingly, and in reckless disregard of the fact, that Epstein would use governmental support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Plaintiffs, as well as many other young women. Defendants' conduct was outrageous and intentional.

151.     Defendants knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Plaintiffs, as well as many other young women serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

152.     Defendants' knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Plaintiffs, as well as many other young women, harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 32 of 48
EXHIBIT A - FAC - P. 32
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 32 of 48

153.    Defendants' criminal conduct in aiding, abetting, and inducing Epstein's TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking organization.

154.    Defendants' intentional and/or negligent conduct has caused Plaintiffs, and many other young women serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

155.    Defendants' conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex-trafficking organization.

156.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), and 1595. Defendants are liable to Plaintiffs for the damages that they sustained and reasonable attorneys' fees. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1) , 1591(a)(2), and 1595.

157.    Defendants are liable to Plaintiffs for punitive damages, for their aforementioned conduct.

158.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

159.    This action falls within exceptions to Article 16 of the C.P.L.R.

**AS AND FOR A THIRD CAUSE OF ACTION AS TO CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT UNDER 18 U.S.C. §§ 1594(c), 1591, 1595**

**(As to All Defendants)**

160.    Plaintiffs incorporate the foregoing paragraphs as set forth herein at length.

161.    Defendants intentionally conspired with others, including Epstein and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2) &

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 33 of 48
EXHIBIT A - FAC - P. 33
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 33 of 48

1591(d), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Plaintiffs and other young victims, all in violation of 18 U.S.C. § 1594(c). Defendants and their officers and employees directly conspired with Epstein himself to further the sex-trafficking venture.

162.    Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18.

163.    Defendants' conspiracy directly, proximately, and foreseeably harmed Plaintiffs and other young victims, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Plaintiffs and other young victims.

164.    Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18.

165.    Defendants' conspiracy directly, proximately, and foreseeably harmed Plaintiffs and other young victims, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways.

166.    Defendants' conspiracy victimized Plaintiffs and other young victims.

167.    Defendants conspired with Epstein and his other co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex-trafficking. Defendants had actual and/or constructive knowledge of Epstein's sex-trafficking venture. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's sex-trafficking venture and with the specific intent to further venture. Defendants and Epstein had a meeting of the minds as to the essential nature of the plan.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 34 of 48
EXHIBIT A - FAC - P. 34
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 34 of 48

168.    Defendants' conspiracy with Epstein was part of its participation in his sex-trafficking venture. Without Defendants' agreement to facilitate the venture, Epstein would not have been a position to move forward with his sex-trafficking venture on USVI and to recruit and entice victims of the venture there and transport them elsewhere to engage in commercial sex acts.

169.    Defendants also conspired with Epstein and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Epstein's sex-trafficking venture secret or, at least, concealed to the greatest extent possible.

170.    Defendants intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing Plaintiffs and other young victims to engage in commercial sex acts, through providing financial and other support for the Epstein sex-trafficking venture. A number of those acts were committed by First Lady de Jongh, acting within the actual and apparent scope of her office to further USVI's and Epstein's interests.

171.    Among the many overt acts intentionally committed by Defendants in furtherance of the sex-trafficking venture were creating and maintaining a special and unusual relationship between Defendants and Epstein within the USVI designed to facilitate Epstein's unfettered sex-trafficking on the islands.

172.    Defendants' actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as providing a place, protection, favorable laws, and beneficial treatment for the sex-trafficking venture were essential tools for Epstein to commit coercive commercial sex acts.

173.   It was part of the conspiracy that Defendants would financially benefit from providing financial support for the Epstein sex-trafficking venture. Defendants did financially benefit from its participation in the venture, including receiving valuable donations and business opportunities from Epstein.

174.   Defendants' participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Plaintiffs, as well as many other young women through its affirmative and overt acts supporting Epstein. Defendants knew, and was in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, and a combination of such means would be used by Epstein and his other co-conspirators to cause Plaintiffs, as well as many other young women to engage in commercial sex acts.

175.   Defendant knew and acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Plaintiffs, as well as many other young women.

