# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1, individually, and on behalf of ) all others similarly situated, JANE DOE 2, ) individually and on behalf of all others ) similarly situated, JANE DOE 3, individually) and on behalf of all others similarly situated, ) JANE DOE 4, individually and on behalf of ) all others similarly situated, JANE DOE 5, ) individually and on behalf of  all others ) similarly situated, and JANE DOE 6, ) individually and on behalf of all others ) similarly situated,                       ) <br>         PLAINTIFFS,            ) <br>                  ) <br>      V.                              ) <br>                  ) <br> GOVERNMENT OF THE UNITED ) STATES VIRGIN ISLANDS, FIRST LADY ) CECILE DE JONGH) , GOVERNOR ) KENNETH MAPP) SENATOR CELESTINO ) WHITE) ATTORNEY GENERAL VINCENT) FRAZER) GOVERNOR JOHN DE JONGH) SENATOR CARLTON DOWE, DELEGATE) STACEY PLASKETT, and JOHN DOES 1-100,                              ) <br>                  ) <br>        DEFENDANTS.          ) | **INDIVIDUAL AND CLASS ACTION SECOND AMENDED COMPLAINT** <br><br><br> 23-CV-10301 <br><br> **ACTION FOR DAMAGES** <br><br> <u>JURY TRIAL DEMANDED</u> |

## <u>SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL</u>

1.      Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6, individually and on behalf of all others similarly situated file this Second Amended Complaint against the Government of the United States Virgin Islands (hereafter "USVI"), First Lady Cecile de Jongh, Cecile de Jongh, individually, Governor Kenneth Mapp, Senator Celestino White, Attorney General Vincent Frazer, Governor John de Jongh, Senator Carlton Dowe,

Delegate Stacey Plaskett, and John Does 1-100, for violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1591 to 1595, and of negligence, and in support thereof allege as follows:

## I. JURISDICTION, VENUE, AND TIMELINESS

2.      This action is brought pursuant to various federal and U.S. territorial statutes, including the federal Trafficking Victims Protective Act (TVPA), 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6, each individually and on behalf of all others similarly situated, proceed under the federal TVPA statute.

3.      This Court has specific jurisdiction over all Defendants as a majority of the actions involving the sex trafficking venture occurred and were felt in New York through Defendants' purposeful actions in New York.  Defendants benefitted from the abuse and trafficking of New York victims, Defendants enabled, encouraged, and facilitated the abuse of New York victims, directed the payment of monies and loans in the form of, inter alia, charitable contributions and political donations from Epstein's New York bank accounts to them and/or their designees, in exchange for their facilitation in the trafficking of the victims, and transport of Epstein and his customers from New York without hindrance, and diverted the trafficking of Epstein's sex trafficking victims to those having New York residents.

2.4.    Some of those directed payments were requested by emails, as follows and attached as a chart annexed hereto as *Exhibit R*: First Lady Cecile De Jongh's emails include: "John and I have put money into the campaign based on what we thought was going to happen with the tuition payments" *Exhibit S;* "you might want to consider putting Celestino on some sort of monthly retainer…that is what will get you his loyalty and access."  *Exhibit B;* "the Mapp campaign is going to take the $ that you gave to attack John" *Exhibit C; "*Governor Mapp will come for lunch

to the island on Wednesday, carlos can use nanna." *Exhibit D;* "to waive the notice requirement all together will not be acceptable to the federal DOJ program managers…remember they must review and determine if we are in compliance….this is the suggested language, **will it work for you?** *Exhibit E;* "we will work with Vincent to give the discretion for status quo for you-that's the least he can do" *Exhibit F;* "John wanted to know whether you would support Carlton Dowe's bid to get back to VIPA…he would be a good person for us at VIPA." *Exhibit G;* "your help is needed… we are trying to get Stacey Plaskett elected to Congress…she needs to raise about $75K between now and August…do you think any of your friends would give to her campaign?" *Exhibit H;* "I am confirming with you that STC will send $13K to the Democratic Party for the benefit of Stacey Plaskett." *Exhibit I;* "how much would you like to give to the St. Croix District Democratic Party" *Exhibit J;* "please confirm this is to be paid from JEE personal account" *Exhibit K;* "I just want to confirm that you want to donate $10,000 to the Mapp-Potter inaugural committee and that it should come from Southern Trust." *Exhibit L;* "Albert asked that the $30K go to the VI Little League." *Exhibit M;* "would you have any interest in funding this? *Exhibit N;* "how much would you like to give to the school and JA." *Exhibit O;* "John said that there are properties.  How much do you need to collateralize." *Exhibit P;* "I got a call from the Bryan/Roach Inaugural Committee and they asked for a $25,000 donation to the inaugural events…they are trying to raise all the money privately…please let me know your thoughts." *Exhibit Q;* "Hi Rich, can you please prepare a check for $15,000 made payable to the Governor's Special Events Fund.  Thanks." *Exhibit R.*

5.      From the few publicly available emails, the below chart depicts the extent of communications directing payments.

From the Few Emails Publicly Available

| To | From | Date | Contents |
|---|---|---|---|
| Jeffrey Epstein Exhibit A to SAC | Cecile de Jongh | 9/21/10 | Cecile requesting Epstein pay her son's Skidmore tuition |
| Jeffrey Epstein Exhibit B | Cecile de Jongh | 2/11/15 | Cecile suggests Epstein consider putting Senator White on monthly retainer. "This will get you his loyalty and access" |
| Jeffrey Epstein Exhibit C | Cecile de Jongh | 11/10/14 | Cecile directs "Can we stop payment on the check to send a message?" after Mapp campaign taking money you gave to attack John, Celestino, Seb and others so directs |
| Ann Rodriguez Exhibit D | Jeffrey Epstein | 9/22/15 | Governor Mapp will come for lunch on the island on Monday |
| Cecile de Jongh Exhibit E | Jeffrey Epstein | 5/15/11 | Cecile working on revisions to legislation for sex offender monitoring to avoid "violat*ing*" Epstein's "Privacy. Restrict my business and livelihood." "This needs to be settled by Thursday because J goes away for a week and AG needs to submit by June 1." |
| Jeffrey Epstein Exhibit F | Cecile de Jongh | 7/1/12 | "Will need to work through Dowe and White" to change SORNA legislation. "In the meantime, we will work with Vincent to give the discretion for status quo for you - thats the least he can do." |
| Jeffrey Epstein Exhibit G | Cecile de Jongh | 12/24/18 | Cecile recommended that "John wanted to know whether you would support Carlton Dowe's bid to go back to the VIPA [VI Port Authority]. . . He would be a good person for us at VIPA." |
| Jeffrey Epstein Exhibit H | Cecile de Jongh | 6/19/14 | Cecile requesting Epstein raise money for Stacey Plaskett for Congress, as she would be "a friend," while her opponent came after Epstein last week. "Do you think any of your friends would give to her campaign?" |
| Cecile de Jongh | Jeffrey Epstein | 6/19/14 | Epstein lists friends who would contribute to Plaskett for Congress. |
| Jeffrey Epstein Exhibit I | Cecile de Jongh | 10/24/14 | Will send 13k to Democratic Party for the benefit of Stacey Plaskett |

4

| Jeffrey Epstein Exhibit J | Cecile de Jongh | 10/16/14 | Kenn Mapp and Celestino White wanted to see you.  Will be in NY for a fundraiser.  Cecile asks how much Epstein will contribute to St. Croix Democratic Party and he agrees to give $15,000 |
|---|---|---|---|
| Jeffrey Epstein Exhibit K, M | Cecile de Jongh Richard Kahn | 1/24/14 | Cecile requests Epstein match $15,000 for husband's State of the Territory reception and Epstein has Richard Kahn arrange for it to be paid from New York City |
| Cecile de Jongh Exhibit L | Sebastino Cassinelli | 12/18/14 | Sebastino requesting Epstein contribute to Mapp-Potter Inaugural Committee |
| Jeffrey Epstein Exhibit L | Cecile de Jongh | 12/18/14 | Cecile confirms Epstein $10,000 for the Mapp-Potter Inaugural Committee |
| Jeffrey Epstein Exhibit M | Cecile de Jongh Cc Richard Kahn | 12/20/18 | Cecile telling Epstein and Kath that "Albert asked that the $30k go to VI Little League" |
| Jeffrey Epstein Exhibit N | Cecile de Jongh | 8/6/12 | Epstein agrees to fund the training of two St. Thomas police officers after this brought to him by Cecile |
| Jeffrey Epstein Exhibit O | Cecile de Jongh Cc Richard Kahn | 12/6/18 | Cecile suggesting that Epstein donate at least half of $50,000 to Junior Achievement who "we have given to" before. |
| Cecile de Jongh Exhibit P | Jeffrey Epstein | 2/3/17 | Epstein writes that "vi govt is desperate for cash.  Does john know of any asset they might have that I can use as collateral" |
| Jeffrey Epstein | Cecile de Jongh | 2/3/17 | Cecile wrote back "Yes, John said that there are properties.  How much do you need to collateralize?"  Epstein responded 50m to which Cecile wrote she would get a list of properties |
| Jeffrey Epstein Exhibit Q | Cecile de Jongh | 12/20/18 | Cecile wanted to know if Epstein wanted to help the Bryan/Roach Inaugural Committee by raising money "privately" with a $25,000 donation |

6.      Indeed, even with defendants' extraordinary efforts to shield form the public and the World their role in the Epstein sex-trafficking venture, that were solidified by the protective order in the USVI's lawsuit verses JP Morgan, there is still more than enough evidence at this early stage to establish a quid pro quo as to how each defendant participated and benefited from the Epstein sex trafficking venture. See chart categorizing participation and benefit below:*Exhibit T.*

| Defendant | Participation | Benefit |
|---|---|---|
| USVI | Unrestricted entry port for sex offender traveling with young women and girls.<br><br>Never searched airplane nor residence.<br><br>Former air traffic controller "didnt understand how this guy was still allowed to be around children."<br><br>Current airstrip employee "he was flaunting it"<br><br>Tier 1 Sex Offender when should have been Tier 2.<br><br>Given Customs and Border Protection Security seals and VIPA badges for VIP access through airport.<br><br>See below incorporated here. | $50 million "loan"<br><br>$25,000 to USVI Dept Planning and Natural Resource $50,000 to various schools<br><br>$75 million JPM "settlement"<br><br>Turkeys for thanksgiving to all airport and customs personnel.<br><br>Donation to little leagues, school and VI programs.<br><br>Donation to train police officers.<br><br>See below incorporated here. |
| Cecile de Jongh | Identify officials and candidates who would be favorable to Epstein's sex trafficking venture (ie Plaskett, Celestino).<br><br>Heard sexual assaults and did nothing.<br><br>In 2011, input over sex offender monitoring laws.<br><br>In 2010 called head of customs to ensure customs official did not cause "difficulty".<br><br>Student visas for young European women. | $625,000 to children's tuition.<br><br>Directed $ to PACs for USVI candidates.<br><br>$200,000 annual salary.<br><br>$20,000 donation to University for student visas.<br><br>See below for her husband - Gov. John deJong. |

| | | |
|---|---|---|
| | Setup ESL classes for other USVI victims. Obtained I-20 visa for another victim.<br><br>Coordinated USVI government letters of support for visa applications.<br><br>Withhold victims' passports and travel documents. | |
| Kenneth Mapp | Waiver sex offender registry | $75,000 for Mapp Super PAC. $10,000 for Mapp-Potter Inaugural Committee.<br><br>Advice on USVI's investments and fiscal imbalance.<br><br>"Spread word" on USVI pushing for business investment.<br><br>Input on "critically needed bonds".<br>Develop EDC so more attractive to repatriate income.<br><br>Drafted EDC legislation. |
| Celestino White | Waiver sex offender registry.<br><br>"Loyalty and access" for Epstein.<br><br>Controlled CZM commission.<br><br>Changed sex trafficking law in accord with Epstein's lawyer's recommendations.<br><br>Got licenses for one victim. | Monthly retainer.<br><br>$10,000 to consult changing name of one of Epstein's islands |
| Vincent Frazer | Soliciting Epstein input in sex trafficking legislation.<br><br>Waiver sex offender registry.<br><br>No law enforcement site visits. | Monetary and Political Influence. |

7

| | | |
|---|---|---|
| John de Jongh | Approving EDC $300 million tax breaks<br><br>Waiver sex offender registry<br><br>University Virgin Islands student visas<br><br>Advice on how to create IBE | $625,000 to children's tuition.<br><br>Donate to special events fund.<br><br>$215,000 for criminal fine.<br><br>$15,000 for State of Territory dinner.<br><br>See above for Cecile deJong. |
| Carlton Dowe | Waiver sex offender registry<br><br>Changed sex trafficking law in accord with Epstein's lawyer's recommendations. | Epstein supported bid for USVI Port Authority job |
| Stacey Plaskett | GC for EDC, $300 million tax breaks despite being sex offender.<br><br>Epstein's "friend" vs prior Senator Sean Malone "who came after Epstein" | Job at Kellerhals, Ferguson and Kroblin.<br><br>$13,000 to the Democratic Party to support campaign.<br><br>Donated maximum amount in 2016 and 2018.<br><br>July 12, 2018 email from Plaskett requesting support of Epstein and "those that he may direct to assist me" for NYC fundraiser.<br><br>September 2018 Epstein hosted fundraiser.<br><br>Loaned $30,000. |

3. 7.     This Court also has supplemental jurisdiction of the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

4.8.      Venue is proper in the United States District Court of the Southern District of New York, pursuant to 28 USC 1391(b)(2), because substantial activities occurred in this District including, but not limited to, the following:

i.      Epstein's sex-trafficking operation was based, managed and operated out of New York City, in this District.

ii.     Defendants, their officers, agencies, agents, servants, and/or employees regularly communicated with Epstein about the formation, operation, and maintenance of Epstein's sex-trafficking ring by electronic means, including voice telephone, text message, video telephone or meeting, while Epstein was in his New York office and/or residence, in this District.

iii.    Epstein and his co-conspirators in the sex-trafficking venture, including Defendants, knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through financial and non-financial transactions that originated in this District.

iv.     The commercial acts of sexual abuse, committed by Epstein and certain select friends, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street, New York City (among other locations, including the USVI). Epstein used his New York mansion to harbor Plaintiffs and otherhis victims and as a base from which to transport them to other locations outside of New York.

