# EXHIBIT Q

```
 1               UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    GOVERNMENT OF THE UNITED        )
 3  STATES VIRGIN ISLANDS,          )
                                    )
 4           Plaintiff,             )
    vs.                             )  1:22-cv-10904-JSR
 5                                  )
    JPMORGAN CHASE BANK, N.A.,      )
 6                                  )
             Defendant/Third-       )
 7           Party Plaintiff.       )
    _____)
 8                                  )
    JPMORGAN CHASE BANK, N.A.,      )
 9                                  )
             Third-Party            )
10           Plaintiff,             )
    vs.                             )
11                                  )
    JAMES EDWARD STALEY,            )
12                                  )
             Third-Party            )
13           Defendant.            )
14               THURSDAY, JULY 6, 2023
15       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

16                      —  —  —

17           Remote Videotaped Deposition of CARLYN IRWIN,

    taken pursuant to notice and conducted at the location of
18
    the witness in the State of California, commencing at
19
    9:01 a.m., Pacific Time, on the above date, before Jennifer
20
    A. Dunn, Registered Merit Reporter, Certified Realtime
21
    Reporter, California, Illinois & Texas Certified Shorthand
22
    Reporter, and Missouri Certified Court Reporter.
23                      —  —  —
24            GOLKOW LITIGATION SERVICES
         P:  877.370.3377 | F:  917.591.5672
25                 deps@golkow.com
```

1    Q    All right.  Do you know whether -- was that

2    statute provided to you or did you or your team find it

3    yourself?

4    A    If it's not Bates stamped then we would have found

5    it ourselves.

6    Q    Okay.  Did you review any other Virgin Islands'

7    statutes or regulations in forming your opinions?

8    A    Only the background material about the EDC program

9    that I cite in my report.

10   Q    Okay.  So this Statute 29, Virgin Islands Code,

11   Section 1101, is the only statute or regulation that you

12   reviewed in forming your opinions for this case, correct?

13   A    Correct.

14            MR. ACKERMAN:  We can take that down, Gina.

15   BY MR. ACKERMAN:

16   Q    In forming your opinions for this case, did you

17   speak with any other expert retained by WilmerHale or

18   JPMorgan?

19   A    No.

20   Q    In forming your opinions for this case, did you

21   speak with anyone other than counsel?

22   A    No.  Other than counsel and my team, no.

23   Q    And again, the members of your team that you spoke

24   with were Mr. Govarra and Ms. Borg and Mr. Kruskol, correct?

25   A    Correct.  Well, and obviously I mentioned I had

```
 1      A    You did.

 2      Q    Okay.  In terms of calculating, or did you --

 3  strike that.

 4           Did you perform any independent analysis to

 5  determine the economic benefits that the territory received

 6  in return for tax benefits granted to Mr. Epstein's

 7  companies?

 8      A    I relied on the data that was produced in this

 9  litigation by the U.S. Virgin Islands.  That's the data I

10  relied upon.

11      Q    The data you relied upon are the cost-benefit

12  ratios, correct?

13      A    Correct.

14      Q    Okay.  Is there any other data that you relied

15  upon in calculating the economic benefits that the territory

16  received in return for tax benefits granted to Mr. Epstein's

17  companies?

18      A    No.  It was solely based on the data provided by

19  USVI in discovery in this matter.

20      Q    And when you say:  "Data provided by USVI," you're

21  referring only to the cost-benefit ratios, correct?

22      A    I'm referring to the Excel spreadsheets that laid

23  out various categories of benefits that went to the island

24  in terms of employment, expenses, taxes, et cetera.

25      Q    Okay.  And if you look at your Appendix B, those
```