176.   The conspiracy that Defendants joined had specific knowledge that Plaintiffs, as well as many other young women, were being coercively sex trafficked by Epstein. The conspiracy's knowledge extended to meeting and knowing Epstein's victims, because Epstein and his co-conspirators met some of the victims, including Jane Does 1-6. Specifically, First Lady de Jongh met and knew many of Epstein's victims.

177.   Defendants conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Plaintiffs, as well as many other young women to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 36 of 48
EXHIBIT A - FAC - P. 36
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 36 of 48

178.    Defendants benefited financially from conspiring to participate in the Epstein sex-trafficking venture, which Defendants knew and should have known that had engaged in coercive sex-trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2), as well as obstruction of the enforcement of the TVPA in violation of 18 U.S.C. § 1591(d).

179.    Defendants' conspiracy has caused Plaintiffs, as well as many other young women serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

180.    Defendants' conspiracy has caused Plaintiffs harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

181.    By virtue of these violations of 18 U.S.C. § 1594(c), 1595, Defendants are liable to Plaintiffs for the damages that they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595. 451.

182.    Defendants' tortious conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious conspiracy was directed specifically at Jane Does 1-5 and other members of the class, who were the victims of Epstein's sex trafficking organization.

183.    By virtue of Defendants' conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Plaintiffs for punitive damages under 18 U.S.C. § 1595.

184.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

185.    This action falls within exceptions to Article 16 of the C.P.L.R.

## AS AND FOR A FOURTH CAUSE OF ACTION AS TO NEGLIGENCE
### (As to all Defendants)

186.    Plaintiffs incorporate the foregoing paragraphs as set forth herein at length.

187.    Plaintiff Jane Doe 1 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2001 to 2019 in New York, Florida, USVI, and around the world.

188.    Plaintiff Jane Doe 2 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2015 to 2019 in New York, Florida, USVI, and around the world.

189.    Plaintiff Jane Doe 3 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2015 to 2019 in New York, Florida, USVI, and around the world.

190.    Plaintiff Jane Doe 4 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2001 to 2009 in New York, Florida, USVI, and around the world.

191.    Plaintiff Jane Doe 5 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2001 to 2009 in New York, Florida, USVI, and around the world.

192.    Plaintiff Jane Doe 6 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators in approximately 2004 in New York and USVI.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 38 of 48
EXHIBIT A - FAC - P. 38
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 38 of 48

193.    Epstein and his co-conspirators committed numerous intentional acts against

Plaintiff Jane Doe 1 which constitute sexual offenses as defined in New York Penal Law § 130,

including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 1 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 1 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 1 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 1 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 1 by forcible compulsion.

194.    Epstein and his co-conspirators committed numerous intentional acts against

Plaintiff Jane Doe 2 which constitute sexual offenses as defined in New York Penal Law § 130,

including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 2 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 2 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 2 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 2 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 2 by forcible compulsion.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 39 of 48
EXHIBIT A - FAC - P. 39
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 39 of 48

195.    Epstein and his co-conspirators committed numerous intentional acts against

Plaintiff Jane Doe 3 which constitute sexual offenses as defined in New York Penal Law § 130,

including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual
intercourse with Jane Doe 3 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual
intercourse with Jane Doe 3 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein
engaged in oral sexual conduct with Jane Doe 3 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no
legitimate purpose, engaged the forcible sexual touching of Jane Doe 3 for the purpose of
degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a
foreign object in the vagina of Jane Doe 3 by forcible compulsion.

196.    Epstein and his co-conspirators committed numerous intentional acts against

Plaintiff Jane Doe 4 which constitute sexual offenses as defined in New York Penal Law § 130,

including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual
intercourse with Jane Doe 4 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual
intercourse with Jane Doe 4 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein
engaged in oral sexual conduct with Jane Doe 4 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no
legitimate purpose, engaged the forcible sexual touching of Jane Doe 4 for the purpose of
degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a
foreign object in the vagina of Jane Doe 4 by forcible compulsion.