v.      All Defendants directed that Epstein make received numerous substantial payments and alleged loans from Epstein's his J.P. Morgan Chase New York accounts, which they knew were funded with the proceeds of the sex trafficking

9

venture, and which were sent, directly or indirectly, to Defendants or their designees, as demonstrated below and as set forth in the various filings of both parties in government of the *U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.,* Case No. 1:22-CV-10904-JSR (S.D.N.Y. 2023).

vi.    All Defendants used their political power and personal influence to coerce customs, coast guard, airport and law enforcement agents so that Epstein could bring New York men and women to the USVI to engage in commercial sex acts in the USVI without intervention, rather than soliciting customers and women from the USVI.

vii.    Defendants also used their political power and personal influence to coerce customs, coast guard, airport and law enforcement agents so that Epstein, his customers and the victims could leave the USVI without any intervention or repercussions, thereby causing injury in New York, by permitting sex traffickers and abusers to re-enter New York and without alerting authorities.

v.viii.    Defendants agreed to participate in the venture by facilitating the trafficking of women from New York.

vi.ix.    On at least one occasion, First Lady Cecile de Jongh stayed in one of Epstein's apartments in New York for a month in 2017, nearly a decade after Epstein completed his prison sentence for soliciting minors women for prostitution, in order to advise and assist him in securing the USVI's cooperation as a safe harbor for his sex-trafficking ring.

vii.x.    Stacey Plaskett, delegate to the U.S. House of Representatives from the USVI's at-large district, visited Epstein at his New York mansion to request that he

contribute to her political campaigns, and Epstein and his colleagues paid her campaigns $30,000.  Plaskett also visited Epstein at his New York mansion to request a $30,000 contribution to the Democratic National Committee, which was ultimately declined because, Plaskett knew, Epstein failed their vetting. Plaskett held a fundraiser in New York and specifically invited Epstein and any of his colleagues whom he believed would be supportive.

viii.xi.    The transportation for the Epstein sex-trafficking ring was owned, stored, and maintained in New York State.  In particular, Epstein's private jets and vehicles which were used to transport Plaintiffs and other victims and Epstein's clients, or purchased, owned, stored, and maintained in New York.

ix.xii.    Many of the trafficked womenvictims, including Plaintiffs herein, were solicited by Epstein while he was in New York and then transported from New York to the USVI and held captive and abused in the U.S. Virgin Islands at Epstein's USVI estate.

x.xiii.    At the time of the events at issue, Pplaintiffs resided in New York, New York, in this district.

xi.xiv.    Likewise, Epstein solicited Defendants and many of his co-conspirators for the sex-trafficking ring venture during meetings held in New York, seeking out their interest in engaging in sex crimes before extending invitations to the island, inclusive of his private transportation to avoid publicity.

xv.    Epstein also facilitated entry into the United States Virgin Islands for the procurement of travel documents while he was in his New York office and/or residence.

11

xvi.     Defendants conspired, facilitated, accepted and encouraged the transfer and/or travel of Epstein, his associates, his victims, and his clients from New York to USVI.

xvii.    Defendants conspired, facilitated, accepted and encouraged the abuse and sex trafficking of the NY victims at the behest and hands of Epstein, a New York based individual, and his New York clients to occur, continue to occur, and flourish in the USVI.

i.xviii.   After Epstein and his clients sexually abused the victims in the USVI, Defendants conspired, facilitated, accepted and encouraged the unencumbered transfer and/or travel of Epstein, his associates, his victims, and his clients from USVI to NY

9.      Numerous additional factual allegations, set forth below, further establish personal jurisdiction and venue.

5.10.   All causes of action arose from 2001 and continuing until 2019, except for the causes of action brought under the Trafficking Victims Protection Act and the Racketeer Influenced and Corrupt Organization Act.

11.     This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a Plaintiffs shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex-trafficking. As the conspiracy sex-trafficking venture continued until 2019, this action is timely.

6.1.    This action is also timely under New York's Adult Survivor's Act.

7.12.    Further, Defendants actively and knowingly concealed their tortious actions from Plaintiffs and the public, for many years. It was not until the recent case, *U.S. Virgin Islands v. JPMorgan Chase Bank NA*, U.S. District Court, S.D.N.Y., No. 22-10904, where JPMorgan Chase disclosed that it had deposed members of the USVI government, that the Plaintiffs and public learned of the many acts committed by Defendants which contributed to and caused Plaintiffs' injuries under the federal statutes set forth below. *See U.S. Virgin Islands v. JPMorgan Chase Bank NA*, U.S. District Court, S.D.N.Y., No. 22-10904.

━━━━━This action is also timely under New York's Adult Survivor's Act, which ˌ

8.13.    In addition, the New York Adult Survivors Act created a one-year window for adult sexual abuse victims to bring their negligence claims making this action timely under CPLR 214-j.

## II.  INTRODUCTION

9.14.    Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6, on their behalf and on behalf of others similarly situated, file this complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex-trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for aiding and abetting, and negligence.

10.15.  The suit arises from Defendants' the USVI's agreement with Jeffrey Epstein to participate ion and involvement in Jeffrey Epstein's his widespread and well-publicized sex-trafficking operationventure, by using their government authority and personal influence to provide a government-sanctioned sanctuary for wealthy men, travelling from New York, to engage in commercial sex acts with women traveling from New York and/or New York residents in exchange for their payment of substantial sums of money to Epstein who deposited said revenue

13

as in his New York bank accounts.  Defendants influenced and coerced others to allow the sex trafficking venture to operate without any hindrance whatsoever from anyone in government.

11.16.  Defendants agreed to facilitate Epstein's violation of the law by allowing this registered sex offender to travel into the USVI with young women.

12.17.  In exchange, Defendants directed that Epstein provide them with financial benefits, through payments from his New York accounts directly or indirectly, via Financial Trust Company and/or Southern Trust Company, to these Ddefendants or their designees, in addition to "loaning" substantial sums of money to dDefendants.  well as the many individuals and representatives of the government who gave orders to provide preferential treatment to Epstein which allowed, collaborated, and encouraged him to continue his sex trafficking venture, in order to continue to receive the benefits it derived from its relationship with him.

13.18.  The USVI government's Defendants' actions actively facilitated Epstein's crimes and misconduct.

14.19.  Government officials, including but not limited to Defendants First Lady Cecile de Jhongh, Governor Kenneth Mapp, Senator Celestino White, Attorney General Vincent Frazer, Governor John de Jongh, Stacey Plaskett, and Senator Carlton Dowe facilitated Epstein in his ongoing sex-trafficking operation by ensuring that Epstein received preferential treatment and unfettered, unmonitored freedom while in the USVI, and by providing Epstein and/or his companies instruments which further enabled his sex-trafficking ring and related crimes.

15.20.  Upon information and belief, gGovernment employees John Does 1-100John Does 31-40, followed the orders and demands of Defendantsthe aforementioned government officials, the USVI, Epstein, and his co-conspirators and others, further facilitating the success of the sex trafficking ventureenabling Epstein in his crimes.

16.21.  Defendant USVI knew, or should have known, that it was providing Epstein with a safe haven -- that could not be replicated anywhere else in the United States -- to create, operate, maintain and expand his sex-trafficking ringsex-trafficking venture through the , the protection, and affirmative and knowing assistances of the government to run said operationventure , and the willful ignorance that such operations were occurring and continuing to occur at the behest of the USVI government.

17.22.  Government officials and employees were coerced, directed, and influenced by Defendants, Epstein, and his co-conspirators given orders to use their carry out said government positions to provide Epstein and his co-conspirators government-sanctioned priorities, privileges, and benefits, for the specific purpose of facilitating and furthering the sex-trafficking venture. Such actions permitted the venture negligently allowing Epstein to continue with his operations uninterrupted and without fear of police, airport, coast guard, or customs intervention. In exchange, the USVI government leaders, staff, and officials benefitted by receiving generous financial donations, financial advice, support, loans, access to lines of credit from Epstein and his entities, and that crucial financial support allowed Epstein to successfully rape, sexually assault, coercively sex traffic Plaintiffs and numerous other young women freely and openly, access to underage and other women, and a haven to act without government scrutiny -- by customs, police, or airport personnel -- or public knowledge.

18.23.  Other government staff and officials, including John Does 1-100100, followed the orders of these officials, and in turn, maintained their government employment.

## III. PARTIES

19.24.  Jane Doe is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

20.25.  Jane Doe 2 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

21.26.  Jane Doe 3 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

22.27.  Jane Doe 4 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

23.28.  Jane Doe 5 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

24.29.  Jane Doe 6 is a U.S. citizen and was, at all relevant times, a resident of and domiciled in the State of New York, New York County.

25.30.  The Jane Doe Plaintiffs are using a pseudonym to protect their identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

26.31.  The Jane Doe Plaintiffs are also at serious risk of retaliatory harm because Defendants and other the co-conspirators who participated in the Epstein sex-trafficking venture venture had and continue to possess tremendous wealth and power and have demonstrated a clear ability to cause their serious harm.

27.32.  The Jane Doe Plaintiffs' safety, right to privacy, and security outweigh the public interest in their identification.

28.33.  The Jane Doe Plaintiffs' legitimate concerns outweigh any prejudice to Defendants by allowing them to proceed anonymously. Accordingly, the Jane Doe Plaintiffs filed a Motion to Proceed Anonymously that was granted by this Court.

34.    As discussed below, many other women, who are victims and survivors of sexual abuse and trafficking are similarly situated to the Jane Doe Plaintiffs and also need to proceed

anonymously for the same reasons. The identities of most of these other women are known to Defendants and will be provided to them as required.

35.    Jane Does 1-6 bring this Count individually and on behalf of the other Class Members they respectively seeks to represent.

36.    All causes of action are brought against the individual Defendants, except Cecile de Jongh in their individual and official capacities because they committed the conduct alleged before, during, and/or after they left office.

29.37.  Plaintiffs bring this action against the Attorney General, pursuant to its authority to represent the Government of the United States Virgin Islands.

30.38.  Plaintiffs bring this action against the Attorney General, as a representative of the USVI, which is vicariously liable for the negligent acts of its employees, including ~~John Does 1-100~~John Does 31-40, pursuant to V.I. Code Ann. tit. 33, § 3411, and § 3414(a).

39.    Defendant ~~First~~Lady Cecile de Jongh was, at all relevant times, a private individual ~~and/or the First Lady of the USVI~~, and a resident or and domiciled in the Virgin Islands with a place of abode in ~~a~~New York, at 885 West End Avenue, NY, NY.

40.    Defendant Cecile de Jongh was the First Lad~~e~~y from 2007-2015.

41.    Defendant Cecile de Jongh worked for Financial Trust Company and/or Southern Trust Company from 2000 to 2019, entities in which Jeffery Epstein conducted business and provided support to Defendants from New York to the USVI as part of the sex trafficking venture.

31.42.  At all times, Defendant Cecile de Jongh also acted as a private individual.

43.    Defendant Governor John de Jongh was, ~~at all relevant times,~~ a private individual and/or the governor of USVI from January 1, 2007 through January 5, 2015, and is a resident or domiciled in the USVI. As governer, he had brought authority;

> The Governor shall have general supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of the government of the Virgin Islands. He may grant pardons and reprieves and remit fines and forfeitures for offenses against local laws. He may veto any legislation as provided in this chapter. He shall appoint, and may remove, all officers and employees of the executive branch of the government of the Virgin Islands, except as otherwise provided in this or any other Act of Congress, or under the laws of the Virgin Islands, and shall commission all officers that he may be authorized to appoint. He shall be responsible for the faithful execution of the laws of the Virgin Islands and the laws of the United States applicable in the Virgin Islands.  48 USCA § 1591.

44.     Defendant Governor de Jongh remained a vital contributor to the sex-trafficking venture even after he left public office by using his influence to ensure that Epstein continued to receive a waiver of compliance with sex offender laws, and to ensure that law enforcement continue to violate the law by refusing to perform their functions as required by sex offender law.

32.45.  Defendant Senator Celestino White was, at all relevant times, a private individual and/or a senator of USVI, and a resident or domiciled in the USVI.

33.46.  Defendant Attorney General Vincent Frazer was, at all relevant times, a private individual and/or, the Attorney General of USVI, and a resident or domiciled in the USVI.

47.     Defendant Governor Mapp was, at all relevant times, a private individual and/or the governor of USVI from 2015 through 2019, and a resident or domiciled in the USVI. As governor, he had broad authority:

> The Governor shall have general supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of the government of the Virgin Islands. He may grant pardons and reprieves and remit fines and forfeitures for offenses against local laws. He may veto any legislation as provided in this chapter. He shall appoint, and may remove, all officers and employees of the executive branch of the government of the Virgin Islands, except as otherwise provided in this or any other Act of Congress, or under the laws of the Virgin Islands, and shall commission all officers that he may be authorized to appoint. He shall be responsible for the faithful execution of the laws of

18

the Virgin Islands and the laws of the United States applicable in the Virgin Islands.  48 USCA § 1591.

48.    Defendant Governor Mapp remained a vital contributor to the sex-trafficking venture by using his influence to ensure that Epstein continued to receive a waiver of compliance with sex offender laws, and to ensure that law enforcement continue to violate the law by refusing to perform their functions as required by sex offender laws.

34.49.  Defendant Senator Carlton Dowe was, at all relevant times, a private individual and/or a Senator of USVI, and a resident or domiciled in the USVI.

35.50.  Defendant Stacey Plaskett was, at all relevant times, an attorney with Epstein's longtime law firm, Kellerhals Ferguson Kroblin PLLC; the attorney for the USVI's EDC when it approved over $300 million in tax breaks for Epstein's companies, and a delegate to the U.S. House of Representatives from the U.S. Virgin Islands' at-large district. Plaskett was a resident of and domiciled in the Washington D.C.

36.51.  Defendants John Does 1-10, and 51-100, were USVI customs agents and/or officers, employed by the federal government who acted as employees Defendants' agents in furtherance of the sex trafficking venture of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI customs agents and/or officers.

37.52.  Defendants John Does 11-20, were air traffic controllers who acted as Defendants' agents in furtherance of the sex trafficking venture and were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI air traffic controllers.

38.53.  Defendants John Does 21-30, were airport baggage check agents employees of the USVI, who acted as Defendants' agents in furtherance of the sex trafficking venture working for

19

~~and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI airport baggage check agents~~.