Confidential - Pursuant to Protective Order

```
1        A    I do not.

2        Q    Okay.  Do you know whether it is considered as

3   authoritative by the EDC staff or commission members?

4        A    The word "authoritative" is what's hanging me up

5   there.  I know that the statistic itself is something that

6   the EDC measures, that it reports to the public in an

7   aggregated fashion, and it is something that the EDC

8   discusses when granting benefits or extending benefits.

9             And I do know that the commission has, through the

10  meeting minutes, I'm aware that the commission has certain

11  ratios that they refer to as either acceptable or

12  unfavorable.

13       Q    Did you perform any analysis on your own to test

14  the cost-benefit ratios that were -- that the EDC provided?

15       A    We -- when we were summarizing certain year --

16  summarizing performance for certain years, we performed

17  those calculations independently.

18            And in some cases they differed than what's in the

19  table on page 22 of my report.

20            So that would be the extent of the analysis that

21  we did.

22       Q    I'm sorry, can you -- for certain years you

23  performed the calculations on your own and they differed

24  from what's on Table 22, or on the table on page 22, is that

25  what you're saying?
```

Confidential - Pursuant to Protective Order

```
 1              And the reason for that is in that spreadsheet,

 2    the EDC, for whatever reason, didn't include certain

 3    benefits in the denominator.

 4         Q    So is that listed in your -- is that identified in

 5    your report somewhere?

 6         A    It is.

 7         Q    Where?  I'm just not seeing that.

 8         A    So -- so when we calculated -- if you look at the

 9    footnotes.

10         Q    Yeah.

11         A    We can see the tab that we're looking at.  So for

12    tab -- for footnote 133, we are identifying the Excel file,

13    as well as the tab that we are relying on.

14         Q    And so where -- sorry, keep going.

15         A    I'm just trying to see something here.

16              And so that showed -- that allows anyone to go

17    into the -- the file that we identify and reference the data

18    that we're pulling.

19              Whereas, in 2013 -- in 2013, there was certain

20    components, whether it's procurement or charitable

21    contributions, I don't know because -- but it was -- so, for

22    example, okay, so I can see it.

23              In 2013, the .01 that is calculated by the EDC in

24    the file that they sent to us, if you look at the benefits

25    tab, the calculation is -- results in .01, but that only
```

Confidential - Pursuant to Protective Order

```
 1    term, "without any clear economic basis," that's based on

 2    the cost-benefit ratios that we discussed earlier, correct?

 3         A    Correct.

 4         Q    Is that -- is that based on any other evaluation

 5    that you performed?

 6         A    I think part of it might also be the noncompliance

 7    with charitable donations.  But that's the only other thing

 8    I can think of.

 9         Q    Okay.  And then further down in the paragraph, you

10    note -- I'll just read the whole thing.

11              So it says:  "The extending of benefits without

12    any clear economic basis and without USVI asking the

13    appropriate questions to develop a basis for extending them

14    suggests there is some other reason why Mr. Epstein was

15    given $300 million in tax incentives by USVI and is

16    consistent with the possibility that these benefits were

17    granted as part of an improper quid pro quo exchange between

18    Mr. Epstein and USVI officials."

19              Did I read that correctly?

20         A    You did.

21         Q    Okay.  Are you opining that there was an improper

22    quid pro quo between the USVI and Mr. Epstein?

23         A    No.  As a CFE, a certified fraud examiner, my

24    understanding is that would be a legal conclusion and is

25    left up to the trier of fact.
```

1    Q    Okay.  So you were not opining that there was an

2    improper quid pro quo between the USVI and Mr. Epstein?

3    A    Correct.  I'm merely saying that it suggests that

4    there's a possibility.

5    Q    All right.  Are there other possibilities you

6    haven't ruled out?

7              MR. O'LAUGHLIN:  Objection.

8              THE WITNESS:  I would need to know what other

9         possibilities are out there.

10   BY MR. ACKERMAN:

11   Q    Well, could it be that the EDC performs a

12   different analysis than you're performing?

13   A    I've seen no evidence that they perform a

14   different analysis.  If it's somewhere in the record, it

15   hasn't been produced to me.

16             Based -- I'm using the EDC's own standards that

17   they articulate, their own formula that they set forth, to

18   evaluate the extension of these benefits.

19   Q    What about testimony from Ms. Benjamin?

20             Are you aware of testimony from Ms. Benjamin that

21   the cost-benefit ratios are not entirely appropriate when

22   dealing with financial services companies?