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 40 of 48
EXHIBIT A - FAC - P. 40
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 40 of 48

197.    Epstein and his co-conspirators committed numerous intentional acts against Plaintiff Jane Doe 5 which constitute sexual offenses as defined in New York Penal Law § 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 5 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 5 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 5 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 5 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 5 by forcible compulsion.

198.    Epstein and his co-conspirators committed numerous intentional acts against Plaintiff Jane Doe 6 which constitute sexual offenses as defined in New York Penal Law § 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 6 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 6 by forcible compulsion;

c. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 6 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

d. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 6 by forcible compulsion.

199.    At all times mentioned herein, Defendants owed a duty of care, including, but not limited to ensuring the citizens, aliens, and travelers to USVI, are protected by the USVI

government uniformly under the federal law, including 18 U.S.C. §§§ 1591, 1594, and 1595 prohibiting the facilitation and promotion of sex-trafficking, and the profiting thereof.

200.    At all times mentioned herein, Defendants owed a duty of care, including, but not limited to ensuring the citizens, aliens, and travelers to USVI, are reasonably protected by the USVI's government under the federal law prohibiting sex-trafficking, and in the promotion of sex-trafficking and facilitating of sex-trafficking when on USVI's territories.

201.    Defendants acted under the complete supervision and control of the USVI.

202.    USVI had a duty to supervise their government employees, such as Defendants, to ensure their actions, in following government-directed orders, do not promote, encourage, or facilitate sex-trafficking within the USVI, from the USVI, or to the USVI.

203.    USVI had a duty to supervise their government employees, Defendants, to ensure their actions, in following government-directed orders, enforce the law reasonably and equally within the USVI.

204.    At all times mentioned herein, Defendants, and/or their agents, servants and/or employees breached the above-stated duty in a negligent manner, and enabled, facilitated, and allowed Epstein's sex-trafficking to continue unfettered.

205.    Defendant USVI negligently hired, supervised, and retained Defendants John Does 1-100.

206.    Defendants were negligent in their failure to carry out their jobs, positions, and duties as government employees to their fullest extent and, instead following orders from others, directing them to ignore Epstein's enterprise of continuous and open sex-trafficking of young women, and/or directing them to provide specialized services to Epstein, a civilian, in furtherance of Epstein's sex-trafficking scheme.

207.    Defendants, as USVI customs agents, facilitated Epstein's, his associates', and many female victims being trafficked by Epstein, including Plaintiffs, by failing to check and/or inspect Plaintiffs and Epstein's guests for legally valid travel documents, including customs forms, passports, and/or VISAs; by failing to inspect his guests or Jane Doe's travel documents, including customs forms, passports, and/or VISAs; by failing to inquire as to Jane Doe's and Epstein's guests' legally valid travel documents, including customs forms, passports, and/or VISAs; by failing to require Plaintiffs and Epstein's guests provide and/or present the agents with legally valid and required travel documents, including customs forms, passports, and/or VISAs; by failing to require Plaintiffs and Epstein's guests provide and/or present the agents with any form of identification before granting Plaintiffs and Epstein's guests entry into the USVI; by failing to require Plaintiffs and Epstein's guests provide and/or present the agents with legally valid and required travel documents, including customs forms, passports, and/or VISAs before issuing Plaintiffs and Epstein's guests travel documentation allowing Plaintiffs and Epstein's guests to travel back into the United States from the USVI; by failing to require Plaintiffs and Epstein's guests provide and/or present the agents with any form of identification before issuing Plaintiffs and Epstein's guests travel documentation allowing Plaintiffs and Epstein's guests to travel back into the United States from the USVI; by allowing Plaintiffs, Epstein, and his associates to enter and remain on USVI territory without the proper travel documentation; by failing to ensure Plaintiffs, Epstein, and his associates were entering the USVI legally; by failing to ensure Plaintiffs, Epstein, and his associates did not remain in the USVI illegally; by failing to question and/or investigate Plaintiffs and the other sex-trafficking victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by failing to ensure Plaintiffs, Epstein, and his associates were leaving the USVI legally and of their own accord; by, in

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 43 of 48
EXHIBIT A - FAC - P. 43
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 43 of 48

accordance with government orders, not conducting searches nor questioning of Epstein and his female guests; by, in accordance with government orders, not detaining under any circumstances Epstein and his female guests; by, in accordance with government orders, not questioning Epstein and any of his female guests; providing and any and all courtesies to Epstein; and by failing to perform the proper checks when granting Plaintiffs, Epstein, and his associates entry into the USVI.