39.54.  Defendants John Does 31-40, were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI police officers.

40.55.  Defendants John Does 41-50, were coast guard agents, who acted as Defendants' agents in furtherance of the sex trafficking venture and were employees of the USVI, working for and of the USVI as their agents, employees, and/or officers acting in the scope of their employment as USVI coast guard agents.

41.56.  The USVI is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this Complaint.

42.57.  The acts alleged were committed by USVI's officers, directors, employees, and agents were within actual and apparent scope of their employment and with the intention, at least in part, to benefit the USVI. At other times, the individual Defendants acted in their individual or personal capacities because, even when they were not acting officially, they maintained influence over others, and coerced other, due to their access to Epstein's money which was also used to gain the cooperation of government officials and employees.

58.      USVI's governmental activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the airports, ports, and territories.

## IV.  FACTS OF THE CASE

20

A. *Epstein's Sex Trafficking ~~Ring~~ Enterprise and Defendants' Knowledge, Assistance and Facilitation of the Criminal ~~Enterprise~~Venture.*

~~43.~~59.  The Epstein sex-trafficking ~~venture~~ venture originated in the early 1990's. From its inception until Jeffrey Epstein's arrest by the FBI for sex-trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the venture operated primarily for the purpose of luring young women and girls ("victims"), including Plaintiffs, into a position where Jeffrey Epstein and his other co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. His venture provided financial and other benefits to those who assisted and enabled the venture.

~~44.~~60.  The Epstein sex-trafficking venture was well-structured and grew increasingly more complex and powerful as it victimized more ~~young women~~victims and as its relationships with the USVI and its many government officials grew.

~~45.~~61.  The Epstein sex-trafficking venture's purpose included enticing, obtaining, harboring, and transporting ~~the young~~ victims, including Plaintiffs, to numerous places, including but not limited to USVI, where they would be removed from their families, friends, and loved ones and be completely isolated. The venture had everything a sex-trafficking organization needed—funding, infrastructure, a place to operate said organization openly and without fear of interference or oversight, and complicit laws, employees, and government. It was by many accounts the most powerful and wealthiest sex-trafficking venture ever created. Once in Epstein's clutches, ~~each~~ Plaintiffs and other victims ~~was~~were taught and understood that they~~she~~ must be completely compliant with every demand Epstein or his clients made; otherwise, they~~she~~ would certainly suffer serious reputational, financial, and psychological harm.

46.62.  In creating and maintaining this network of victims worldwide whom they could force to engage in commercial sex acts, Epstein conspired with others, including Defendants and others who facilitated his conduct by, among other things, recruiting Plaintiffs and other victims, coercing Plaintiffs and other victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the USVI. Epstein's victims were young women and girls, like Plaintiffs, who suffered severe abuse as Epstein's sex-trafficking victims and who believed they had to remain loyal to the venture at all costs to survive. Epstein victimized hundreds of young women and girls, including Plaintiffs, with the assistance of a wide network of co-conspirators, including the USVI and its many government officials and staff.

47.63.  The sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause Jane Does 1-6 and many dozens of others similarly situated to engage in commercial sex acts. Epstein fraudulently represented to the victims, including Plaintiffs, that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, select others, as well as to create the opportunity for Epstein to sexually abuse them.

48.64.  Among other things, Epstein caused his Plaintiffs and other victims to engage in commercial sex acts.

49.65.  As one means of causing victims to engage in commercial sex acts, Epstein, Defendants, and his co-conspirators threatened that harm would come to Plaintiffs and other victims if they did not comply with their demands that they perform commercial sex acts.

50.66.  As another means of causing Plaintiffs and other victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further Plaintiffs and other victims' educational or career aspirations if they would comply with his sexual demands.

51.67.  Epstein and his co-conspirators also caused Plaintiffs and other victims to engage in commercial sex acts, Epstein and his co-conspirators would "gift" Plaintiffs and other his victims money and provide them with living accommodations, clothing, education, or other necessities. Epstein and his co-conspirators would then force them to pay off the "debt" by complying with Epstein's sexual demands.

52.68.  Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his Plaintiffs and other victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cellular telephones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

53.69.  Epstein transported his Plaintiffs and other victims in interstate and foreign commerce, including transportation to and from his mansion in this District.

54.70.  The Epstein sex-trafficking venture transported Plaintiffs and other victims across state boundaries between New York, Florida, and the USVI and elsewhere.

71.     Epstein did not act alone. He created and maintained his sex-trafficking venture with the assistance of Defendants and his other co-conspirators, who are other influential individuals and entities who knew, or should have known, that he was sexually abusing and sexually trafficking Plaintiffs and other young women and girls, but nevertheless supported the sex-trafficking venture. Epstein's sex-trafficking venture was not possible without the assistance and complicity of Defendants and his other co-conspirators, who provided his operation with an

23

appearance of legitimacy and special treatment to the sex-trafficking venture, thereby ensuring its continued operation and sexual abuse and sex-trafficking of Plaintiffs and other young women and girls. Without Defendants' participation, Epstein's sex-trafficking scheme could not have existed nor flourished.

72.    Defendants created a channel of trade that allowed Epstein, his customers, Defendants, and co-conspirators to freely operate a sex trafficking venture.

55.

*B. Defendants' Agreements With Epstein.*

73.    As detailed below, all Defendants were aware that Epstein was trafficking wealthy customers from New York and women from New York to his residence in the USVI for the purpose of engaging in unlawful commercial sex acts in exchange for money.  All Defendants agreed to use the power of their office and/or influence for the purpose of facilitating Epstein's venture in exchange for financial gain or increased political influence.

74.    In furtherance of their agreement to participate in the sex trafficking venture, Defendants encouraged and facilitated Epstein's trafficking of women from New York, by coercing and influencing all of those individuals, such as members of law enforcement, customs, air traffic controllers, coast guard members, who could have and should have prevented the venture from flourishing to affirmatively violate and disregard the law and their obligations.

75.    In furtherance of their agreement to participate in the sex trafficking venture, Defendants encouraged and facilitated Epstein's trafficking of wealthy clients from New York to the USVI by coercing and influencing all of those individuals, such as members of law enforcement, customs, air traffic controllers, coast guard members, who could have and should

have prevented the venture from flourishing to affirmatively violate and disregard the law and their obligations.

76.     Defendants solicited Epstein's New York clients for financial assistance and advice in exchange for their use of their authority and or personal influence to coerce others into permitting Epstein, his co-conspirators, customers, and co-Defendants to engage in a sex trafficking venture in complete sanctuary in the USVI.

77.     Defendants transacted business with Epstein in New York by directing payments of money from Epstein's New York bank accounts as payment for their abuse of the power of their office and/or exercise of their personal influence to ensure that the sex trafficking venture operated without any legal intervention, which caused Plaintiffs and other victims to suffer significant permanent injuries.

78.     Defendants conspired with Epstein, through his agents including other Defendants, to offer protections for Epstein and his affluent customers, traveling from New York to the USVI with their victims in furtherance of Epstein's sex trafficking venture.

79.     New York bank accounts were used as an instrument to achieve the very wrong alleged. The New York bank accounts were funded with money paid to Epstein by his wealthy customers, who either resided in or travelled from New York to the USVI, for the ability to engage in commercial sex acts with young women in the sanctuary of the USVI. Such funds were then used to pay government officials – Defendants herein and/or their designees – who had the ability, whether acting officially or not, to influence and coerce others into permitting such unlawful conduct to continue and to thrive, because the sex trafficking venture could only succeed if men could engage in unlawful commercial sex acts with women without disclosure of their identities, or investigation and prevention of such crimes.

80.     Epstein made regular and routine payments to Cecile and John de Jongh, Mapp, Plaskett, and Frazer, often through Ms.de Jongh, to ensure that they would continue to coerce and influence others so that Epstein, his customers, co-conspirators, co-Defendants could continue to engage in commercial sex acts with women in the USVI in full privacy without any consequences.

81.     Epstein could not have operated the sex trafficking venture without the cooperation, participation and facilitation of Defendants.

1.82.    Defendants knew that Epstein's bank accounts were in New York and that his bank accounts were funded with payments made from his customers in exchange for the ability to engage in unlawful commercial sex acts with young women in complete privacy and without interference in the USVI.

83.     All Defendants agree-d with Epstein and/or co-Defendants to participate in the sex trafficking venture in exchange for financial gain and political power and influence, and with full knowledge that all monies paid to them derived from the New York bank accounts.

84.     As part of their agreements to assist Epstein with the sex trafficking venture, Defendants Cecile and John de Jongh, Mapp, Frazer, and Plaskett directed that Epstein remit payments to them from his New York bank accounts which was funded by payments made by Epstein's customers in exchange for engaging in commercial sex acts with young women in complete sanctuary and safety and privacy of the USVI.

85.     As part of their agreements to assist Epstein with the sex trafficking venture, Defendants Cecile and John de Jongh solicited loans from Epstein with the knowledge and intent that the money be transferred from Epstein's New York bank accounts which were funded by Epstein's customers.

86.    As part of their agreements to assist Epstein with the sex trafficking venture, Defendants Cecile and John de Jongh solicited college tuition payments, and other funds, from Epstein with the knowledge and intent that the money be transferred from Epstein's New York bank accounts.

**87.    Defendants Mapp and Frazer directed that Epstein pay them, in furtherance of their agreement with Epstein to facilitate the sex trafficking venture, from Epstein's New York bank accounts, which were funded by Epstein's customers.**

88.    Plaskett solicited campaign contributions and funds from Epstein with the knowledge and intent that the money be transferred from Epstein's New York bank accounts, so that she could achieve greater political influence which, in turn, would be used to assure that the sex trafficking venture operated without any legal intervention.

89.    Cecile de Jongh purposely directed and coordinated the payments to Defendants or their designees from Epstein's New York bank accounts to her and other Defendants.

90.    Defendants communicated with Epstein while Epstein was in New York about the payment of money to them via telephone regularly.

91.    Ms. de Jongh's coordination of Epstein's sex trafficking venture caused young women and girls to be groomed and abused in New York before Epstein traveled with them to the USVI.

92.    The individual Defendants through emails and calls to individuals in New York, solicited and enticed Epstein and his co-conspirators and wealthy clients to bring business and investment income from New York to the USVI by promising tax breaks, unfettered access to women for purpose of commercial sex acts, tax incentives, privacy and freedom from investigation

and or supervision by any and all government agencies, including federal agencies, through their promised coercion and influence over anyone who could interfere with the sex trafficking venture.

93.     All defendants derived substantial revenue from these acts as set forth herein.

94.     The USVI actively solicited and accepted payments from Epstein and/or the sex trafficking venture, including a $50 million loan, paid from Epstein's New York bank account.

95.     Plaskett entered into agreement with Epstein and/or Cecile, as his agent, and/or co-Defendants to facilitate the sex trafficking venture by ensuring tax breaks when on EDC when he was not qualified, assisting him when working for his law firm, and using her political influence as a Congresswoman to ensure that Epstein's clients, co-conspirators, and co-Defendants, travelled freely and had access to victims and Plaintiffs.

96.     In exchange, Epstein agreed to provide her with financial support, to retain her political position, which further assisted Epstein in his continued unfettered operation of the sex trafficking scheme.

97.     Both before and, as relevant, after he left office, Governor Mapp entered into agreement with Epstein and/or Cecile, as his agent, and/or co-Defendants to facilitate the sex trafficking venture by ensuring no oversight of Epstein as a registered sex offender by coercing his attorney general into providing Epstein with a waiver from sex offender registration requirements, by approving EDC's tax breaks for Epstein and/or entities, by coercing law enforcement and preventing any investigation of Epstein's activities and the sex trafficking venture, by coercing all individuals employed at the airport into permitting Epstein, clients, co-conspirators, Plaintiffs and other victims to enter the USVI without restriction. Mapp exercised his influence and engaged in coercive tactics to accomplish these goals even after he left office.

28

98.     In exchange, Mapp directed that Epstein make payments from his New York accounts to Mapp's accounts or those of a designee, such as a charitable or political campaign. Mapp also requested, in exchange for his agreement to facilitate the sex trafficking venture, that Epstein assist him and advise him as to how to encourage New York businesses and wealthy individuals to invest in the USVI.

99.     Both before and, as relevant, after he left office, Vincent Frazier entered into an agreement with Epstein and/or Cecile, as his agent, and/or co-Defendants to facilitate the sex trafficking venture by coercing and influencing the legislature to pass a sex trafficking law that met with Epstein's approval, by soliciting Epstein's input concerning the most favorable sex trafficking legislation in order that the sex trafficking venture would continue to flourish, providing Epstein with a waiver from compliance with USVI's sex offender registration laws (SONRA) for years, by coercing law enforcement to provide Epstein with free and unfettered access to the USVI without investigation; by coercing law enforcement into refusing to perform any site visits to Epstein's residence as required for a registered sex offender, by declining to ever inspect Epstein's aircraft and passengers, despite his admitted authority to do so.

100.    Frazier exercised his influence and engaged in coercive tactics to accomplish these goals even after he left office.

101.    Both before and, as relevant, after he left office, John de Jongh entered into an agreement with Epstein and/or Cecile, as his agent, and/or co-Defendants to facilitate the sex trafficking venture by ensuring no oversight of Epstein as a registered sex offender by coercing his attorney general into providing Epstein with a waiver from sex offender registration requirements, by approving EDC's tax breaks for Epstein and/or entities, by coercing law enforcement and preventing any investigation of Epstein's activities and the sex trafficking

venture, by coercing all individuals employed at the airport into permitting Epstein, clients, co-conspirators, Plaintiffs and other victims to enter the USVI without restriction, and by establishing a program at the University of the Virgin Islands to serve as a sham basis for student visas for Plaintiffs and other victims, de Jongh exercised his influence and engaged in these coercive tactics to accomplish these goals even after he left office.

102.    In exchange, de Jongh directed that Epstein make payments from his New York accounts to de Jongh's accounts or those of a designee, such as a charity or political campaign, requested and received a loan from Epstein in furtherance of a criminal matter against de Jongh, requested payments from Epstein for his children's school tuition.

103.    John de Jongh exercised his influence and engaged in coercive tactics to accomplish these goals even after he left office.