23             MR. O'LAUGHLIN:  Objection.

24             THE WITNESS:  I'm aware of that, but in

25        analyzing other financial service company's data that

Confidential Pursuant to Protective Order

```
 1    BY MR. ACKERMAN:

 2         Q    Then if you go to paragraph G.  There's a next one

 3    down.

 4              It says:  "Assess the work done by IDC, EDC, in

 5    connection with evaluating, extending benefits to, and

 6    monitoring of, Mr. Epstein's companies."

 7              Did I read that correctly?

 8         A    You did.

 9         Q    And is that part of your assignment in this case?

10         A    Yes.

11         Q    Okay.  So would you agree that you're basically

12    evaluating EDC's work to see if you agreed with their --

13    with their -- with their methodology and their decisions?

14                   MR. O'LAUGHLIN:  Objection.

15                   THE WITNESS:  I would say I'm assessing the

16              work that they performed relative to their own

17              benchmarks and standards.

18                   So I'm not -- I'm not an expert in their

19              jobs.  I'm merely comparing and assessing what they did

20              relative to their own -- their own goals and their own

21              objectives.

22    BY MR. ACKERMAN:

23         Q    Were you determining whether EDC did anything

24    illegal?

25         A    No.
```

Confidential -- Pursuant to Protective Order

```
 1    to the same person, or a company backed by the same person,

 2    the same person's going to be managing it, and the same

 3    person's making the representations that you should put --

 4    give some context or some consideration to the historical

 5    poor performance.

 6        Q    And is it your opinion that the EDC should not

 7    have granted Southern Trust's certificate?

 8        A    I don't have an opinion about that one way or the

 9    other.  I'm just observing what transpired.

10        Q    Is it your opinion that Southern Trust acted

11    unreasonably in granting tax benefits.  I'm sorry, strike

12    that.

13             Is it your opinion that the EDC acted unreasonably

14    in granting tax benefits to Southern Trust?

15                 MR. O'LAUGHLIN:  Objection.

16                 THE WITNESS:  I don't have an opinion about

17        that one way or the other.  I'm simply noting that

18        there is this track record of very unfavorable, or I

19        won't say very, of unfavorable and concerning ratios,

20        and they gave the same person a certificate for another

21        10 years.

22    BY MR. ACKERMAN:

23        Q    Part of your assignment was to assess the EDC's

24    application process, right?

25        A    I think it's more broad than that.  But, yes.  To
```

1  of Southern Trust's application for tax benefits?

2     A    Except the EDC granted the tax benefits in spite

3  of Financial Trust's poor performance, and a history of an

4  application's projections being not -- being off by a

5  magnitude of 10.

6     Q    So are you opining that they should not have

7  granted the benefits of the application?

8     A    No.  I think I said I'm not opining on whether or

9  not they should have.  I'm simply saying as part of my

10  review, I'm observing that they did, in spite of these other

11  factors that I discussed.

12     Q    So you're not opining on whether they should have

13  granted the certificate.  You're just criticizing their

14  decision to do so?

15             MR. O'LAUGHLIN:  Objection.  Misstates

16        testimony.

17             THE WITNESS:  I'm pointing to the decision as

18        part of my overall opinion regarding the potential

19        other factors that went into the EDC's decision to

20        extend benefits.  So it's -- it's one -- it's one of

21        the supporting observations for my overall conclusion.

22  BY MR. ACKERMAN:

23     Q    And your overall conclusion, again, is that there

24  is a possibility that other factors went into the EDC's

25  decision to extend benefits, right?