208.    Defendants, as USVI air traffic controllers, facilitated Epstein's, his associates, and many female victims being trafficked by Epstein, including Plaintiffs, by allowing Epstein to land his plane at the USVI airports without entering the plane; providing and any and all courtesies to Epstein; by allowing Epstein to land his plane at the USVI airports without inspecting the plane; by allowing and ensuring Epstein could at all times land his plane in isolated areas to protect his sex-trafficking enterprise; to allowing Epstein to land his plane and disembark without any government oversight or inquiry; by allowing Plaintiffs, Epstein, and his associates to enter and remain on USVI territory without checking them for the proper travel documentation; by failing to ensure Plaintiffs, Epstein, and his associates were entering the USVI legally; and by failing to perform the proper checks when granting Plaintiffs, Epstein, and his associates entry into the USVI.

209.    Defendants, as USVI airport baggage check agents, facilitated Epstein's, his associates', and many female victims being trafficked by Epstein, including Plaintiffs, by allowing Epstein to land his plane at the USVI airports without entering the plane;  by allowing Epstein to land his plane at the USVI airports without inspecting the plane; by allowing and ensuring Epstein could at all times land his plane in isolated areas to protect his sex-trafficking enterprise; providing and any and all courtesies to Epstein; by, in accordance with government orders, not conducting

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 44 of 48
EXHIBIT A - FAC - P. 44
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 44 of 48

searches of Epstein and his female guests; by failing to question and/or investigate Plaintiffs and the other sex-trafficking victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by failing to question and/or investigate Plaintiffs and the other sex-trafficking victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by, in accordance with government orders, not detaining under any circumstances Epstein and his female guests; by, in accordance with government orders, not questioning Epstein and any of his female guests; to allowing Epstein to land his plane and disembark without any government oversight or inquiry; by allowing Plaintiffs, Epstein, and his associates to enter and remain on USVI territory without checking them for the proper travel documentation; by failing to ensure Plaintiffs, Epstein, and his associates were entering the USVI legally; and by failing to perform the proper checks when granting Plaintiffs, Epstein, and his associates entry into the USVI.

210.    Defendants, as USVI police officers, facilitated Epstein's, his associates', and many female victims being trafficked by Epstein, including Plaintiffs, by, when instructed, providing Epstein with protection when traveling around USVI; by, in accordance with government orders, not conducting searches of Epstein and his female guests; by failing to question and/or investigate Plaintiffs and the other sex-trafficking victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by, in accordance with government orders, not detaining under any circumstances Epstein and his female guests; by, in accordance with government orders, not questioning Epstein and any of his female guests; and in providing and any and all courtesies to Epstein when on USVI.

211.    Defendants, as USVI coast guard agents, facilitated Epstein's, his associates', and many female victims being trafficked by Epstein, including Jane Does 1-6, in providing any and

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 45 of 48
EXHIBIT A - FAC - P. 45
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 45 of 48

all courtesies to Epstein on the USVI waterways; by, in accordance with government orders, not conducting searches of Epstein and his female guests; by failing to question and/or investigate Plaintiffs and the other sex-trafficking victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by, in accordance with government orders, not detaining under any circumstances Epstein and his female guests; by, in accordance with government orders, not questioning Epstein and any of his female guests; by, in accordance with government orders, not boarding, searching, and/or inspecting any of Epstein's watercrafts or boats;  providing and any and all courtesies to Epstein; by allowing and ensuring Epstein could travel and traffic females freely on the waters of the USVI; and by failing to perform the proper checks when granting Plaintiffs, Epstein, and his associates entry into the USVI.