104.    Both before and, as relevant, after she left office, Cecile de Jongh entered into an agreement with Epstein and/or co-Defendants to facilitate the sex trafficking venture by identifying and soliciting political candidates who would willingly and knowingly facilitate the sex trafficking venture by approving any legislation that was favorable to Epstein, the sex trafficking venture, his clients, co-conspirators, and Defendants provide Epstein with waivers and tax benefits, and advising Epstein that, if offered financial and other support, these individuals would use their positions to further and protect the sex trafficking venture and its participants and co-conspirators; using her influence to ensure no oversight of Epstein as a registered sex offender; by coercing law enforcement and preventing any investigation of Epstein's activities and the sex trafficking venture, by coercing all individuals employed at the airport into permitting Epstein, clients, co-conspirators, Plaintiffs and other victims to enter the USVI without restriction, and by establishing a program at the University of the Virgin Islands to serve as a sham basis for student

visas for Plaintiffs and other victims. Cecile de Jongh exercised her influence and engaged in these coercive tactics to accomplish these goals even after she left office.

105.    Cecile de Jongh, for example, recommended that Epstein support Plaskett for Congress as she would be a "friend" to him.

**106.    Cecile de Jongh, also, as part of her agreement with Epstein to facilitate the sex trafficking venture, agreed to, and did, take passports and relevant travel documents from Plaintiffs and other victims to prevent their escape and ensure their compliance with demands for unlawful sexual abuse, as detailed here.**

107.    In Eexchange, de Jongh directed that Epstein make payments from his New York bank accounts to de Jongh's accounts or those of a designee, such as her children's school, a charity or political campaign, she requested and received a loan from Epstein in furtherance of her husband's criminal matter.

108.    Governor de Jongh, Cecile de Jongh, Kenneth Mapp, Senator Celestino White, Attorney General Vincent Frazer, Senator Carlton Dowe, and Delegate Stacey Plaskett entered into an agreement with Jeffrey Epstein to assist him in starting, growing, and expanding a venture in which wealthy men, who resided in or were solicited in New York, paid significant sums of money to Epstein, into his New York bank accounts, in exchange for sexually abusing young women incomplete sanctuary and freedom from all authority in the United States Virgin Islands.

109.    Upon information and belief, Governor John de Jongh facilitated the sex-trafficking venture by (a) ensuring that Epstein, the victims, Defendants and other co-conspirators could enter the USVI freely, without any of the required monitoring following his conviction through his official and unofficial influence over law enforcement and all other government agencies and officials; (b) working to encourage the passage of sex-trafficking legislation that did not hamper

31

Epstein's free access in and out of the USVI, as well as the free access of the victims, Defendants and other co-conspirators; (c) advising Epstein to whom he should make contributions or donations in order to secure tax and other financial benefits from the USVI, and to maintain the private and unfettered access for the participants in the sex-trafficking venture; (d) advising Epstein how to secure tax and other financial benefits from the USVI; and (e) provided Epstein with inside information relating to international banking entities (Epstein had been attempting to create an IBE and was successful in December 2014), which allowed Epstein to increase the amount of funding available to maintain and expand the sex-trafficking venture.

110.    Governor de Jongh has admitted that he was aware of Epstein's criminal conviction for sex abuse, but he ensured, as Governor and former Governor, that USVI authorities did not investigate, monitor, nor report Epstein's criminal activities to authorities in Florida.

111.    ~~the USVI.~~Governor de Jongh assisted Epstein in gaining influence over Stacey Plaskett, by attending her fundraiser in New York and by assisting Epstein in hosting that fundraiser.

112.    Upon information and belief, Governor John de Jongh facilitated the sex-trafficking venture in the same manner even after he left public office, using his influence and financial leverage, provided to him by Epstein's payment of the Governor's personal expenses.

~~2.~~113.  Governor De Jongh agreed to the foregoing.

~~3.~~114.  The USVI negligently and/or intentionally provided special treatment to Jeffrey Epstein and the sex-trafficking ~~venture~~ venture through their territories, laws, employees, staff, airports, ports, and government staff and officials, thereby ensuring Epstein's sex-trafficking ~~venture's~~ venture's continued operation and sexual abuse and sex-trafficking of young women and

girls.  Without the USVI government, inclusive of Defendants, Epstein's sex-trafficking scheme could not have existed and flourished, undisturbed in the USVI.

4.115.  Defendant USVI negligently hired, supervised, and retained Defendants John Does 1-100John Does 31-40.

5.116.  The victims, including Plaintiffs,Plaintiffs and other victims could not escape from Epstein's venture because the Epstein sex-trafficking venture venture used the USVI laws and agencies, Defendants and others to cause Plaintiffs, and many dozens of others similarly situated women to engage in commercial sex acts and remain in the USVI until Epstein permitted them to leave, as explained herein.

117.    The Epstein sex-trafficking venture enteprise operated in and affected interstate and foreign commerce. Epstein recruited, solicited, coerced, harbored, transported, and enticed some of hisPlaintiffs and other victims, including Plaintiffs and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York), Florida, and the USVI.

118.    Even after Epstein's arrest and death, the USVI used the very same authority it had which facilitated the success of the venture, to profit from it as an alleged "parens patriae" of Plaintiffs and the other victims by bringing suit on behalf of USVI residents to protect them from sex trafficking, when USVI was well aware that no USVI resident had been a victim of the sex trafficking scheme.

119.    USVI availed itself of the New York courts by suing JPM and others involved in the sex trafficking venture and reaped one final reward from the very same illegal venture that it had sustained for years.  The settlement monies from the USVI's lawsuit came from this District.

120.     The USVI's actions in suing as *parens patriae* were a continuation of its efforts to profit from the Epstein sex trafficking venture because USVI never acted as parens patriae of USVI visitors.  USVI facilitated Epstein's trafficking of women from New York so that its residents were never at risk of injury from the venture.

121.     The USVI's actions in suing as *parens patriae* also furthered the sex trafficking venture because USVI secured a broad protective order over evidence proving its involvement, and those of Defendants herein, thus preventing the discovery of Defendants' knowing and intentional involvement of Defendants in the sex trafficking venture.  In other words, that lawsuit aided USVI and other Defendants to "cover their tracks."

~~availed itself of the New York courts by suing JPM and others involved in the sex trafficking venture and reaped one final reward from the very same illegal venture that it had sustained for years—the payment of .~~

~~6.~~

~~7.~~122.  Plaintiffs and other victims were injured as a result of the existence and success of the ~~sex trafficking ring~~sex-trafficking venture.  For instance, Epstein arranged with ~~D~~defendants and/or their agents, servants and/or employees to allow Jane Doe 2 and Jane Doe 3 into the USVI for the purpose of sexually abusing them even though their visas were expired, which caused them to be sexually trafficked, abused, assaulted and battered by Epstein in the USVI.  Epstein could not and would not have sexually trafficked, abused, assaulted and battered Jane Doe 2 and Jane Doe 3 in the USVI without the unlawful conduct of defendants and/or their agents, servants and/or employees.

~~8.~~123.  In approximately 2003 or 2004, Epstein brought Jane Doe 4 to his office in Red Hook on St. Thomas for the purpose of sexually abusing her.  Epstein's office had two doors- one

that led out to an open courtyard- and the other to an area where defendant Cecile de Jongh sat, with her desk positioned adjacent against the exterior wall of Epstein's office. There, Epstein grabbed Jane Doe 4 into his office from the courtyard entrance and raped her over his desk.  The brutal assault lasted about ten minutes. When Epstein was finished, they exited through the other door, where defendant Cecile de Jongh was sitting.  Given her proximity, de Jongh heard the sexual assault, yet she looked at Jane Doe 4, straight into her eyes from her desk and did nothing at that time or at any time afterwards. Given her proximity, it would have been impossible for her to have not heard the sexual assault and yet she did nothing with that information at that time.

9.124.  In 2002, Epstein took Jane Doe 1 to his office in Red Hook on St. Thomas. When they entered the office, defendant de Jongh was sitting behind the desk.  Epstein said hello to her and immediately took Jane Doe 1 down the short hallway into his office and immediately thrust her against the wall, trapping her.  Epstein aggressively pulled down Jane Doe 1's pants, ripped her panties to the side, and orally copulated her.  In that moment, Jane Doe 1 was petrified, shocked and did not know what to do. The only word that was said was a soft spoken, "No", but that did not even phase him, as he proceeded to rape her. Knowing there were others in the office nearby, made Jane Doe 1 even more petrified and in shock knowing others could hear what was happening. Defendant de Jongh was in very close proximity during this sexual attack and heard the vicious assault yet did nothing to stop it.  Epstein was not fazed in the slightest by de Jongh's close proximity.  Jane Doe 1 came out disheveled and was seen by de Jongh. Given that de Jongh was in close physical proximity to the attack, could hear the attack, and did nothing to help Jane Doe 1, Jane Doe 1 felt that she had nowhere to go. After that experience, Jane Doe 1 knew she could not tell anyone as she began to fear this network behind his venture. Epstein continued to sexually assault her for years thereafter on the island.

10.125.        In approximately 2004, even though Epstein knew that Jane Doe 6 did not have a passport, Epstein arranged with Defendants, their agents, servants, and/or employees for Jane Doe 6 to be brought into the USVI and to his USVI island residence for the purpose of sexually abusing her without question or hindrance- an arrangement that was executed successfully solely because of the help provided to Epstein by the Defendants. Soon after Jane Doe 6 arrived on Epstein's private USVI island, he sexually assaulted and raped her in his bed. The next day, he ordered Jane Doe 6 to go with his staff to secure temporary travel documents from USVI officials.

11.126.        On one occasion, after already in the USVI, Jane Doe 3's travel documents had expired. Epstein ordered Jane Doe 3 to take one of his boats to go to the main USVI island to a specific USVI customs agent who would extend her stay in the USVI. After Jane Doe 3 attempted to obtain travel documents from USVI officials without Epstein present, Jane Doe 3 returned to his estate unsuccessful. Epstein appeared annoyed and angry and escorted her down to the USVI office himself to the same designated USVI official who did not provide the documents requested on her earlier attempt. With Epstein present and without Jane Doe saying a word the USVI customs agent quickly provided Jane Doe 3 with the travel documents required.

12.127.        The responses and reactions by the USVI customs agents indicated that USVI regularly and routinely provided Epstein with visas, passports or other travel documents documents to enable him to trafficktraffic his Plaintiffs and other victims internationally, including to the USVI.  Jane Doe 6 was escorted by Epstein's co-conspirators to a government building on the main USVI island, where two USVI customs agents and/or government officials chatted and laughed with the two Epstein associates while Jane Doe 6 stood silent. Without once asking Jane Doe 6 any questions, without Jane Doe 6 providing any documentation supporting her identity or

citizenship, without Jane Doe signing anything, and without Jane Doe saying one word, the USVI officials gave Jane Doe 6 documents authorizing her travel back into the U.S. from the USVI.

13.128.        Epstein could not and would not have sexually trafficked, abused, assaulted, and battered Jane Doe 6 in the USVI without the unlawful conduct of Ddefendants and/or their agents, servants and/or employees.

14.129.        Epstein could not have sexually trafficked, abused, assaulted, and battered Plaintiffs and other class members in the USVI without the unlawful conduct of Ddefendants and/or their agents, servants and/or employees.

130.    In this complaint, Jane Does 1-6 and other members of the class allege that Defendants acted outrageously and intentionally. But, in addition, wherever Jane Does 1-6 and the other members of the class allege that the Defendants acted with actual knowledge, or in reckless disregard of the fact, that the Epstein sex-trafficking venture venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in commercial sex acts, Jane Does 1-6 and other members of the class also allege that, at a bare minimum, the Defendants should have known that the Epstein sex-trafficking venture venture had used such means to engage in illegal sex-trafficking in violation of 18 U.S.C. §§ 1591-94-i.e., that they had constructive knowledge of Epstein's sex-trafficking.

15.131.        Defendants coerced and influenced customs agents to permit Epstein to travel freely.

P.   The Payoffs

17.132.        To support and expand his sex-trafficking empire, Epstein gave payments, advice, and other benefits to the highest USVI government officials.

18.133.        Epstein paid hundreds of thousands of dollars to USVI government entities and officials for over two decades, including paying $625,000 in school tuition for Governor de Jongh's children. Many of Epstein's payments to politicians were advised and directed by USVI's First Lady de Jongh, a USVI government official, and bought Epstein "loyalty and access" among USVI politicians.  The funds were derived from, or originated in, Epstein's New York bank accounts.

19.134.        Governor Kenneth Mapp (USVI's Governor from 2015 to 2019) asked Epstein to advise him on how to increase USVI's business investments and deal with USVI's structural fiscal imbalance. He specifically asked Epstein to "spread the word" that USVI was pushing for business investment and requested Epstein's input on issuing "critically needed bonds" to finance USVI's operations.

20.135.        Governor Mapp also asked Epstein to assist him in developing a means for Economic Development Commission (hereafter, as "EDC") beneficiaries to repatriate their income to make USVI's EDC program more attractive, and one of Epstein's lawyers drafted proposed legislation for the Governor.  As per USVI's own legislation, the EDC's board is under the "general supervision and direction of the Governor." 29 V.I.C. § ll0l (b). As such, actions of the EDC are done of and by the USVI government.

21.136.        On one occasion, when the USVI government was desperate for money, USVI officials affirmatively and directly solicited Epstein's assistance. Epstein worked with both a sitting and former USVI Governor on a plan to secure cash by extending it a $50 million loan paid from a New York bank account, collateralized by USVI's islands.

137.    First Lady de Jongh Cecile de Jongh suggested that Epstein put Senator Celestino White on a monthly retainer to obtain government loyalty and access.  First Lady de Jongh Cecile

de Jongh also directed payments from Epstein's companies to political action committees for Virgin Islands candidates.

22.138.    Governor de Jongh received generous rewards for his work because Epstein, at the Governor's request, loaned the USVI millions of dollars; contributed to the political campaigns of the Governor's colleagues and allies; and donated to the Governor's "special events fund." All such funds originated in Epstein's New York bank accounts.

139.   Epstein also freely loaned the de Jongh family money.  In 2015, former Gov. de Jongh was arrested on charges of using $500,000 of public money to improve his private home. Former Gov. de Jongh resolved the criminal case by paying a settlement of $380,000 without admitting wrongdoing, by successfully borrowing $215,000 from Epstein to pay the settlement, funds for which were derived from Epstein's New York bank account.

140.   At the time that Plaskett agreed to use her influence as the attorney on the EDC, Plaskett knew that she was doing so in order that the sex trafficking venture flourish.