Confidential - Pursuant to Protective Order

```
 1      A     Correct.

 2      Q     And you don't know what those other factors were,

 3   correct?

 4      A     I know that, as I state in my report, I'm aware of

 5   payments that benefited politicians, that benefited

 6   officials, and that those could be another factor, but I

 7   don't know the universe of potential factors.

 8      Q     You don't know whether those payments affected the

 9   decision, correct?

10      A     I don't.

11      Q     You stated it might -- it's possible, but you

12   don't know one way or the other, right?

13      A     It's possible.  A fraud examiner is not allowed to

14   testify about intent.

15            A fraud examiner simply -- and in this case I

16   didn't conduct a fraud investigation, that's not my --

17   that's not the role, you really can't do that in litigation,

18   but it's -- as I stated, my review of the record has given

19   me, you know, I've made several observations that suggest

20   there could be other reasons beyond the benefit to the USVI

21   as to why these benefits were extended over a 20-year

22   period.

23      Q     You said you didn't conduct a fraud investigation.

24   What do you mean by that?

25      A     So a fraud investigation, as defined by the
```

Confidential - Pursuant to Protective Order

```
 1   Association of Certified Fraud Examiners, is an entirely

 2   different project.  It is someone that a company suspects

 3   some sort of wrongdoing, whether it's an issue with the

 4   financial reporting or whether it's a misappropriation of

 5   assets, et cetera.

 6          And then a fraud examiner would, once

 7   understanding what the allegations are, what the concerns

 8   are, would design a work plan to investigate those

 9   allegations, document them, conduct interviews of

10   stakeholders and people who are involved in that aspect of

11   the business, and would ultimately, if -- if there was found

12   to be financial impact, quantify that to the best of that

13   their ability and then issue a report.

14          The report would -- typically goes back to, you

15   know, the audit committee of the company or the risk

16   management arm of the company, and then they decide what to

17   do with it from there.

18          So that's an entirely different exercise.

19      Q    Okay.  And then that's not what you did here,

20   right?

21      A    No.  It's -- in my -- I'm unaware of any

22   litigation where a fraud examiner could actually conduct a

23   fraud investigation because it would require access, open

24   access to underlying financial records.

25          It would require open access to witnesses outside
```

Confidential - Pursuant to Protective Order

1    the context of a deposition, that type of thing.

2        Q    Okay.  Let's go to paragraph 67.

3            The first line of that reads:  "USVI's EDC did not

4    properly evaluate Mr. Epstein's applications for benefits,"

5    right, and it goes on:  "And failed to ask him even the most

6    basic questions based on information that was uniquely

7    available to it about his companies."

8            So is it correct here that you are criticizing the

9    EDC's evaluation of Mr. Epstein's applications?

10       A    I'm pointing out that there were inconsistencies

11   in the public hearing testimony that were not resolved.

12   That basically should have raised some sort of questions and

13   follow-up.

14           And moreover, when extending the benefits in 2009,

15   you know, there was discussion about concerns, dangerous

16   precedents, and based on my review of the record, none of

17   that was resolved before extending that application.  Excuse

18   me, extending that certificate.

19       Q    Did the same people who expressed those concerns

20   vote on the extension of the application?

21       A    Well, it was one month later after expressing

22   those concerns.  I would presume at least some of the same

23   people were voting.

24           I'm not aware that the EDC's membership or

25   committee completely turned over in a month between April

Confidential - Pursuant to Protective Order

```
 1              At no time in April when they were talking about
 2    this and saying this is a dangerous precedent, et cetera,
 3    did someone say, oh, well, we should evaluate them from
 4    zero.  This is like a fresh statement.  Oh, we're going to
 5    set them from zero.
 6              So to me that's -- that's conflicting information.
 7         Q    So you are critical of the EDC's decision-making
 8    process; is that -- is that a fair characterization?
 9         A    Again, it's a observation that supports my
10    ultimate conclusion, right.  It's -- there was historical
11    poor performance, there was discussion about being
12    concerned, and they moved forward anyway.
13              I'm not -- they may have a ton of reasons that
14    they then talk about on the record, I'm not saying that, but
15    it's part of my overall conclusion.  It's something that
16    supports that.
17         Q    Okay.
18         A    I don't have an independent opinion that they
19    shouldn't have approved this.  I'm just observing they
20    approved it in spite of all of these other things and
21    concerns.
22         Q    All right.  Let's take that document down.
23              You said earlier that there were questions asked
24    at the 2012 EDC public hearing, right?
25         A    Correct.
```