212.    As a direct and proximate result of Defendants' acts and/or omissions, Epstein's sex-trafficking enterprise was able to continue to traffic Plaintiffs, and, as a result thereof, Plaintiffs and the Class Members were continually and repeatedly sexually abused by Epstein and others within his sex-trafficking venture, and suffered severe and serious injuries.

213.    The injuries that Plaintiff Jane Does 1-6 and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Epstein and other co-conspirators and criminalized under article 130 of the New York Penal Laws. The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20. The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

214.    The breaches of legal duties by Defendants proximately caused Plaintiff Jane Does 1-6 and the Class Members to repeatedly suffer injuries from Epstein and his co-conspirators,

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 46 of 48
EXHIBIT A - FAC - P. 46
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 46 of 48

including sexual assaults and resulting emotional distress, mental pain and suffering, and other physical and psychological trauma. These injuries were easily foreseeable, because Defendants knew, and acted in reckless disregard of the fact, that their actions and omissions supporting and facilitating Epstein would lead to (among other crimes) sex offenses by Epstein and his co-conspirators forbidden by article 130 of New York Penal Law against his victims, including Jane Does 1-6 and the Class Members.

215.    In the exercise of reasonable care, Defendants knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximate harm that would be caused by his likely sexual crimes and various violations of article 130 of New York Penal Law.

216.    Defendants could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to sex offenses against Plaintiffs and the Class Members. Among other things, the Defendants were specifically aware that Epstein had previously been prosecuted for similar sex crimes and previously paid numerous civil settlements associated with similar sex crimes. Indeed, the Defendants were aware, and should have been aware, that Epstein was a "high risk" to commit sex offenses against young women and girls.

217.    Plaintiffs and the Class Members were easily within the zone of foreseeable harm from Defendants' reckless and negligent acts and omissions. Defendants' acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Plaintiffs and the Class Members fell within that zone.

218.    The sex offenses Jeffrey Epstein committed against Plaintiffs and the Class Members were easily within the zone of foreseeable risks that the Defendants created with their reckless and negligent actions and omissions. Those actions and omissions foreseeably risked

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 47 of 48
EXHIBIT A - FAC - P. 47
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 47 of 48

further sex crimes by Jeffrey Epstein and his co-conspirators-which is exactly and tragically the harm that he inflicted on Plaintiffs and the Class Members.

219.    Defendants' tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct was directed specifically at Plaintiffs and the Class Members, who were the victims of Epstein's sexual abuse and sex trafficking organization.

220.    As a result of the intentional and negligent actions and omissions described in this Count, Plaintiffs and the Class Members have sustained both general and specifical damages in substantial amounts.

221.    Defendants' intentional, outrageous conduct, evinced a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, making Defendants liable to Plaintiffs and the Class Members for punitive damages.

222.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

223.    This action falls within exceptions to Article 16 of the C.P.L.R.

## VII. REQUEST FOR RELIEF

224.    Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 respectfully requests that the Court enter judgment in their favor, and against Defendants, as follows:

a. That the Court certify the Class, name Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 as Class Representatives, and appoint their lawyers as Class Counsel;

Case 1:23-cv-10301-AS   Document 31-4   Filed 01/21/24   Page 48 of 48
EXHIBIT A - FAC - P. 48
Case 1:23-cv-10301-AS   Document 7   Filed 12/13/23   Page 48 of 48

b. That the Court award Plaintiffs and the other members of the Class compensatory, consequential, general, and nominal damages against Defendants in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages and treble damages against Defendants in an amount to be determined at trial;

d. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

## JURY DEMAND

225. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all issues.

Dated: December 12, 2023                    Respectfully Submitted,
        New York, New York

                                            By:_____
                                                Jordan K. Merson, Esq. (JM-7939)
                                                Annette Hasapidis, Esq.
                                                Jordan Rutsky, Esq.
                                                Kimberly A. Kramer, Esq.
                                                *Attorneys for Plaintiffs*
                                                Merson Law, PLLC
                                                950 Third Avenue, 18th Floor
                                                New York, NY 10022
                                                Phone: (212) 603-9100
                                                Email: jmerson@mersonlaw.com;
                                                       agh@hasapidislaw.com;
                                                       kkramer@mersonlaw.com