141.   In exchange for Plaskett's abuse of power in Epstein's favor, Epstein's quid pro quo or reward for Plaskett was that she secured a job at his lawyer's firm, Kellerhals, Ferguson, and Kroblin.

142.   Plaskett, knowing that if she had political influence to assist Epstein in expanding and maintaining the sex trafficking venture, decided to run for political office, the one she currently holds. Plaskett knew, through conversations with Cecile de Jongh, that Epstein would use his money and the money of others to help Plaskett secure the office and place her in a position to further help Epstein by using her influence as a congresswoman. Plaskett knew that, as a congresswoman, she would have even more to trade with – to leverage others in the Virgin Islands government – to meet and satisfy the needs of Epstein's sex trafficking venture.

143.    On June 19, 2014, Cecile de Jongh instructed and/or recommended that Epstein donate to Plaskett's first campaign so that she could oust Sean Malone who "came after [Epstein] in the Senate hearings last week." She further told him that "we would have a friend in Stacey." Epstein agreed and made the maximum donation anonymously.

144.    At the time that Cecile de Jongh made this representation to Epstein, or shortly thereafter, Plaskett had agreed to be Epstein's "friend" – to use the influence he would help her gain by public office to secure government benefits in the forrom of favorable legislation and anything that would facilitate the growth of the sex trafficking venture, including continuing to use her influence to ensure that the EDC extender or granted Epstein and/or Epstein's entities tax breaks – in exchange for money.  By email, Cecild de Jongh had assured Epstein that, wsith his financial support, she would be a "friend" to him.

145.    Plaskett received regular and routine payments, disguised as political contributions, from Epstein as early as 2014. Epstein also paid Plaskett through contributions made to Plaskett's campaign by his attorneys and his assistant. Through Southern Trust Co., Epstein donated $13,000 to the Democratic Party to support Plaskett's campaign.

146.    Epstein donated the maximum allowed to Plaskett's campaign in the 2016 and 2018 election cycles. At the time the regular and routine payments were received, Plaskett knew that such payments were in exchange for using her influence in any manner direct by Epstein and/or his co-Defendants and co-conspirators to ensure that the sex trafficking venture could continue uninterrupted and thrive.

147.    Plaskett specifically availed herself of New York's jurisdiction in order to solicit Epstein and his affluent New York predator co-conspirators and co-Defendants to pay her money from his New York bank accounts in exchange for using her influence in any manner directed by

40

Epstein, his co-conspirators and co-Defendants to ensure that the sex trafficking venture could continue uninterrupted and thrive.

148.   For example on July 12, 2018, Plaskett emailed Lesley Groff, one of Jeffrey Epstein's assistants, and asked that she share an invitation to Plaskett's "Bloomberg fundraiser" that she would be holding in New York City. She advised that "I would be grateful for his support and the support of those that he may direct to assist me." In response, Epstein advised Groff to "get maximum amounts allowed."

149.   Plaskett, through her campaign, also invited Epstein to two campaign fundraisers in September 2018. Epstein instantly offered to host the event and donate the maximum allowed but do so anonymously.

23.150.   Plaskett received all such regular and routine payments from the sex trafficking venture paid from Epstein's New York bank accounts and she directed that Epstein remit the payments from those New York accounts to accounts in her name or those of a designee.

24.151.   Epstein and his colleagues loaned Stacey Plaskett $30,000 from a New York bank account, to support her political campaign; Plaskett was the attorney for the EDC when it approved the $300,000,000 in tax breaks to Epstein's companies and had worked for Epstein's attorney.

25.   By way of example only, Epstein compensated a USVI customs agent and/or border control worker under the guise of playing Caribbean drums for him on his island.

*Z.   The Quid Pro Quo — Defendants Assisted Epstein In Operating And Expanding His*
*Criminal Enterprise~~Enterprise~~.*

~~27.~~152.          In exchange for Epstein's payments to Defendants and various officials and agents within the USVI government, ~~they~~ Defendants provided him with special treatment in order to facilitate his crimes.

~~28.~~153.          In exchange for his payoffs, Epstein received (1) influence over the very laws that were supposed to constrain him; (2) waivers of sex offender monitoring requirements; (3) $300 million in subsidies to the allegedly sham companies he used for sex-trafficking; (4) facilitation of visas, licenses, and/or ignoring requirements for same and other forms of government assistance that enabled his criminal conduct; and (5) immunity from investigation and scrutiny.

i.   <u>Epstein Provides Input Into USVI's Proposed Sex Offender Monitoring Legislation And Is Given A Waiver Of Compliance From It.</u>

~~29.~~154.          In 2011, the USVI First Lady solicited Epstein's input on USVI's pending sex offender monitoring legislation and shared draft language from the DOJ with Epstein, writing: "This is the suggested language; will it work for you?" Epstein responded with directions on how to loosen the restrictions.

~~30.~~155.          In particular, Epstein was concerned that the proposed bill included a 21-day notice requirement which would prevent him and others from coming and going as freely as he wanted.  This provision was rewritten as Epstein's lawyer had recommended.

~~31.~~156.          The First Lady responded that, as Attorney General Vincent Frazer had a deadline to submit the legislation, they had to develop the language that would address Epstein's

concerns by Thursday because the Governor would be traveling for a week and the Attorney General had to submit the proposed legislation during that time frame.

~~32.~~157.        Epstein and his lawyers continued to stay in touch with USVI Justice Department Attorneys and various senators in order to influence the text of the sex offender monitoring bill.

~~33.~~158.        When Epstein's preferred language was omitted from the final bill, the First Lady assured Epstein that "we will work with Vincent [Frazer, then the Atty. Gen.] to give the discretion for status quo for you "that's the least he can do."

~~34.~~159.        With the assistance of First Lady de Jongh, the Attorney General Vincent Frazer promptly provided Epstein with special treatment; a waiver of the 21-day prior notice requirement for Epstein when traveling out of the Virgin Islands.

~~35.~~160.        After Epstein's attorneys complained again, the Attorney General loosened it further, offering that Epstein be allowed to "notify the [USVI Justice Department] of his intention to travel out of the [USVI] 24 hours prior to his departure."

~~36.~~161.        Epstein was thus allowed to circumvent the recently passed legislation with assistance of Senator Carlton Dowe, Senator Celestino White, and Attorney General Vincent Frazer.

~~37.~~162.        Had this 21-day notice requirement been enforced, Epstein would not have been able to freely sex traffic young women and girls to the USVI as he did for years.

ii.    The USVI Gave Epstein's ~~EnterpriseVenture~~Enterprise $300 Million In Tax Breaks.

~~56.~~163.        For twenty years, USVI subsidized the operation of Epstein's two USVI-based companies that were fronts for his sex-trafficking venture by granting them (and by extension Epstein) between 100% and 90% reductions in income taxes.

38.164.        The ultimate decision to provide such tax breaks was made by the USVI governor.  Plaskett was the attorney on the EDC responsible for, upon information and belief, recommending that the EDC provides these benefits to Epstein and his companies and venture.

39.165.        These tax breaks amounted to $300 million in direct benefits to Epstein and his companies and venture.

iii.   <u>Government Officials And Workers Gave Epstein Free Reign In The Country, Bypassing Customs, Law Enforcement, Airport, And Coast Guard Security And Were Instructed To Disregard Any Pleas For Help From Plaintiffs And Other~~The~~ Victims.</u>

40.166.        With the help of ~~First Lady de Jongh~~ Cecile de Jongh and other government officials and staff, Epstein traveled openly through USVI airports accompanied by young sex trafficked women and girls.

41.167.        Defendants were responsible for monitoring Epstein's movements after his release from Palm Beach County Jail in 2009 for procuring a ~~minor~~ woman for prostitution and felony solicitation, but admittedly took no steps to ensure that he was no longer harming ~~minors~~women.

42.168.        Defendant ~~First Lady de Jongh~~ Cecile de Jongh ~~was an~~ actively ~~player in~~ provid~~eding~~ Epstein with numerous opportunities to influence government for the benefit of Epstein and his companies. Throughout their relationship, the First Lady often facilitated gifts from Epstein to airport personnel and 78 customs employees, including a gift of turkeys at Thanksgiving; recommended that he place Senator White on a monthly retainer; and recommended that he support certain political candidates who would be his "friends."

43.169.        Despite Epstein's status as a sex offender, U.S. Customs officials on the USVI never examined either the passports or luggage of anyone arriving on Epstein's private jet.

In fact, Epstein, his clients, ~~and the~~Plaintiffs, and other victims were never mandated to enter through customs; they deplaned from the private jet before boarding Epstein's helicopter or boat.

~~44.~~170.        Upon information and belief, Epstein and/or his assistants, agents, and others seized Plaintiffs and other victims' passports with the full knowledge and consent of Defendants who were directed not to assist the victims if they complained of their virtual captivity.

~~45.~~171.        Indeed, Epstein complained by email to ~~First Lady de Jongh~~ Cecile de Jongh in 2010 because a U.S. Customs official caused him "difficulty," and ~~First Lady de Jongh~~ Cecile de Jongh promised that she would ensure this would not happen again by calling the head of customs.

~~46.~~172.        USVI, its officials, and law enforcement, never investigated Epstein, even after Florida law enforcement faxed Epstein's sexual predator registration information to USVI Department of Justice officials in July 2010, with which they included a news article confirming his status as a sex offender.

~~47.~~173.        Upon information and belief, USVI officials directed law enforcement officers, airport personnel, customs officials, and any other government employees to extend any courtesy or assistance to Epstein, and his affluent customers and guests as part of their official duties.

~~48.~~174.        Upon information and belief, USVI officials is the power of their office and political influence, derived from Epstein's financial support, to direct ~~directed~~ law enforcement officers, airport personnel, customs officials, and any other government employees to disregard or refuse any requests for assistance by any of Epstein's female victims, including Plaintiffs, such as securing a return of the passports from Epstein, and to report any pleas for help directly to Epstein.

49.   iv.   Defendants Secured Visas So That Epstein Could Transport His Victims Into USVI.
50.

51.175.   Cecile ~~de Jongh, who was employed by Epstein as his office manager,~~ facilitated him in obtaining travel documents, including visas, to bring minor women from other countries to the USVI. ~~First Lady de Jongh~~ Cecile de Jongh earned $200,000 in annual salary, in addition to the payment of her children's private school and college tuition among other perks, all paid from New York bank accounts.

52.176.   ~~Upon information and belief~~ In another email, ~~First Lady de Jongh~~ Cecile de Jongh also arranged for three young European women, who were flown in from New York, to secure student visas to enroll at the University of the Virgin Islands to attend a custom-tailored class to provide cover for the virtual enslavement of these women. Epstein's quid pro quo was a $20,000 donation to the University through one of his companies, which funds were advanced from New York bank account(s).

53.177.   Epstein corresponded with ~~First Lady de Jongh~~ Cecile de Jongh and other high-level government officials about securing visas and setting up ESL classes for ~~his many female~~ Plaintiffs and other victims in USVI. On one occasion, when Ms. De Jongh became aware that at least one of Epstein's "young female associates" had only a B-1 temporary business visitor visa, she worked with Epstein to contrive a means for an individual to obtain an I-20 through the University of the Virgin Islands.

54.178.   The First Lady also frequently assisted on immigration matters related to Epstein's foreign, female associates, by speaking with immigration attorneys on Epstein's behalf and by coordinating with members of the USVI government for letters of support for visa applications. But for Defendants' above-described negligent and/or reckless acts and/or

omissions, Plaintiffs and others similarly situated would not have suffered the mental and physical anguish she endures to date.

## V. CLASS ACTION ALLEGATIONS

55.179.       Plaintiff Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5 and Jane Doe 6 bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were sexually trafficked to and through the United States Virgin Islands by Jeffrey Epstein between the years 2001 through 2019, both dates inclusive (the "Class Period").

56.180.       Plaintiffs reserve the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

57.181.       Numerosity: The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein estate executors and the Defendants, including but not limited to Defendants' and others' records related to Epstein and his sex-trafficking to and through the United States Virgin Islands.

58.182.       Typicality: Plaintiffs' claims are typical of the claims of the other Class members that they seek to represent. The claims of Plaintiffs and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' participation in and funding of Epstein's sex abuse and Epstein's sex-trafficking venture, as set forth above and otherwise discovered.

59.183.       Commonality: There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any

questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

60.184.　　Common questions of fact and law affecting Class members include, but are not limited to, the following:

a. Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

b. Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

c. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts

d. Whether Defendants knowingly assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

e. Whether Defendants benefited financially or by receiving things of value from its participation in a venture which has engaged in sex-trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

f. Whether Defendants knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a); and

g. Whether Defendants committed negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such persons who were eighteen years of age or older.

61.185.　　Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

48

62.186.     Adequacy: the Jane Doe Plaintiffs will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. The Jane Doe Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and large scale, high profile sexual abuse-related litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class members.

63.187.     This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendants' records.

64.188.     Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

a. Joinder of all Class Members is impracticable;

b. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

c. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d. Absent a class action, Class Members will continue to suffer losses and be aggrieved and Defendants will continue to violate New York and federal law without remedy;

e. Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f. Plaintiff and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

49

g. The forum is desirable because the Defendants conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h. This action presents no difficulty that would impede its management by the Court as a class action.

189.   Using their official and individual authority, Defendants have withheld and concealed evidence of their involvement in the sex trafficking venture from the public domain in order to contrive a defense that any lawsuit against them is inadequately pleaded.

190.   Defendants should be equitably estopped from claiming that this pleading is inadequately pleaded, as Defendants would be rewarded for their wrongdoing in the sex trafficking venture and their cover-up.

## VI.  CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AS TO PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF TRAFFICKING VICTIMS PROTECTION ACT UNDER 18 U.S.C. §§ 1591(a)(2), 1595(d)
**(As to All Defendants)**

65.191.          Plaintiffs incorporate the foregoing paragraphs herein as if set forth at length.

66.192.          Defendants knowingly and intentionally, through various means, participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

67.193.          Defendants knowingly benefitted from their participation in Epstein's venture.

68.194.     Defendants knowingly and intentionally, participated in Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

69.195.     Among other things, Defendants knowingly and intentionally, through various means, recruited, enticed, provided, facilitated, obtained, advertised, and solicited by various means Plaintiffs, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiffs, to engage in commercial sex acts.

70.196.     Defendants and their officers and employees had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex-trafficking ventureconspiracy to recruit, solicit, entice, coerce, harbor, transport, facilitate, obtain and provide Plaintiffs into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

71.197.     Despite such knowledge, Defendants intentionally accepted payment for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Plaintiffs, as well as other young women, to engage in commercial sex acts.

72.198.     As part of perpetrating TVPA violations, Defendants concealed their extensive involvement and efforts in furtherance of Epstein's sex-trafficking ventures, Epstein, and his associates.

73.199.     Defendants' conduct was committed knowingly, and in reckless disregard of the facts that Epstein would use said governmental support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Plaintiffs. Defendants' conduct was outrageous and intentional.

200.   Defendants' intentional and/or negligent conduct has caused Plaintiffs, and many other young women serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

74.201.   For example, and upon information and belief, but for Governor de Jongh's conduct, Epstein would not have been successful in securing IBE status and/or tax breaks, which allowed the sex-trafficking venture to grow and pay for the costs of operating a sex-trafficking venture, by luring and transporting Plaintiffs and other victims to the USVI.  But for the Governor's acts and omissions, Epstein, Defendants, the co-conspirators, Plaintiffs and the other victims would not have had private and unfettered access to the USVI, which was a key to the venture's success.

75.202.   Defendants also should have known that they were participating in and facilitating a venture that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

76.203.   In exchange for facilitating and covering up Epstein's commercial sex trafficking, Defendants received financial benefits therefrom.

77.204.   Facilitating and covering up Epstein's sexual misconduct was a means of ensuring access to wealth and influence.

78.205.   Defendants' knowing and intentional conduct has caused Jane Does 1-6 and the other members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

79.206.   Defendants' knowing and intentional conduct has caused Jane Does 1-6 and the other members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same

circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

57.    Defendants' tortious conduct in violating the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious conduct was directed specifically at Jane Does 1-6 and other members of the class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

207.    Defendants' tortious conduct was continuous from the first date of their individual and/or official involvement, support, and benefit from the sex trafficking venture as stated in the facts supra, through to 2019.

208.    All tortious acts by Defendants in violation of the TVPRA are claimed to have occurred between 2003 through to 2019.

80.209.    Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants to profit from Epstein's sex-trafficking venture, by gaining access to money and influential people from around the world.

81.210.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Defendants are liable to Plaintiffs and other members of the class for the damages that they sustained and reasonable attorneys' fees, by virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595.

82.211.    By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Jane Doe 1-6 and other members of the class for punitive damages.

83.212.        The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

84.213.        This action falls within exceptions to Article 16 of the C.P.L.R.

**AS AND FOR A SECOND CAUSE OF ACTION AS TO AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT UNDER 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595**
**(As to All Defendants)**

91.      Plaintiffs incorporate the foregoing paragraphs herein as if set forth at length.

92.      Defendants and their officers, agents, and employees aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

93.      Under 18 U.S.C. § 2, Defendants are punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, procured, and induced Epstein's sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women.

94.      Under 18 U.S.C. § 2, Defendants committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, and inducing Epstein's and his conspirators' sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women and other victims. As a consequence, Plaintiffs, as well as many other young women, are victims of Defendants' criminally aiding, abetting, and inducing Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2). These actions were in and affecting interstate and foreign commerce.

95.      The crimes that Defendants aided and abetted are (1) Epstein's perpetrating of coercive sex-trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Epstein's co-conspirators'

knowingly benefitting from coercive sex-trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

96.     Defendants benefited financially and received things of value from their participation in the Epstein sex-trafficking venture, including payments and other compensation from Epstein.

97.     Acting through its officers and employees, the USVI itself perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing a sex-trafficking venture and the sex-trafficking of Plaintiffs, as well as many other young women. Defendants directly violated Chapter 77 by committing and perpetrating these violations.

98.     Among other things, Defendants aided, abetted, and facilitated and induced Epstein's sex-trafficking venture and sex-trafficking of Plaintiffs and other young female victims, as well as many other young women, knowing that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Plaintiffs, as well as many other young women and other young female victims, some of whom were under the age of eighteen, to engage in commercial sex acts.

99.     By aiding, abetting, and inducing Epstein's sex-trafficking venture and sex-trafficking of Plaintiffs, as well as many other young women, Defendants knowingly benefited, both financially and by receiving things of value, from participating in Epstein's sex-trafficking venture.

100.    Defendants and their officers and employees had actual knowledge that they were aiding, abetting, and inducing Epstein's sexual abuse and sex-trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Plaintiffs and other young female

victims, as well as many other young women, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

101.   Defendants knew, and should have known, that Epstein had engaged in acts in violation of the TVPA.

102.   Despite such knowledge, Defendants intentionally aided, abetted, procured, and induced Epstein's and his co-conspirators violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Defendants knew, and acted in reckless disregard of the fact that, Epstein would coerce, defraud, and force Plaintiffs, as well as many other young women and other young female victims, to engage in commercial sex acts.

103.   Defendants' affirmative conduct of aiding, abetting, facilitated, procuring, and inducing Epstein's and his co-conspirators' violations was committed knowingly, and in reckless disregard of the fact, that Epstein would use governmental support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Plaintiffs, as well as many other young women, and other young female victims. Defendants' conduct was outrageous and intentional.

104.   Defendants knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Plaintiffs, as well as many other young women and other young female victims serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

105.   Defendants' knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Plaintiffs, as well as many other young women and other young female victims, harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

106.    Defendants' criminal conduct in aiding, abetting, and inducing Epstein's TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.

107.    Defendants' intentional and/or negligent conduct has caused Plaintiffs, and many other young women serious harm including,  and other young female victims without limitation, physical, psychological, emotional, financial, and reputational harm.

108.    Defendants' conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.

109.    By virtue of its knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1591(a)(2), and 1595. Defendants are liable to Plaintiffs for the damages that they sustained and reasonable attorneys' fees. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1) , 1591(a)(2), and 1595.

110.    Defendants are liable to Plaintiffs for punitive damages, for their aforementioned conduct.

111.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

112.214.        This action falls within exceptions to Article 16 of the C.P.L.R.

### AS AND FOR A ~~THIRD~~ SECOND CAUSE OF ACTION AS TO CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT UNDER 18 U.S.C. §§ 1594(c), 1591, 1595

**(As to All Defendants)**

113.215.        Plaintiffs incorporate the foregoing paragraphs as set forth herein at length.

114.216.        Defendants intentionally conspired with others, including Epstein and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2)

& 1591(d), and to further Epstein's sex-trafficking venture venture to coerce commercial sex acts from Plaintiffs and other young victims, all in violation of 18 U.S.C. § 1594(c). Defendants and their officers and employees directly conspired with Epstein himself to further the sex-trafficking venture.

115.217.        Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18.

116.218.        Defendants' conspiracy to further the sex-trafficking venture directly, proximately, and foreseeably harmed Plaintiffs and other young victims, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy the sex-trafficking venture victimized Plaintiffs and other young victims.

117.219.        Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title 18.

118.220.        Defendants' conspiracy to further the sex-trafficking venture directly, proximately, and foreseeably harmed Plaintiffs and other young victims, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways.

119.221.        Defendants' conspiracy to further the sex-trafficking venture victimized Plaintiffs and other young victims.

120.222.        Defendants conspired with Epstein and his other co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex-trafficking. Defendants had actual and/or constructive knowledge of Epstein's sex-trafficking venture. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's sex-trafficking venture and with the specific intent

to further ~~venture~~that venture. Defendants and Epstein had a meeting of the minds as to the essential nature of the plan.

~~121.~~223.        Defendants' conspiracy to further the sex-trafficking venture with Epstein was part of its participation in his sex-trafficking venture. Without Defendants' agreement to facilitate the venture, Epstein would not have been a position to move forward with his sex-trafficking venture on the USVI and to recruit and entice victims of the venture there and transport them elsewhere to engage in commercial sex acts.

~~122.~~224.        Defendants also conspired with Epstein and his other co-conspirators to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Epstein's sex-trafficking ~~venture~~ venture secret or, at least, concealed to the greatest extent possible.

~~123.~~225.        Defendants intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing Plaintiffs and other ~~young~~ victims to engage in commercial sex acts, through providing financial and other support for the Epstein sex-trafficking venture. A number of those acts were committed by First Lady de Jongh, acting within the actual and apparent scope of her office to further USVI's and Epstein's interests.

~~124.~~226.        Among the many overt acts intentionally committed by Defendants in furtherance of the sex-trafficking venture were creating and maintaining a special and unusual relationship between Defendants and Epstein within the USVI designed to facilitate Epstein's unfettered sex-trafficking on the islands.

125.227.    Defendants' actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as providing a place, protection, favorable laws, and beneficial treatment for the sex-trafficking venture were essential tools for Epstein to commit coercive commercial sex acts.

126.228.    It was part of the conspiracy that Defendants would financially benefit from providing financial support for the Epstein sex-trafficking venture. Defendants did financially benefit from its participation in the venture, including receiving valuable donations and business opportunities from Epstein.

127.229.    Defendants' participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Plaintiffs, as well as many other young women through its affirmative and overt acts supporting Epstein. Defendants knew, and was in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, and a combination of such means would be used by Epstein and his other co-conspirators to cause Plaintiffs, as well as many other young women to engage in commercial sex acts.

128.230.    Defendants knew and acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Plaintiffs, as well as many other young women.

129.231.    The conspiracy that Defendants joined had specific knowledge that Plaintiffs, as well as many other young women, were being coercively sex trafficked by Epstein. The conspiracy's knowledge extended to meeting and knowing Epstein's victims, because Epstein

and his co-conspirators met some of the victims, including Jane Does 1-6. Specifically, ~~First Lady de Jongh~~ Cecile de Jongh met and knew many of Epstein's victims.

~~130.~~232.    Defendants conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Plaintiffs, as well as many other young women to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

~~131.~~233.    Defendants benefited financially from conspiring to participate in the Epstein sex-trafficking venture, which Defendants knew and should have known that had engaged in coercive sex-trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2), as well as obstruction of the enforcement of the TVPA in violation of 18 U.S.C. § 1591(d).

~~132.~~234.    Defendants' conspiracy has caused Plaintiffs, as well as many other young women serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

~~133.~~235.    Defendants' conspiracy has caused Plaintiffs harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

~~134.~~236.    By virtue of these violations of 18 U.S.C. § 1594(c), 1595, Defendants are liable to Plaintiffs for the damages that they sustained and reasonable attorneys' fees under 18 U.S.C. § 1595. 451.

~~135.~~237.    Defendants' tortious conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous

criminal sex trafficking organization. Defendants' tortious conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious conspiracy was directed specifically at Jane Does 1-5 and other members of the class, who were the victims of Epstein's sex trafficking organization.

136.238.    By virtue of Defendants' conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Plaintiffs for punitive damages under 18 U.S.C. § 1595.

137.239.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

138.240.    This action falls within exceptions to Article 16 of the C.P.L.R.

## AS AND FOR A THIRD CAUSE OF ACTION AS TO OBSTRUCTION OF ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT UNDER 18 U.S.C. §§ 1594(c), 1591, 1595

### (As to all Defendants)

139.241.    Plaintiffs incorporate the foregoing paragraphs as set forth herein at length.

242.    Defendants, their officers, agents, and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

243.    Defendants' obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants thereby violated Chapter 77, Title 18. Defendants' obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Jane Does 1-6, as well as other members of the Class, directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

244.    As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the

Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019. On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPRA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPRA.

245.   By providing financing and other benefits, such as the cooperation of all government officials, for Epstein's sex trafficking organization from about 2001 through about 2019, and concealing its actions thereafter, Defendants obstructed, interfered with, and prevented enforcement of the TVPRA against Epstein.

246.   Defendants and their agents obstructed, attempted to obstruct, interfered with, and prevented enforcement of the TVPRA, Defendants used their power as officials and/or influence as private individuals with access to the revenue form the sex-trafficking venture, to coerce individuals and/or entities *against* carrying out their governmental functions in order to facilitate the venture.

247.   As a result of the unlawful and coercive influence that Defendants exercised visitors, like Plaintiffs and other victims, were not safe and protected from crime while in the USVI, but were intentionally and knowingly made the victims of crime.

248.   As a result of the unlawful and coercive influence that Defendants exercised, Epstein was not monitored as required by the USVI's criminal, sex trafficking, and sex offender laws, thus giving him free rein to bring wealthy New York men to the USVI for the sole and

exclusive purpose of committing sex acts on New York women; namely plaintiffs and other victims.

249.   As a result of the unlawful and coercive influence that Defendants exercised, Epstein and/or his entities received millions of dollars in tax breaks from the USVI government thus allowing him to exponentially increase his profits from the sex trafficking venture which profits were shared with defendants who knew the source of those monies -- payments made in furtherance of the sex trafficking scheme.

250.   If Defendants had not knowingly and intentionally used their authority and influence as officials and individuals and as a government, they would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to commit crimes against women in full privacy and without any government interference.

251.   By engaging in these acts, Defendants knew that Epstein's coercive commercial sex acts would escape detection for some period of time and thus knowingly and intentionally, obstructed, attempted to obstruct, interfered with and prevented the enforcement of the TVPA and facilitated Epstein's continued and long-term violations of the TVPA.

252.   Defendants knew, and intended, that their actions obstructed the enforcement of the TVPRA.

253.   Defendants' obstruction of the TVPRA was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Does 1-6 and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture. Defendants knew that Epstein and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Jane Does 1-6 and Class Members to engage in commercial sex acts.

254.    Defendants knew, acted in reckless disregard of the fact, and should have known, that their obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Does 1-6 and other Class Members.

255.    Defendants' obstruction has caused Jane Does 1-6 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

256.    Defendants' obstruction has caused Jane Does 1-6 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

257.    This case does not involve mere fraud. Instead, Defendants' conduct in obstructing enforcement of the TVPRA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization – for financial gain and political power. Defendants' obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' obstruction was directed specifically at Jane Does 1-6 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

258.    By virtue of these violations of 18 U.S.C. § 1591(d), Defendants are liable to Jane Does 1-6 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants perpetrated an obstruction of the TVPRA, and therefore perpetrated a violation of Chapter 77, Title 18.

140.259.    By virtue of their intentional and outrageous obstruction to prevent enforcement of the TVPRA, in violation 18 U.S.C. § 1591(d), Defendants are liable to Jane Does 1-6 and other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

## AS AND FOR A FOURTH CAUSE OF ACTION AS TO AS TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (As to all Defendants)

260.    Plaintiffs incorporate the foregoing paragraphs as set forth herein at length.

261.    Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. §1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property.

262.    The association is and as composed of Epstein and Defendants USVI, Cecile DeJongh, John DeJongh, Mapp, Frazer, Plasket, White, Dowe, and John Does 1-100.

263.    18 U.S.C. §1962(a) makes it:

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through a collection of unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which engaged in, or the activities of which affect interstate or foreign commerce.

264.    18 U.S.C. §162(b) makes it:

unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or in the activities of which affect, interstate or foreign commerce.

265.    18 U.S.C. §1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduce of such enterprise's affairs through a pattern of racketeering activity.

266.    18 U.S.C. §1962(d) makes it unlawful for "any person to conspire to violate any of the provisions" included in 18 U.S.C. §1962.

267.    Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. §1961(4).

268.    Epstein knew that to ensure the longevity and success of the sex trafficking venture he needed to recruit public officials and other influential people in the USVI. To do this, Epstein created the RICO Enterprise in 2001 and began to recruit Defendants and others.

269.    The common purpose of the RICO Enterprise of its members, including the Defendants, was to profit from the sex trafficking venture.

270.    Defendants have unlawfully used their association with the venture to profit from the sex trafficking of Plaintiffs and other young women to the USVI by Epstein and his affluent clients.

271.    Defendants used their association with the venture to solicit travel from Epstein and his affluent clients to the USVI to engage in the sex trafficking of Plaintiffs and other young women and other business.

272.    The venture was a RICO enterprise which all Defendants engaged in, and the activities of which affected interstate for foreign commerce, is comprised of an association-in-fact, of persons including each Defendant and other unnamed co-conspirators. That association-in-fact was structured by various relationships between the Defendants including marital relationships and varying political offices, affiliations and influence to assign each Defendant a role in their agreement to carry out the venture which included their agreement and knowing involvement in the violation of 18 U.S.C. §201; 18 U.S.C. §1510; 18 U.S.C. §1591; 18 U.S.C. §1952; and/or 18 U.S.C. §1590.

273.    Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100  knew or should have known that the venture violated the TVPRA because they were required by law to perform home visits of Epstein and failed to do so, gave Epstein waivers of compliance with sex offender legislation, instructed airport officials not to check the identification of Plaintiffs, other young women, and Epstein's affluent clients traveling with Epstein, withheld Plaintiffs and other young women's passports, instructed law enforcement not to assist Plaintiffs and other young women and instructed law enforcement not to interfere, intervene or investigate Epstein.

274.    Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100  knew or should have known that the venture violated 18 U.S.C. 201 because they each accepted bribes from Epstein, directed bribes from Epstein and facilitated the transfer of the bribes from Epstein to elected officials, as follows: the USVI directed Epstein to provide a $50 million loan to the USVI. USVI also directed Epstein to provide funds to USVI's little league and other programs. Cecile deJongh directed Epstein to pay for her children's college tuition. Cecile deJongh also facilitated the transfer of bribes to elected officials including but not limited to John deJongh, Mapp, Frazer, Plaskett, White, Doe and John Does 1-100. John deJongh directed Epstein to pay for his children's college tuition and his criminal settlement. Mapp directed and accepted a monthly retainer from Epstein. Frazer directed and accepted monthly retainer from Epstein.  Plaskett directed, accepted and solicited political contributions from Epstein and his affluent clients.

275.    Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100  knew or should have known that the venture violated 18 U.S.C. §201

because they handpicked politicians and candidates for Epstein to bribe and/or otherwise financially support in exchange for their loyalty to the venture.

276. Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100 knew or should have known that the venture violated 18 U.S.C. §201 because they each accepted money from Epstein in exchange for waivers of compliance with sex offender legislation, USVI not performing the mandated home visits to Epstein required by their sex offender legislation and giving Epstein and his sham companies tax breaks.

277. Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100 knew or should have known that the venture violated 18 U.S.C. §201 because, as public officials, they demanded, sought, received accepted and/or agreed to receive or accept the payment of money, campaign contributions, gifts and/or other financial support in return for allowing Epstein's input on sex offender legislation, granting Epstein a waiver of compliance with sex offender legislation, not performing the mandated home visits to Epstein required by their sex offender legislation, giving Epstein and his sham companies tax breaks, directing law enforcement not to investigate Epstein and/or their aid of the sex trafficking venture.

278. Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100 knew or should have known that the venture violated 18 U.S.C. §1952 because they each facilitated Epstein's travel with Plaintiffs and other young women from New York to USVI to profit off of the sex trafficking venture which included the sexual assaults and forced prostitution of Plaintiffs and other young women, Epstein using the proceeds to unlawfully bribe and/or extort USVI officials, and promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of the sex trafficking venture.

279.    Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100  knew or should have known that the venture violated 18 U.S.C. §1510 because, in exchange for money, each Defendant protected the venture from criminal investigation and/or prosecution and interference from law enforcement using their political influence.

280.    Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100  knew or should have known that the venture violated 18 U.S.C. §1590 because each Defendant participated in the concealment of the venture including but not limited to instructing airport officials not to check travel documents of people traveling with Epstein, including Plaintiffs and other young women, withholding Plaintiffs' and other young women's passports, instructing law enforcement not to acknowledge Plaintiffs' and/or other young women's' pleas for help and disciplining any airport employee or government official who refused to aid the venture.

281.    The members of the venture, including Defendants, all shared a common purpose: to enrich themselves financially through the operation of a prostitution business at the expense of Plaintiffs and other young women who were being sex-trafficked. As set forth herein, Defendants benefitted financially from the venture and the sex trafficking of Plaintiffs and other young women by demanding, seeking, receiving accepting and/or agreeing to receive or accept the payment of money, campaign contributions, gifts and/or other financial support in return for allowing Epstein's input on sex offender legislation, granting Epstein a waiver of compliance with sex offender legislation, not performing the mandated home visits to Epstein required by their sex offender legislation, giving Epstein and his sham companies tax breaks, directing law enforcement not to investigate Epstein, directing airport personnel not to review travel documents for anyone traveling

with Epstein, directing law enforcement not to respond to Epstein's victims, including Plaintiffs, cries for help, withholding Plaintiffs' and other young women's passports,  and/or otherwise aiding the sex trafficking venture.

282.    The venture began in 2001 when Epstein met Cecile deJongh who helped create the RICO enterprise in which the members would profit from the sex trafficking of Plaintiffs and other young women. Cecile deJongh helped Epstein recruit public officials for their participation, aid, assistance and/or cooperation in the venture in exchange for money. Cecile deJongh used her influence as First Lady to recruit her husband, Defendant John deJongh to the venture as well as other public officials with influence over legislation and law enforcement including but not limited to Mapp, Frazer, Plaskett, White, Dowe, and John Does 1-100.

283.    The venture constituted an ongoing organization whose members functioned as a continuing unit.

284.    The enterprise engaged in racketeering activities for approximately 20 years.

285.    As evidenced by documents including electronic mail communications which are publicly available, Defendants orchestrated, participated, managed and executed the venture by permitting Epstein's input on sex offender legislation, granting Epstein waivers of compliance with sex offender legislation, influencing law enforcement not to perform home visits to Epstein in violation of USVI sex offender laws, directing law enforcement not to investigate Epstein, withholding the passports of Plaintiffs and other young women, directing the payment of money to public officials and political candidates in exchange for access and loyalty to the venture, terminating officials who refused to aid the venture, and/or otherwise orchestrating, participating, managing and executing the venture.

286.    At all times relevant herein, Epstein and Defendants USVI, Cecile deJongh, John deJongh, Mapp, Frazer, Plaskett, Celestino, Dowe, and John Does 1-100 operated as an association in fact to participate in predicate acts of racketeering to facilitate a long-term criminal conspiracy to sex traffic Plaintiffs and others.

287.    Defendants concealed their participation in the venture and Plaintiffs only discovered the venture in 2023 when portions of deposition transcripts, electronic mail communications and other documents became publicly available which revealed the Defendants participation in and association with the venture.

288.    Defendants profited from the venture, and Plaintiffs and other young women suffered irreparable harm because the venture involved them being sexually assaulted and forced into sexual acts.

289.    Defendants used the proceeds from the venture to advance the venture by donating to political campaigns and paying public officials who they believed would be loyal to and assist in the venture.

290.    Defendants obtained revenue from the venture via wire transfers, documents, and banking transactions that were exchanged via electronic means over interstate wires from this district, thereby growing the venture and causing further injury to Plaintiffs and other young women.

291.    Defendants each had the specific intent to participate in the venture, including the pattern of racketeering activities.

292.    Defendants each had a legal and ethical obligation to monitor the activities and travel of Epstein, a known sexual predator, to the USVI with young women, including Plaintiffs,

and failed to do so. During the 10 years proceeding the filing of this action, Defendants knowingly, willfully and unlawfully participated in a pattern of racketeering that continues to this day.

293.    The acts set forth above had the same pattern and purpose to profit from the sex trafficking of Plaintiffs and other young women.

294.    Without the repeated predicate acts, the continued sex trafficking of Plaintiffs and other young women to have been sex trafficked through the USVI would not have been possible.

295.    The predicate racketeering acts all relate to each other in that they were part of concerted actions by Defendants to use the sex trafficking venture to personally enrich themselves and their political allies at the expense of Plaintiffs and other young women.

296.    The Defendants' wrongful conduct has caused injury to Plaintiffs and other young women.

297.    Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of illegal activities over a substantial number of years which continues to this day.

298.    To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including but not limited to, sex trafficking, forced prostitution, bribing public officials, accepting bribes as public officials and/or obstructing and preventing criminal investigation.

299.    Defendants' participation in the venture was the proximate cause of the injuries suffered by Plaintiffs and other young women.

### AS AND FOR A F~~OURIF~~TH CAUSE OF ACTION AS TO NEGLIGENCE
**(As to all Defendants)**

~~58.~~300.        Plaintiffs incorporate the foregoing paragraphs as set forth herein at length.

59.301.        Plaintiff Jane Doe 1 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2001 to 2019 in New York, Florida, USVI, and around the world.

60.302.        Plaintiff Jane Doe 2 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2015 to 2019 in New York, Florida, USVI, and around the world.

61.303.        Plaintiff Jane Doe 3 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2015 to 2019 in New York, Florida, USVI, and around the world.

62.304.        Plaintiff Jane Doe 4 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2001 to 2009 in New York, Florida, USVI, and around the world.

63.305.        Plaintiff Jane Doe 5 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators from 2001 to 2009 in New York, Florida, USVI, and around the world.

64.306.        Plaintiff Jane Doe 6 was sexually abused, forced to engage in commercial sex acts, and trafficked by Epstein and his co-conspirators in approximately 2004 in New York and USVI.

65.307.        Epstein and his other co-conspirators committed numerous intentional acts against Plaintiff Jane Doe 1 which constitute sexual offenses as defined in New York Penal Law § 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 1 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 1 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 1 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 1 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 1 by forcible compulsion.

66.308.        Epstein and his other co-conspirators committed numerous intentional acts

against Plaintiff Jane Doe 2 which constitute sexual offenses as defined in New York Penal Law

§ 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 2 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 2 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 2 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 2 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 2 by forcible compulsion.

67.309.        Epstein and his other co-conspirators committed numerous intentional acts

against Plaintiff Jane Doe 3 which constitute sexual offenses as defined in New York Penal Law

§ 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 3 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 3 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 3 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 3 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 3 by forcible compulsion.

68.310.          Epstein and his other co-conspirators committed numerous intentional acts

against Plaintiff Jane Doe 4 which constitute sexual offenses as defined in New York Penal Law

§ 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 4 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 4 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 4 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 4 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 4 by forcible compulsion.

69.311.          Epstein and his other co-conspirators committed numerous intentional acts

against Plaintiff Jane Doe 5 which constitute sexual offenses as defined in New York Penal Law

§ 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 5 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 5 by forcible compulsion;

c. Criminal sexual act in the first degree as defined in § 130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe 5 by forcible compulsion;

d. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 5 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 5 by forcible compulsion.

70.312.    Epstein and other~~his~~ co-conspirators committed numerous intentional acts against Plaintiff Jane Doe 6 which constitute sexual offenses as defined in New York Penal Law § 130, including but not limited to the following:

a. Sexual misconduct as defined in § 130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 6 without her consent;

b. Rape in the first degree as defined in § 130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe 6 by forcible compulsion;

c. Forcible touching as defined in § 130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe 6 for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

d. Sexual abuse in the third degree as defined in § 130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe 6 by forcible compulsion.

313.    Defendants had a special relationship with Plaintiffs because Plaintiffs belonged to a class for whose benefit a ~~statue~~statute was enacted, namely the TVPRA and RICO, and USVI sex offender laws (SONRA).

314.    Defendants had a special relationship with Plaintiffs because they took positive control of a known and dangerous safety condition, namely Epstein's sex trafficking venture, which is an indisputable hazard to human health and the safety of others.

315.    Defendants did not merely fail to enforce but used their money and influence, whether in office or not, to ensure that these laws were affirmatively violated without any hindrance or repercussion to any member of the sex trafficking venture.

316.    Defendants affirmatively attempted to revise the USVI's sex offender legislation (SONRA) to further assist Epstein in travelling freely with his co-conspirators  and/or co-Defendants, Plaintiffs and other victims.

317.    Defendants knew that Epstein was trafficking young women and wealthy men from New York for the sole and exclusive purpose of engaging in commercial sex acts in the USVI and not only agreed with Epstein and/or his co-conspirators and co-Defendants to facilitate the venture, but actively assisted Epstein in his operation by coercing and exerting influence over all individuals and entities that could have, and should have, prevented the venture from continuing, namely law enforcement, airport personnel, customs agents and coast guard officials.

318.    Defendant Frazer admitted that, as Attorney General, he had the ability and authority to investigate who Epstein was bringing into the USVI on his private jet but never did so.

71.319.       USVI law enforcement never investigated Epstein, because Defendants coerced and influenced them into permitting the sex trafficking venture to continue.

⸻Defendants also permitted Epstein, his co-conspirators and co-Defendants to leave the USVI without any hindrance, or reporting to mainland authorities. Defendants knew that the commercial sex acts in furtherance of the sex trafficking venture were occurring on the USVI yet they coerced and influenced all individuals and entities that could have, and should have, prevented the sex trafficking venture from continuing and prevented them from leaving the USVI without any repercussions.

⸻

320.    Defendants also coerced and exerted influence over all individuals and entities that were obligated to supervise Epstein's conduct as a registered sex offender in order to prevent them

from complying with those laws. For example, these Defendants ensured that Epstein was issued waivers from compliance with the sex offender laws, and prevented any meaningful inspection of his residence for years, despite the legal requirement that such inspections occur because of Epstein's status as a registered sex offender. Defendants also coerced and influenced others so that Epstein was never obligated, despite his status as a registered sex offender, from registering his aircraft or boats, which were indispensable instrumentalities of the sex trafficking venture.

321.   Defendants engaged in these acts with full knowledge that they were coercing and exerting influence over all individuals and entities for the purpose of ensuring that the sex trafficking venture flourish so that they could financially profit from it.

322.   Through Defendants' actions, they took exclusive control of the sex trafficking venture, because they continuously, and for a period of years, permitted Epstein, his co-conspirators and co-Defendants to travel to the USVI from New York with young women for the exclusive purpose of engaging in commercial sex acts in exchange for payments that they directed Epstein to make from his New York bank accounts.

72.323.   At all times mentioned herein, Defendants owed a duty of care, including, but not limited to ensuring the citizens, aliens, and travelers to USVI, are protected by the USVI government uniformly under the federal law, including 18 U.S.C. §§§ 1591, 1594, and 1595 prohibiting the facilitation and promotion of sex-trafficking, and the profiting thereof.

73.324.   At all times mentioned herein, Defendants owed a duty of care, including, but not limited to ensuring the citizens, aliens, and travelers to USVI, are reasonably protected by the USVI's government under the federal law prohibiting sex-trafficking, and in the promotion of sex-trafficking and facilitating of sex-trafficking when on USVI's territories.

74.325.   Defendants acted under the complete supervision and control of the USVI.

75.326.      USVI had a duty to supervise their government employees, such as Defendants, to ensure their actions, in following government-directed orders, do not promote, encourage, or facilitate sex-trafficking within the USVI, from the USVI, or to the USVI.

76.327.      USVI had a duty to supervise their government employees, Defendants, to ensure their actions, in following government-directed orders, enforce the law reasonably and equally within the USVI.

77.328.      At all times mentioned herein, Defendants, and/or their agents, servants and/or employees breached the above-stated duty in a negligent manner, and enabled, facilitated, and allowed Epstein's sex-trafficking to continue unfettered.

78.329.      Defendant USVI negligently hired, supervised, and retained Defendants John Does 1-100John Does 31-40.

79.330.      Defendants were negligent in their failure to carry out their jobs, positions, and duties as government employees to their fullest extent and, instead following orders from others, directing them to ignore Epstein's venture of continuous and open sex-trafficking of young women, and/or directing them to provide specialized services to Epstein, a civilian, in furtherance of Epstein's sex-trafficking scheme.

80.331.      Defendants, whether in an official or individual capacity, in furtherance of the venture used their influence and/or coerced , as USVI customs agents to violate the law in order to, facilitated Epstein's, his associates', and many female victims being trafficked by Epsteinthe sex-trafficking venture, including Plaintiffs, by failing to check and/or inspect Plaintiffs, other victims, and Epstein's guests for legally valid travel documents, including customs forms, passports, and/or VISAs; by failing to inspect his guests or Jane Doe's travel documents, including customs forms, passports, and/or VISAs; by failing to inquire as to Jane Doe's and

Epstein's guests' legally valid travel documents, including customs forms, passports, and/or VISAs; by failing to require Plaintiffs, other victims, and Epstein's guests provide and/or present the agents with legally valid and required travel documents, including customs forms, passports, and/or VISAs; by failing to require Plaintiffs, other victims, and Epstein's guests provide and/or present the agents with any form of identification before granting Plaintiffs, other victims, and Epstein's guests entry into the USVI; by failing to require Plaintiffs, other victims, and Epstein's guests provide and/or present the agents with legally valid and required travel documents, including customs forms, passports, and/or VISAs before issuing Plaintiffs, other victims, and Epstein's guests travel documentation allowing Plaintiffs, other victims, and Epstein's guests to travel back into the United States from the USVI; by failing to require Plaintiffs, other victims, and Epstein's guests provide and/or present the agents with any form of identification before issuing Plaintiffs, other victims, and Epstein's guests travel documentation allowing Plaintiffs, other victims, and Epstein's guests to travel back into the United States from the USVI; by allowing Plaintiffs, Epstein, and his associates to enter and remain on USVI territory without the proper travel documentation; by failing to ensure Plaintiffs, other victims, Epstein, and his associates were entering the USVI legally; by failing to ensure Plaintiffs and other victims, Epstein, and his associates did not remain in the USVI illegally; by failing to question and/or investigate Plaintiffs and the other sex trafficking victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by failing to ensure Plaintiffs, Epstein, and his associates were leaving the USVI legally and of their own accord; by, in accordance with government orders, not conducting searches nor questioning of Epstein, Plaintiffs, and other victims and his female guests; by, in accordance with government orders, not detaining under any circumstances Epstein, Plaintiffs, and other victims and his female guests; by, in accordance with

government orders, not questioning Epstein and any of his female guests, Plaintiffs, and other victims; providing and any and all courtesies to Epstein; and by failing to perform the proper checks when granting Plaintiffs and other victims, Epstein, and his associates entry into the USVI.

81.332.    Defendants, whether in an official or individual capacity, in furtherance of the venture used their influence and/or coerced as USVI air traffic controllers, facilitated Epstein's, his associates, and many female victimsPlaintiffs, and other victims being trafficked by Epstein, including Plaintiffs, byto allowing Epstein to land his plane at the USVI airports without entering the plane; providing and any and all courtesies to Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs and other victims; by allowing Epstein to land his plane at the USVI airports without inspecting the plane; by allowing and ensuring Epstein could at all times land his plane in isolated areas to protect his sex-trafficking venture; to allowing Epstein to land his plane and disembark without any government oversight or inquiry; by allowing Plaintiffs and other victims, Epstein, and his associates to enter and remain on USVI territory without checking them for the proper travel documentation; by failing to ensure Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs and other victims, Epstein, and his associates were entering the USVI legally; and by failing to perform the proper checks when granting Plaintiffs and other victims, Epstein, and his associates entry into the USVI.

82.333.    Defendants, whether in an official or individual capacity, in furtherance of the venture used their influence and/or coerced as USVI airport baggage check agents, facilitated Epstein's, his associates', and many femalePlaintiffs and other victims victims being trafficked by Epstein, including Plaintiffs, by allowing to allow Epstein to land his plane at the USVI airports without entering the plane;  by allowing Epstein to land his plane at the USVI airports without inspecting the plane; by allowing and ensuring Epstein could at all times land his plane in isolated

areas to protect his sex-trafficking venture; providing and any and all courtesies to Epstein; by, in accordance with government orders, not conducting searches of Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, and other victims ~~and his female guests~~; by failing to question and/or investigate Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs and the other ~~sex-trafficking~~ victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by failing to question and/or investigate Plaintiffs and the ~~other sex-trafficking~~ victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by, in accordance with government orders, not detaining under any circumstances Epstein, his customers, co-conspirators, co-Defendants ~~and his female guests~~, Plaintiffs, or other victims; by, in accordance with government orders, not questioning Epstein~~,~~, his customers, co-conspirators, co-Defendants, Plaintiffs, or other victims~~and any of his female guests~~; to allowing Epstein to land his plane and disembark without any government oversight or inquiry; by allowing Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, or other victims~~Plaintiffs, other victims, Epstein, and his associates~~ to enter and remain on USVI territory without checking them for the proper travel documentation; by failing to ensure ~~Plaintiffs, other victims, Epstein,~~Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, or other victims ~~and his associates~~ were entering the USVI legally; and by failing to perform the proper checks when granting ~~Plaintiffs, other victims, Epstein, and his associates~~Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, or other victims entry into the USVI.

~~83.~~334.    Defendants, ~~as~~whether in an official or individual capacity, in furtherance of the venture~~used their influence and/or coerced~~ USVI police officers, ~~facilitated Epstein's, his associates', Plaintiffs and other victims~~ and many female victims being trafficked by Epstein~~,~~, including Plaintiffs, by, when instructed, providing~~to provide~~ Epstein, his customers, co-

conspirators, co-Defendants, Plaintiffs, or other victims with protection when traveling around USVI; by, in accordance with government orders, not conducting searches of ~~Epstein~~ , Plaintiffs, ~~and other victimsand his female guests~~Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, or other victims; by failing to question and/or investigate Plaintiffs and ~~the other sex-traffiking~~other victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by, in accordance with government orders, not detaining under any circumstances ~~Epstein and his female guests~~Plaintiffs, and other victims Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, or other victims; by, in accordance with government orders, not questioning ~~Epstein~~ , Plaintiffs, or other ~~victimsand any of his female guests~~Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs or other victims; and in providing and any and all courtesies to Epstein when on USVI.

~~84.~~    Defendants, whether in an official or individual capacity, in furtherance of the venture used their influence and/or coerced ~~as~~ USVI coast guard agents, ~~facilitated Epstein's, his associates', and many female victims being trafficked by Epstein, including Jane Does 1-6, in providing~~to provide any and all courtesies to Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, and other victims on the USVI waterways; by, in accordance with government orders, not conducting searches of ~~Epstein~~ , Plaintiffs, or other ~~victimsand his female guests~~Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, and other victims; by failing to question and/or investigate Plaintiffs and ~~the~~ other ~~sex-trafficking~~ victims to ensure that they were in the USVI legally, on their own accord and not being sex trafficked; by, in accordance with government orders, not detaining under any circumstances Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, and other ~~victimss Epstein~~ , Plaintiffs, or other ~~victimsand his female guests~~; by, in accordance with government orders, not questioning ~~Epstein~~ , Plaintiffs,

~~or othr victims~~~~and any of his female guests~~Epstein, his customers, co-conspirators, co-Defendants, Plaintiffs, and other victims; by, in accordance with government orders, not boarding, searching, and/or inspecting any of Epstein's watercrafts or boats;  providing and any and all courtesies to Epstein; by allowing and ensuring Epstein could travel and traffic ~~females~~ Plaintiffs and other victims freely on the waters of the USVI; and by failing to perform the proper checks when granting Plaintiffs, Epstein, and his associates entry into the USVI.

335.    Each of the Defendants are alleged to have engaged in the foregoing acts and omissions throughout the time period alleged, in both their official and/or individual capacities.

~~85.~~336.            As a direct and proximate result of all Defendants' acts and/or omissions, Epstein's sex-trafficking venture was able to continue to traffic Plaintiffs, and, as a result thereof, Plaintiffs and the Class Members were continually and repeatedly sexually abused by Epstein and others within his sex-trafficking venture, and suffered severe and serious injuries.

~~86.~~337.            The injuries that Plaintiff Jane Does 1-6 and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Epstein and other co-conspirators and criminalized under article 130 of the New York Penal Laws. The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20. The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

~~87.~~338.            The breaches of legal duties by Defendants proximately caused Plaintiff Jane Does 1-6 and the Class Members to repeatedly suffer injuries from Epstein and his co-conspirators, including sexual assaults and resulting emotional distress, mental pain and suffering, and other physical and psychological trauma. These injuries were easily foreseeable, because

Defendants knew, and acted in reckless disregard of the fact, that their actions and omissions supporting and facilitating Epstein would lead to (among other crimes) sex offenses by Epstein and his co-conspirators forbidden by article 130 of New York Penal Law against his victims, including Jane Does 1-6 and the Class Members.

88.339.     In the exercise of reasonable care, Defendants knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximate harm that would be caused by his likely sexual crimes and various violations of article 130 of New York Penal Law.

89.340.     Defendants could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking venture would lead to sex offenses against Plaintiffs and the Class Members. Among other things, the Defendants were specifically aware that Epstein had previously been prosecuted for similar sex crimes and previously paid numerous civil settlements associated with similar sex crimes. Indeed, the Defendants were aware, and should have been aware, that Epstein was a "high risk" to commit sex offenses against young women and girls.

90.341.     Plaintiffs and the Class Members were easily within the zone of foreseeable harm from Defendants' reckless and negligent acts and omissions. Defendants' acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Plaintiffs and the Class Members fell within that zone.

91.342.     The sex offenses Jeffrey Epstein, his customers, and co-conspirators committed against Plaintiffs and the Class Members were easily within the zone of foreseeable risks that the Defendants created with their reckless and negligent actions and omissions. Those actions and omissions foreseeably risked further sex crimes by Jeffrey Epstein and his co-

conspirators-which is exactly and tragically the harm that he inflicted on Plaintiffs and the Class Members.

92.343.    Defendants' tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct was directed specifically at Plaintiffs and the Class Members, who were the victims of Epstein's sexual abuse and sex trafficking organization.

93.344.    As a result of the intentional and negligent actions and omissions described in this Count, Plaintiffs and the Class Members have sustained both general and specifical damages in substantial amounts.

94.345.    Defendants' intentional, outrageous conduct, evinced a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, making Defendants liable to Plaintiffs and the Class Members for punitive damages.

95.346.    The amount of damages sought exceeds the jurisdiction of all lower courts which would otherwise have jurisdiction.

96.347.    This action falls within exceptions to Article 16 of the C.P.L.R.

## VII. REQUEST FOR RELIEF

97.348.    Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 respectfully requests that the Court enter judgment in their favor, and against Defendants, as follows:

a. That the Court certify the Class, name Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 as Class Representatives, and appoint their lawyers as Class Counsel;

b. That the Court award Plaintiffs and the other members of the Class compensatory, consequential, general, and nominal damages against Defendants in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages and treble damages against Defendants in an amount to be determined at trial;

d. That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

## JURY DEMAND

98.349.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury as to all issues.

Dated: May 10, 2024                          Respectfully Submitted,
       New York, New York

By: _Jordan Merson_

Jordan K. Merson, Esq. (JM-7939)
Annette Hasapidis, Esq.
Kimberly A. Kramer, Esq.
Jennifer Plotkin, Esq.
*Attorneys for Plaintiffs*
Merson Law, PLLC
950 Third Avenue, 18th Floor
New York, NY 10022
Phone: (212) 603-9100
Email: jmerson@mersonlaw.com;
       agh@hasapidislaw.com;
       kkramer@mersonlaw.com