# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, and JANE DOE 6, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, FIRST LADY CECILE DE JONGH, GOVERNOR KENNETH MAPP, SENATOR CELESTINO WHITE, ATTORNEY GENERAL VINCENT FRAZER, GOVERNOR JOHN DE JONGH, SENATOR CARLTON DOWE, DELEGATE STACEY PLASKETT, and JOHN DOES 1-100,<br><br>Defendants. | 23-CV-10301 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

This case arises out of Jeffrey Epstein's notorious sex-trafficking enterprise. The complaint alleges that Epstein brought women to the United States Virgin Islands to abuse them there, and that the defendants—the United States Virgin Islands and various USVI-based political figures—were complicit in Epstein's sex trafficking. Defendants have moved to dismiss. For the reasons below, all claims other than those against Stacey Plaskett are dismissed.

## BACKGROUND

According to the complaint, Jane Does 1–6 were coerced into commercial sex acts by Epstein and his associates. Dkt. 112 ¶ 63. They initiated this lawsuit against the Government of the United States Virgin Islands ("the USVI"), Cecile de Jongh, Kenneth Mapp, Celestino White, Vincent Frazer, John de Jongh, Carlton Dowe, Stacey Plaskett, and John Does 1–100 on November 22, 2023, alleging that defendants made the United States Virgin Islands a "safe haven" for Epstein's sex trafficking. Dkt. 1 ¶¶ 15, 19.

Defendant USVI is the territorial government of the United States Virgin Islands. Defendant Cecile de Jongh was the First Lady of the United States Virgin Islands from 2007 to 2015, and her spouse, defendant John de Jongh, was Governor of the United States Virgin Islands during the same period. Dkt. 122-1 at 1. Defendant Kenneth Mapp was the Governor of the United States Virgin Islands from 2015 to 2019. Dkt. 112 ¶ 134. Defendant Vincent Frazer was Attorney General of the United States Virgin Islands from 2006 to 2015. Dkt. 125-4. Defendants Celestino White and Carlton Dowe were both senators in the United States Virgin Islands Legislature—White until

2013, and Dowe from 2001 to 2004 and from 2007 to 2013. Dkt. 125 at 12; Dkt. 112 ¶¶ 45, 49. Defendant Stacey Plaskett has been the United States Virgin Islands' delegate to the United States House of Representatives since 2015. Dkt. 125 at 15; Dkt. 112 ¶ 50. Previously, she was General Counsel for the Virgin Islands Economic Development Authority ("VIEDA"). Dkt. 118 at 2. Defendants John Does 1–100 were or are unnamed employees of the USVI and the federal government. Dkt. 112 ¶¶ 51–55. Plaintiffs sue the individual defendants other than Cecile de Jongh in both their individual and official capacities "because they committed the conduct alleged before, during, and/or after they left office." *Id.* ¶ 36; Dkt. 148-1 at 81 ("The SAC pleads that [de Jongh] is sued in her individual capacity.").

Plaintiffs filed an amended complaint on December 13, 2023, Dkt. 7, and a second amended complaint ("SAC") on May 24, 2024. Dkt. 112. The SAC states that plaintiffs were "solicited by Epstein while he was in New York," "transported from New York to the [United States Virgin Islands]," and "held captive and abused" there. *Id.* ¶ 8(xii). Defendants are accused of "facilitat[ing] . . . the trafficking of the victims," including plaintiffs, and then "direct[ing] the payment of monies and loans . . . from Epstein's New York bank accounts to them and/or their designees." *Id.* ¶ 3. The SAC lays out defendants' alleged roles in the Epstein scheme, including labeling Epstein as a Tier 1 Sex Offender when he should have been Tier 2, connecting with customs officials to avoid scrutiny of Epstein's travel, modifying sex-trafficking laws, and arranging visas for young women. *Id.* ¶ 6. It also alleges the rewards defendants received, including a $50 million loan, payment of financial obligations, campaign donations, and monthly retainer fees. *Id.* Based on this conduct, plaintiffs allege that defendants violated the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591 *et seq.*, and New York tort law.[1]

## LEGAL STANDARDS

When faced with a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, courts "constru[e] all pleadings and affidavits in the light most favorable to the plaintiff and resolv[e] all doubts in the plaintiff's favor." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). "[A] plaintiff must make a prima facie showing of jurisdiction," including "facts that, if credited by the trier of fact, would suffice to establish jurisdiction over the defendant." *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018). "[C]onclusory non-fact-specific jurisdictional allegations" are insufficient to make such a showing. *Id.* (alteration in original) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint may include conclusions about the law, but these legal conclusions "must be supported by factual allegations."

---

[1] At a conference held on September 30, 2024, plaintiffs confirmed they are dropping their RICO claim. *See* Dkt. 180 at 35; *see also* Dkt. 148-1 at 5 n.5.

*Id.* at 679. The complaint's well-pleaded factual allegations must be taken as true at this stage. *See id.* ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

## DISCUSSION

### I.   The release bars all claims against Cecile de Jongh.

Cecile de Jongh argues that any claim against her is barred by the release plaintiffs agreed to in resolving claims against Epstein's estate. Dkt. 122-1 at 6–7, 10–11; Dkt. 160 at 2–4. De Jongh correctly identifies (and plaintiffs appear to concede) that the release's language is "so broad that it should be read to include a release of all claims," "regardless of the capacity in which she's being sued." Dkt. 122-1 at 10.

#### A.   The release may be considered on a 12(b)(6) motion to dismiss.

On a motion to dismiss, a court is typically limited to the complaint, attached exhibits, and documents "incorporated in the complaint by reference" or integral to the complaint. *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). But as this Court recently explained in another case arising out of Epstein's sex-trafficking enterprise, courts may "take judicial notice of an adjudicative fact 'that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Bensky v. Indyke*, 743 F. Supp. 3d 586, 592 (S.D.N.Y. 2024) (quoting Fed. R. Evid. 201(b)).

Just as in *Bensky*, the release here was "not in the complaint, attached to it, mentioned in it, or relied on by it," but nor do plaintiffs "dispute the release's authenticity or that [they] signed it." *Id.* at 592–93; *see* Dkt. 148-1 at 76–81 (arguing only that defendants do not fall within the language of the release). So the Court may take judicial notice of the release and consider it on a motion to dismiss. *See Bensky*, 743 F. Supp. 3d at 593; *see also Doe I v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 401 (S.D.N.Y. 2023) (holding that when the "authenticity of [a release] is not disputed, and neither party has suggested that extrinsic evidence would inform the Court's interpretation of it," it is "appropriately considered" at the motion-to-dismiss stage); *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 438 (S.D.N.Y. 2022) (similarly holding that when the "wording of [an agreement] . . . is accepted by both parties," a court can take judicial notice and consider it on a Rule 12(b)(6) motion to dismiss).

#### B.   The release includes claims against Cecile de Jongh.

There is no dispute concerning the language of plaintiffs' release. Dkt. 122-1 at 6. In each of the plaintiffs' settlement agreements, the release states that the claimant:

> releases and forever discharges . . . any entities or individuals who are or have ever been engaged by . . . , employed by, or worked in any capacity for Jeffrey E. Epstein and/or the Epstein Estate . . . from any and all claims, demands, actions, [and] causes of action[,] . . . whether now existing, hereafter existing or revived in the

future[,] . . . including without limitation any and all claims or causes of action that
arise or may arise from or which otherwise concern acts of sexual abuse or sex
trafficking by Mr. Epstein.

Dkt. 122-5. In a supplemental letter submitted at the Court's request, plaintiffs appear to concede
that Cecile de Jongh is covered by the release. The letter says that "[t]he [r]elease's plain terms
define [r]eleasees in the first paragraph," and "all Defendants *except* Cecile [de Jongh] are outside
of this definition." Dkt. 177 at 4 (emphasis added).

This underscores what the release's plain language already makes clear. By signing the release,
plaintiffs agreed to "release[] and forever discharge[] . . . any . . . individuals who are or have ever
. . . worked in any capacity for Jeffrey E. Epstein . . . from any and all claims." Dkt. 122-5. This
language is "about as broad and categorical as it gets," *Bensky*, 743 F. Supp. 3d at 593, and it
conspicuously does not include any requirement that a releasee have worked for Epstein for a
specific length of time or that a releasee not have had any other employment while working for
Epstein. All that's needed is that an individual have worked for Epstein in *any* capacity. And the
SAC itself pleads that de Jongh is an "individual[] who . . . worked . . . for Jeffrey E. Epstein." *See*
Dkt. 122-5. It states that she "worked for Financial Trust Company and/or Southern Trust
Company from 2000 to 2019, entities in which . . . Epstein conducted business." Dkt. 112 ¶ 41. In
addition, plaintiffs' opposition brief describes de Jongh as being "paid . . . a salary by Epstein for
her office manager work" and refers to her as "his office manager" and someone in "Epstein's
employ." Dkt. 148-1 at 78. Taking these statements as true, as the Court must on a motion to
dismiss, de Jongh worked for Epstein and did so for the entire period at issue in the SAC. As an
Epstein employee, she, like the defendants in *Bensky*, is covered by the release.

This Court's decision in *Bensky* rejected many of plaintiffs' legal arguments for limiting the
scope of the release. However, plaintiffs have suggested that there are factual questions about
whether de Jongh was employed by Epstein. *See id.* at 77 ("Discovery is needed to determine if de
Jongh was employed by an Epstein entity . . . ."); Dkt. 180 at 57–58 ("We haven't seen a W-2. . .
. I'm not positive what her employment status was."). These assertions are difficult to credit when
plaintiffs' own complaint and other submissions (quoted above) describe de Jongh as an Epstein
employee. *See also* Dkt. 1 ¶ 92 (alleging in the original complaint that de Jongh was "employed
by Epstein as his office manager"). But in any event, the release covers any individuals "who . . .
have ever . . . worked in any capacity for Jeffrey E. Epstein." Dkt. 122-5. That plainly covers de
Jongh. The pleadings and plaintiffs' arguments make clear that their claims against de Jongh have
been released.[2]

---

[2] De Jongh alternatively argues that the exercise of personal jurisdiction over her is improper and that
service was deficient. The Court exercises its discretion to address de Jongh's merits argument in lieu of
deciding personal jurisdiction. *See Moreira v. Société Générale, S.A.*, 125 F.4th 371, 397 n.17 (2d Cir.
2025). The practice of "treat[ing] personal jurisdiction as a threshold question" is prudential, *id.* (quoting
*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013)), and plaintiffs have all
but conceded the merits question. On de Jongh's claim that service was improper, *see* Dkt. 122-1 at 15, the

## II.    This Court lacks personal jurisdiction over six of the seven remaining named defendants.

The remaining defendants move to dismiss this case on personal-jurisdiction grounds. Plaintiffs focus their response solely on specific jurisdiction. To establish specific personal jurisdiction, two questions must be answered in the affirmative. First, does the state "long-arm statute authorize[] jurisdiction"? And second, does "jurisdiction comport[] with constitutional due process principles"? *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 639 (2d Cir. 2023); *see* Fed. R. Civ. P. 4(k)(1)(A).

As to the long-arm statute, plaintiffs focus on N.Y. C.P.L.R. § 302(a)(1), which allows a court to "exercise personal jurisdiction over any non-domiciliary" defendant who, "in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."[3] Plaintiffs suggest that jurisdiction under § 302(a)(1) is available directly based on defendants' own acts, and also through Epstein's acts based on a conspiracy-based theory of jurisdiction. Conspiracy jurisdiction generally requires that 1) "the defendant had an awareness of the effects in New York of its activity," 2) "the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators," and 3) "the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant." *Tarsavage v. Citic Tr. Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014) (quoting *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442–43 (S.D.N.Y. 2008)).

### A.    A conspiracy-jurisdiction theory is not available under § 302(a)(1).

Although "[i]t appears that New York state courts have not weighed in on the precise question" directly, "numerous district courts sitting in New York have held that Section 302(a)(1) . . . does not provide for co-conspirator jurisdiction." *Przewozman v. Charity*, 2023 WL 2562537, at *16 (E.D.N.Y. Mar. 17, 2023); *see also Suber v. VVP Servs., LLC*, 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("As an initial matter, the conspiracy theory of jurisdiction is not available under section 302(a)(1), which is for business transactions and not torts."), *aff'd in part, rev'd in part*, 2023 WL 115631 (2d Cir. Jan. 10, 2023); *E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*, 2003 WL 22064259, at *9 (S.D.N.Y. Sept. 5, 2003) ("The 'conspiracy theory' of jurisdiction . . . has been held to be 'inapplicable' under section 302(a)(1)."); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 400–01 (S.D.N.Y. 2021) (similar); *Khalil v. Fox Corp.*, 2022 WL 3370826, at *1 (S.D.N.Y. Aug. 16, 2022) (similar).

---

Court granted a *nunc pro tunc* extension of the time to serve her, Dkt. 92, and plaintiffs filed proof of personal service that cures the defects she points to. Dkt. 91-2.

[3] Plaintiffs expressly waived any argument for personal jurisdiction under § 302(a)(3), Dkt. 180 at 7–8, and they have never raised § 302(a)(4) as a basis for personal jurisdiction. They argued that § 302(a)(2) applied "[s]olely [a]s [t]o Cecile de Jongh," Dkt. 148-1 at 25, but the court has dismissed all claims against de Jongh on the merits.

This Court, like another court in this circuit, could not find a single New York state-court decision recognizing conspiracy jurisdiction under § 302(a)(1). *See Przewozman*, 2023 WL 2562537, at *16 ("[T]he court is unable to find any New York case relying on a co-conspirator theory to establish personal jurisdiction under section 302(a)(1)."). And plaintiffs fail to identify any case, state or federal, that supports conspiracy jurisdiction under § 302(a)(1). In fact, most of the cases they cite discuss the due-process requirements for conspiracy jurisdiction, not the New York long-arm statute. *See, e.g.*, *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 291–92 (S.D.N.Y. 2019) (discussing conspiracy jurisdiction as part of the due-process analysis); *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269–73 (2d Cir. 2023) (same); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121–25 (2d Cir. 2021) (same). The few decisions plaintiffs cite that discuss the New York long-arm statute address § 302(a)(2), not § 302(a)(1). *See, e.g.*, *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 125–26 (2d Cir. 2023) (conducting the conspiracy-jurisdiction inquiry under § 302(a)(2)); *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 7 (1st Dep't 2013) (same).

The New York decisions that come closest to addressing the question of conspiracy jurisdiction under § 302(a)(1) are *Bluewaters Communications Holdings, LLC v. Ecclestone*, 996 N.Y.S.2d 232 (1st Dep't 2014), which held that a plaintiff asserting conspiracy jurisdiction under § 302(a)(1) "d[id] not meet the requirements" because the business transactions at issue were "not a tort," *id.* at 233–34, and *FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, 56 N.Y.S.3d 12 (1st Dep't 2017), which entertained the possibility of conspiracy jurisdiction in a case involving business transactions only because "[u]sing a New York bank account for a fraudulent scheme constitutes a tort within New York," *id.* at 18. These cases seem to confirm that under New York law, conspiracy jurisdiction must be tethered to a tort committed within the state. That's the province of § 302(a)(2), which extends the state long-arm statute to anyone who "commits a tortious act within the state." (A reminder here that plaintiffs disavowed § 302(a)(2) as a basis for jurisdiction for everyone except Cecile de Jongh, against whom all claims have already been dismissed.)

Indeed, when courts sitting in New York recognize conspiracy jurisdiction, it has almost always been under § 302(a)(2). *See Bangladesh Bank v. Rizal Com. Banking Corp.*, 208 N.Y.S.3d 2, 18 (1st Dep't 2024) ("This Court has long recognized that conspiracy is a type of agency and that '[t]he acts of a co-conspirator may, in an appropriate case, be attributed to a defendant for the purposes of obtaining personal jurisdiction over that defendant' under CPLR [§] 302(a)(2)." (first alteration in original) (citation omitted)); *United States v. Besneli*, 2018 WL 443747, at *5 (S.D.N.Y. Jan. 16, 2018) ("[I]n cases where courts have considered conspiracy-based jurisdiction over a non-domiciliary defendant, jurisdiction over the alleged co-conspirator has usually been premised on § 302(a)(2) . . . ."). This makes sense. Out-of-state parties may be liable for conspiring with an in-state defendant to commit a tort in the state, so it is understandable that courts have recognized a complementary theory of jurisdiction to rope those defendants in. But § 302(a)(1) focuses on business dealings and contracts—with no regard to their lawfulness or unlawfulness— where notions of "conspiracy" don't easily fit.

Of course, § 302(a)(1) permits plaintiffs to establish jurisdiction over defendants through defendants' actions in the state or those done "through an agent." But here, plaintiffs don't allege that Epstein acted as the defendants' agent in "transact[ing] any business within the state." If anything, it's the other way around—the complaint alleges that Epstein utilized the defendants as *his* agents in transacting business in the Virgin Islands. With no cases or authorities of any kind recognizing conspiracy jurisdiction in this context, and no convincing argument for expansion of the doctrine, plaintiffs will have to establish jurisdiction under § 302(a)(1) the old-fashioned way. *See Przewozman*, 2023 WL 2562537, at *16 ("[T]he court agrees with the many federal decisions concluding New York law does not support coconspirator jurisdiction under section 302(a)(1)."); *Bluewaters*, 996 N.Y.S.2d at 233–34 (rejecting the use of co-conspirator jurisdiction under § 302(a)(1) because, among other reasons, the "purchase of . . . shares was not a tort"). Because plaintiffs' counsel stated at the September 30 conference that the "sole basis" for jurisdiction over Carlton Dowe "is conspiracy jurisdiction" and the SAC does not allege that he received any payments from Epstein, the Court does not have jurisdiction over Dowe. Dkt. 180 at 61; *see* Dkt. 112 ¶ 6.

## B. Section 302(a)(1) does not reach John de Jongh, Kenneth Mapp, Celestino White, Vincent Frazer, or the USVI.

Because a conspiracy-jurisdiction theory is unavailable under § 302(a)(1), the SAC must plead adequate facts that each defendant, either "in person or through an agent," "transact[ed] any business within the state or contract[ed] anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). Under § 302(a)(1), "two requirements must be met." First, "[t]he defendant must have transacted business within the state"; and second, "the claim asserted must arise from that business activity." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)). "[O]ne transaction in New York" is enough even if the defendant "never enters New York[] so long as the defendant's activities here were purposeful." *Eades v. Kennedy, PC Law Offs.*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010)).

Plaintiffs argue that defendants received money from Epstein's New York bank account and therefore "transacted business" in New York. They say that "[r]eceiving a single payment in another state without maintaining a New York account give[s] rise to jurisdiction" under § 302(a)(1). Dkt. 177 at 1. But in *Timothy Coffey Nursery Landscape Inc. v. Soave*, 760 F. App'x 58 (2d Cir. 2019), the Second Circuit held that when the "only contact defendants allegedly had with New York is the use of funds flowing" from a New York bank account to "defendants' Canadian bank account and some communications associated with these wire transfers," the involvement of a New York bank account was "essentially adventitious" and did not constitute transacting business. *Id.* at 60 (quoting *Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012)). While *Timothy Coffey* was a non-precedential order, district courts in this circuit have followed the same approach. *See Johannes Baumgartner Wirtschafts-und Vermogensberatung GmbH v. Salzman*, 2010 WL 3781978, at *4 (E.D.N.Y. Sept. 17, 2010) (holding that merely

receiving a "wire transfer from a New York bank account" does not "subject [someone] to personal jurisdiction" under § 302(a)(1)); *Landau v. New Horizon Partners, Inc.*, 2003 WL 22097989, at *6 (S.D.N.Y. Sept. 8, 2003) (holding that argument for jurisdiction based on funds "drawn from [a] New York bank account" had "no merit"); *cf. Ljungkvist v. Rainey Kelly Campbell Roalfe/Young & Rubicam, Ltd.*, 2001 WL 1254839, at *3 (S.D.N.Y. Oct. 19, 2001) ("Simply stated, an agreement to send payments to New York, without more, [cannot] constitute 'transacting business' under section 302(a)(1).").

Plaintiffs fail to identify a single case in which merely receiving money from a New York bank account was considered "transacting business." Every case they cite involves something more. *See Licci*, 984 N.E.2d at 900 (holding that a foreign bank's "repeated use of a correspondent account in New York on behalf of a client" was "transacting business"); *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 19 (E.D.N.Y. 2016) (similar, but defendant also had a "New York Branch that was staffed with employees and licensed to operate under New York banking laws"); *Skutnik v. Messina*, 113 N.Y.S.3d 195, 198 (2d Dep't 2019) (holding that a defendant who had a New York bank account and requested that plaintiff send money into the New York bank account "transacted business"); *First Manhattan Energy Corp. v. Meyer*, 56 N.Y.S.3d 28, 30 (1st Dep't 2017) (defendant was named in an escrow agreement as a New York law firm's agent and accepted money as part of that agreement).

The only New York connections alleged for John de Jongh, Mapp, Frazer, and White are based on Epstein's New York bank account. De Jongh specifically is alleged to have, along with his spouse, also "solicited loans from Epstein with the knowledge and intent that the money be transferred from Epstein's New York bank accounts" and "solicited college tuition payments . . . from Epstein" that he knew would come from Epstein's New York accounts as well. Dkt. 112 ¶¶ 85–86. All defendants, according to the SAC, "communicated with Epstein while Epstein was in New York about the payment of money to them via telephone." *Id.* ¶ 90.

As to these defendants, the only contacts with New York alleged in the SAC are that 1) defendants received money from Epstein that they knew was sent from his New York bank account and 2) they communicated with Epstein about the payments while he was in New York. This parallels the facts in *Timothy Coffey* and other cases, in which courts have declined § 302(a)(1) jurisdiction where defendants' only contacts with New York were payments from New York and related communications. The SAC doesn't claim that defendants specifically wanted New York money from New York bank accounts; all they cared about was getting paid, and the fact that the money was coming from New York was "essentially adventitious." *Licci*, 984 N.E.2d at 900. Plaintiffs have failed to satisfy their burden of "mak[ing] a prima facie showing that jurisdiction exists." *Holmes v. Apple Inc.*, 797 F. App'x 557, 559 (2d Cir. 2019) (quoting *Penguin Grp.*, 609 F.3d at 34–35).

The Court also lacks jurisdiction over the USVI. The SAC alleges that the USVI "actively solicited and accepted payments from Epstein . . . including a $50 million loan, paid from Epstein's New York bank account." Dkt. 112 ¶ 94; *see id.* ¶ 136 ("Epstein . . . extend[ed] [the USVI] a $50 million loan paid from a New York bank account . . . ."). The USVI denies that such a loan was

8

ever solicited or made and says that "there is no plausible allegation to the contrary." Dkt. 158 at 9. But even crediting plaintiffs' claim that the loan was made, a $50 million loan is not on its own sufficient for long-arm coverage. The SAC doesn't say anything about the loan other than that it existed, was collateralized by the islands, and that it was for $50 million. Dkt. 112 ¶ 136. The SAC includes no allegations that the alleged solicitation occurred in New York, or that Epstein was in New York when the USVI asked him for a loan. It says nothing about where the alleged terms of the loan were negotiated or whether there was a loan agreement. As with John de Jongh, Mapp, Frazer, and White, the only New York connection pleaded in the SAC is that the money Epstein allegedly loaned to the USVI in exchange for facilitating his sex trafficking came from a New York bank account.

While the USVI allegedly received more than the other defendants, plaintiffs don't point to a single case that suggests larger amounts should be treated differently. In fact, loans in the same ballpark have been held insufficient to support long-arm jurisdiction. *See, e.g.*, *Daewoo Int'l Corp. v. Orion Eng'g & Serv. Inc.*, 2003 WL 22400198, at *2 (S.D.N.Y. Oct. 20, 2003) (holding that a $20 million loan was not enough even though "the loan was dispersed through (and interest payments made to) a New York bank" because "[w]iring of money . . . is insufficient to establish jurisdiction under New York's long arm statute").

John de Jongh, Mapp, Frazer, White, Dowe, Plaskett, and John Does 1–100 are all sued in both their individual and official capacities. Dkt. 112 ¶ 36. "Ordinarily, a suit against a state official in her official capacity is deemed an action against the state itself," *Williams v. Marinelli*, 987 F.3d 188, 197 n.13 (2d Cir. 2021), and so the personal-jurisdiction contacts of an individual sued in their official capacity should be incorporated into the personal-jurisdiction analysis as to the government entity itself. *See also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). The only John Does the SAC alleges are USVI employees are John Does 11–20 (air traffic controllers), John Does 21–30 (baggage check agents), John Does 31–40 (USVI police officers), and John Does 41–50 (coast guard agents). Dkt. 112 ¶¶ 51–55. Even assuming that these individuals were USVI employees, which the USVI strongly contests, *see* Dkt. 125 at 22, none of these individuals is alleged to have had any New York contacts.

During part of the period at issue, Plaskett was employed by the VIEDA (the Virgin Islands Economic Development Authority). Dkt. 112 ¶ 50. Even if the VIEDA is part of the USVI and Plaskett was a USVI employee from 2007 to 2012, which is also disputed, the SAC fails to allege that Plaskett had any New York contacts while working at the VIEDA. It states that Plaskett received payments "as early as 2014," *id.* ¶ 145, by which time she had already left the VIEDA. It also states that Plaskett went to New York to solicit donations, but for congressional campaigns that occurred long after her tenure as VIEDA general counsel. *Id.* ¶ 148–49. There is simply no allegation whatsoever that Plaskett "transacted business" in New York, or in fact had anything to do with New York while working at the VIEDA other than allegedly granting tax breaks to Virgin-Islands-based businesses run by Epstein. *Id.* ¶ 50. And contacts by John de Jongh, Mapp, Frazer, White, and Dowe don't change the analysis either. The most plaintiffs say about the USVI is that

it—or its agents—received funds from a New York bank account. Under the circumstances alleged here, that isn't enough to constitute "transacting business" under New York's long-arm statute.

Plaintiffs suggest in the alternative that the "USVI availed itself of the New York courts by suing [JP Morgan] and others involved in the sex trafficking venture" to "reap[] one final reward from the very same illegal venture that it had sustained for years." *Id.* ¶ 119. Plaintiffs don't argue that the lawsuit constituted "transacting business" under § 302(a)(1). And in any event, contacts that occur "after the cause of action arises [are] irrelevant." *Paterno v. Laser Spine Inst.*, 23 N.E.3d 988, 995 (N.Y. 2014) (citing *Harlow v. Children's Hosp.*, 432 F.3d 50, 62 (1st Cir. 2005)). The JP Morgan lawsuit was filed in 2022, and the SAC clearly states that "[a]ll causes of action arose from 2001 and continu[ed] until 2019, except for the causes of action brought under the [TVPA] and [the RICO] Act." Dkt. 112 ¶ 10. The TVPA cause of action ran from 2003 to 2019, *id.* ¶ 208, and plaintiffs dropped the RICO claim. So the JP Morgan lawsuit happened years after the causes of action arose, and indeed, years after the offending conduct subsided. Further, the USVI explains that it brought the prior case against JP Morgan in New York because JP Morgan is headquartered here, an argument that plaintiffs never address. It's hard to understand how a lawsuit could count as a relevant jurisdictional contact under these circumstances.

In a supplemental letter, plaintiffs raised a "consent" theory of personal jurisdiction for the first time, more than five months after motion-to-dismiss briefing concluded. They argued that the JP Morgan lawsuit "constituted [the USVI's] consent to this Court's jurisdiction in this action," Dkt. 197 at 2, citing the rule stated in *General Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20 (1st Cir. 1991). This argument has long since been waived.

In any event, the "consent" theory wouldn't apply to the facts of this case. First, plaintiffs were not parties in the JP Morgan lawsuit. In *Interpole*, the leading case on this issue, the First Circuit held that there was personal jurisdiction because the lawsuit "ar[ose] out of the same transaction" as another lawsuit brought in the same district by the party challenging jurisdiction. The parties in both cases were the same. *Interpole*, 940 F.2d at 25. The Ninth Circuit, in *Dow Chemical Co. v. Calderon*, 422 F.3d 827 (9th Cir. 2005), later summarized *Interpole* and its progeny as "rest[ing] primarily on the conclusion that there is nothing unfair, or violative of due process, about requiring a party that has affirmatively sought the aid of our courts with regard to a particular transaction to submit to jurisdiction in the same forum as a defendant *with regard to the same transaction with the same party*." *Id.* at 835 (emphasis added).

While the Second Circuit has not yet endorsed the "consent" theory, it recently affirmed a district court decision holding that the rule didn't apply to a case that "[did] not involve the same parties on both sides as the [previous] action." *V&A Collection, LLC v. Guzzini Props.*, 2021 WL 982461, at *5 (S.D.N.Y. Mar. 15, 2021); *see V&A Collection, LLC v. Guzzini Props.*, 46 F.4th 127, 132–33 (2d Cir. 2022) (observing that the defendant challenging jurisdiction "did not name [the plaintiff] as a party" in its previous lawsuit in the district). The USVI sued JP Morgan in its 2022 lawsuit in this district; it did not sue plaintiffs. And just like in *V&A*, here, plaintiffs' "attempt to intervene in the [previous] action was rejected." *V&A*, 2021 WL 982461, at *5; *see Gov't of U.S. Virgin Islands v. JPMorgan Chase Bank, N.A.*, 2024 WL 3227095 (S.D.N.Y. June 28, 2024).

There may be cases in which a "consent" theory applies outside of litigation between the parties to the first lawsuit. But especially where the defendant challenging jurisdiction explains why the first case was filed in New York, with no response from the plaintiff, holding that the defendant consented to jurisdiction in the second case is a stretch.

### C. The Court has personal jurisdiction over Stacey Plaskett.

Plaskett is the last defendant standing. And while she may not have had any New York contacts while she was acting in her official capacity as an alleged USVI employee, she did have sufficient contacts in her individual capacity.

Plaskett is the only defendant that the SAC alleges ever traveled to New York and the only defendant alleged to have actively solicited funds from Epstein in New York. *See* Dkt. 112 ¶ 8(x) (stating that Plaskett "visited Epstein at his New York mansion to request" political donations and "held a fundraiser in New York and specifically invited Epstein and any of his colleagues"). As plaintiffs argue, the repeated solicitation of donations in New York has been enough for "transacting business" in previous cases. *See Sills v. Ronald Reagan Presidential Found., Inc.*, 2009 WL 1490852, at *6 (S.D.N.Y. May 27, 2009) (holding that the Foundation "transacted business" "through its concerted and purposeful campaign of solicitation of charitable donations"). Here, Plaskett traveled to New York on multiple occasions to access not only Epstein, but also his wider donor network based in the state. The touchstone of this analysis is whether a defendant has deliberately targeted New York to benefit from what this state has to offer, *see Timothy Coffey*, 760 F. App'x at 60 ("CPLR 302(a)(1) jurisdiction is proper only if . . . the defendant, through volitional acts, avails itself of the privilege of conducting activities" in New York, "thus invoking the benefits and protections of its laws." (cleaned up) (quoting *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007))), and Plaskett's actions are clearly sufficient under this standard. Unlike John de Jongh, Mapp, White, Frazer, and the USVI, who are not alleged to have specifically desired New York money from New York bank accounts, the SAC adequately pleads that Plaskett traveled to New York and met with Epstein in the hopes of accessing the New York donor market.

Plaskett's response quotes a different part of *Sills*, arguing that "it may not necessarily be the case" that a defendant satisfies § 302(a)(1) "anytime it solicits a contribution." 2009 WL 1490852, at *8. This is certainly true, especially because § 302(a)(1) has two requirements. A defendant must "transact[] business," but "the claim asserted must [also] arise from that business activity." *Licci*, 732 F.3d at 168 (quoting *Solé Resort*, 450 F.3d at 103). The Second Circuit has rejected § 302(a)(1) jurisdiction when the solicitation's connection with the alleged wrongdoing is too attenuated. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 254–55 (2d Cir. 2007) (holding that the "nexus . . . between allegedly tortious conduct" and the donations defendant solicited is "so attenuated" that it "cannot alone be a sufficient basis upon which to establish jurisdiction over the defendant"); *see also Weil v. Am. Univ.*, 2008 WL 126604, at *6 (S.D.N.Y. Jan. 2, 2008) (no personal jurisdiction where plaintiffs "failed to demonstrate that there is a nexus" between the business transactions and cause of action). What is required is "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *Licci*, 732 F.3d at 168–69 (quoting *Licci*, 984

11

N.E.2d at 900). In Plaskett's case, the money she solicited from Epstein in New York and eventually received is directly related to the alleged *quid pro quo* to facilitate Epstein's sex-trafficking enterprise. *See* Dkt. 112 ¶ 6.

Because Plaskett "transacted business" in New York and the SAC's claims "arise from that business activity," long-arm jurisdiction under § 302(a)(1) has been established at this stage. *See Licci*, 732 F.3d at 168 (quoting *Solé Resort*, 450 F.3d at 103).

As for constitutional due process, a defendant must have "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 169 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). First, courts decide if "minimum contacts" exist such that "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Id.* at 170 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)). Second, if there are minimum contacts, courts must weigh factors like the "burden that the exercise of jurisdiction will impose on the defendant," "the interests of the forum state in adjudicating the case," and "plaintiff's interest in obtaining convenient and effective relief" to decide if "the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id.* (citations omitted). Given § 302(a)(1)'s requirements, however, the Second Circuit expects cases in which "personal jurisdiction [is] permitted under the long-arm statute" but "prohibited under due process analysis" to be "rare" and "unusual." *Id.* Here, Plaskett purposefully traveled to New York on multiple occasions to avail herself of the New York donor network (including Epstein) and the benefits of soliciting donations in New York. This clearly satisfies the minimum-contacts requirement.

Nor would exercising personal jurisdiction over Plaskett "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). While Plaskett "does not live or work in New York," Dkt. 118 at 8, she has a home in Washington, DC and would not need to travel directly from the United States Virgin Islands. *Id.* at 2. Contrary to Plaskett's assertion that "[t]o the extent any forum has an interest in this litigation, it is the USVI," *id.* at 8, New York has a strong interest in protecting its citizens from sexual predators and those who enable them. Plaintiffs were New York citizens at the time of the alleged wrongdoing, Dkt. 112 ¶¶ 24–29, and they were trafficked from New York. Finally, plaintiffs have a strong interest in "convenient and effective relief" in New York. *Licci*, 732 F.3d at 170 (citation omitted).

### D. Jurisdictional discovery is inappropriate.

As to the defendants other than Plaskett, plaintiffs cursorily suggest that jurisdictional discovery is warranted. Dkt. 177 at 2; Dkt. 148-1 at 4. But no motion for jurisdictional discovery was made, nor have plaintiffs explained—for any defendant other than Cecile de Jongh—exactly what discovery they want or what facts they believe they will uncover. (The Court notes that certain limited discovery has been ongoing pending the resolution of these motions, and plaintiffs have *still* not explained what they might find.)

Jurisdictional discovery is warranted "[i]f a plaintiff has identified a genuine issue of jurisdictional fact." *Wilson & Wilson Holdings LLC v. DTH, LLC*, 673 F. Supp. 3d 409, 413 (S.D.N.Y. May 15, 2023) (quoting *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004)). But "where a plaintiff fails to establish a prima facie case for jurisdiction," a "district court may deny jurisdictional discovery." *Herlihy v. Sandals Resorts Int'l, Ltd.*, 795 F. App'x 27, 30 (2d Cir. 2019); *see also Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 18–19 (2d Cir. 2015) ("Where plaintiffs do not establish a prima facie case that the district court has jurisdiction over the defendant, the district court does not err in denying jurisdictional discovery."); *Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009) (explaining that a district court "is typically within its discretion to deny jurisdictional discovery when 'the plaintiff [has] not made out a prima facie case for jurisdiction'" (alteration in original) (quoting *Best Van Lines*, 490 F.3d at 255)). In this district, where a plaintiff has not made a *prima facie* case for personal jurisdiction, "jurisdictional discovery is generally not granted." *La. Health Serv. & Indem. Co. v. Celgene Corp.*, 2024 WL 3342603, at *2 (S.D.N.Y. July 9, 2024) (quoting *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 402 (S.D.N.Y. 2009)).

Here, there are no genuine issues of jurisdictional fact. The SAC falls short of its requisite showing of personal jurisdiction even if the Court credits the SAC's claims about defendants' alleged contacts with New York. As to the USVI's alleged $50 million loan, which the USVI denies was ever made, *see* Dkt. 180 at 19 ("The Court: Are you saying there was no such loan? [Counsel for the USVI]: There was no such loan."), there is no long-arm coverage under § 302(a)(1) even if what plaintiffs say about the loan's existence is true. Nothing in the SAC indicates that there was a written loan agreement or that the loan was negotiated in New York; all the SAC says is that the loan was paid out from a New York bank account, and it attaches an email chain in which potential collateral is discussed. Dkt. 112-2. Jurisdictional discovery is not designed as a tool to "allow [plaintiffs] to fish for additional grounds of jurisdiction that they ha[ve] not alleged"; plaintiffs should first plead "legally sufficient allegations of jurisdiction." *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, 560 F. App'x 52, 56 (2d Cir. 2014) (citation omitted). Plaintiffs have not done so and cannot rely on jurisdictional discovery to make new allegations that were not in the SAC.

Furthermore, where plaintiffs seek jurisdictional discovery, they have the burden of demonstrating to the court why jurisdictional discovery is needed. *See Haber v. United States*, 823 F.3d 746, 754 (2d Cir. 2016). If plaintiffs seek additional information, they must show that "the requested discovery is likely to produce the facts needed to establish jurisdiction." *Id.* at 750; *see also Holmes*, 797 F. App'x at 560 ("[J]urisdictional discovery is inappropriate where [the] requesting party has not shown how the requested discovery would produce facts necessary to withstand dismissal." (quoting *Haber*, 823 F.3d at 753)). Plaintiffs have not met this burden. In their opposition brief, they merely say that "even if the Court concludes that there are insufficient facts to establish jurisdiction, jurisdictional discovery is needed." Dkt. 148-1 at 4. "Discovery" is mentioned at other points in the brief, but usually referring to non-jurisdictional discovery. In a supplemental letter, plaintiffs say that "[j]urisdictional discovery is the solution where the SAC's

allegations plead the requisite facts, but the Court finds the details could be more extensive." Dkt. 177 at 2. And at oral argument on the motions to dismiss, plaintiffs didn't discuss jurisdictional discovery with any specificity. *See* Dkt. 180. Nowhere do plaintiffs explain, as to defendants other than Cecile de Jongh, what jurisdictional discovery they seek or how it would support personal jurisdiction. The Court rejects plaintiffs' ill-explained invitation for a fishing expedition, especially after two rounds of motion practice where the defendants' personal-jurisdiction arguments were plainly a focal point.

## III.  The Court rejects Plaskett's other grounds for dismissal.

### A.  The SAC provides adequate notice.

Complaints must "provide sufficient specificity so that each defendant is on notice of the particular claims asserted against it and the grounds for such claims." *Midcap Bus. Credit, LLC v. MidCap Fin. Tr.*, 2024 WL 3606244, at *3 (S.D.N.Y. July 31, 2024). If a complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct," it may be dismissed. *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001).

The SAC does sometimes refer to the defendants as a group, but it also includes specific allegations against each defendant such that individual defendants are given a sense of what they are alleged to have done. Plaskett is mentioned by name sixty times in the SAC, *see* Dkt. 112, and plaintiffs assert that she engaged in unique conduct (like traveling to New York to solicit donations) that other defendants did not. And plaintiffs' use of more general language in parts of the SAC is not categorically unacceptable at this stage. *See Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) ("Rule 8 does not necessarily require . . . that the complaint separate out claims against individual defendants . . . .").

### B.  Plaskett's other arguments fail at the pleadings stage.

Plaskett makes brief, generalized arguments for dismissal of each of plaintiffs' three TVPA claims against her, saying that plaintiffs have "offer[ed] only . . . conclusory allegations" without any "well-pleaded fact[s]" in support. Dkt. 118 at 11–13. Importantly, while the SAC includes three causes of action under the TVPA, the "civil cause of action [in 18 U.S.C. § 1595] doesn't distinguish between different violations," "[s]o if the complaint plausibly alleges one violation, the § 1595 claim survives, and the Court need not address the others at this time." *Bensky*, 743 F. Supp. 3d at 599. Here, the SAC includes plausible allegations that Plaskett violated § 1595(a) when she "knowingly received a financial benefit or something of value . . . from participating in a venture . . . that [she] knew or should have known" was a violation of the TVPA. Dkt. 118 at 11 (citing *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 147, 152–53 (E.D.N.Y. 2020)).

Here, there's no dispute that Epstein operated a sex-trafficking venture that violated § 1591. As to Plaskett's liability under § 1595, the SAC alleges that Plaskett received a position at a law firm affiliated with Epstein's lawyer, Kellerhals, Ferguson, and Kroblin, that Epstein made the maximum contributions to her campaigns, that Epstein hosted a fundraiser for her, and that Epstein gave her a $30,000 loan. Dkt. 112 ¶¶ 6, 141. In exchange, the SAC alleges that Plaskett "approved

over $300 million in tax breaks for Epstein's companies" and "us[ed] her political influence as a Congresswoman to ensure that Epstein's clients, co-conspirators, and co-[d]efendants[] travelled freely and had access to victims and [p]laintiffs." *Id.* ¶¶ 50, 95. She also allegedly "agreed to be Epstein's 'friend,'" *id.* ¶ 144, and knew that her actions were in service of Epstein's sex-trafficking scheme. *See id.* ¶¶ 140–46 ("At the time that Plaskett agreed to use her influence as the attorney on the EDC, Plaskett knew that she was doing so in order that the sex trafficking venture flourish," and when "payments were received, Plaskett knew that [they] were in exchange for her using her influence . . . to ensure that the sex trafficking venture could continue."). These allegations have not been tested against the evidence, and the Court credits them solely for the purposes of evaluating the motion to dismiss. But at this stage, the SAC adequately pleads a violation of § 1595.

Plaskett also argues for dismissal of the TVPA counts on limitations grounds. First, she relies on the TVPA's ten-year statute of limitations to urge dismissal of any claim arising out of alleged harms committed before 2013. *See* Dkt. 118 at 10–11. But as this Court stated in *Bensky*, the TVPA "involves a continuing tort, [so] a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern." 743 F. Supp. 3d at 602 (alteration in original) (quoting *Schneider v. OSG, LLC*, 2024 WL 1308690, at *5 (E.D.N.Y. Mar. 27, 2024)). Plaintiffs' original complaint was filed on November 22, 2023, and it and the SAC allege wrongdoing until 2019. Dkt. 1 ¶ 5; Dkt. 112 ¶ 10. A motion based on the statute of limitations "is an affirmative defense" and can only be granted "if the defense is apparent on the face of the complaint." *Bensky*, 743 F. Supp. 3d at 601–02. Given that the SAC alleges wrongdoing until 2019, it's not clear from the face of the SAC that this defense is meritorious.

Second, Plaskett moves to dismiss the TVPA claims for violations before 2003, when the civil right of action was created. Dkt. 118 at 10. But the SAC clearly states: "All causes of action arose from 2001 . . . *except for* the causes of action brought under the [TVPA]," which are "claimed to have occurred between 2003 through to 2019." Dkt. 112 ¶¶ 10, 208 (emphasis added). So there's no real dispute here: both Plaskett and plaintiffs agree that the TVPA claims begin in 2003.

As to the SAC's negligence claim, Plaskett argues that she had no duty to plaintiffs based on her alleged lack of authority over customs officials, the Coast Guard, air traffic control, and the police. Dkt. 118 at 20. But Plaskett owed plaintiffs an "ordinary duty of reasonable care," just like "everyone else." *Deutsche Bank*, 671 F. Supp. 3d at 414. In *Deutsche Bank*, it was enough that plaintiffs alleged that JP Morgan and Deutsche Bank "helped 'set in motion' Jeffrey Epstein's sex-trafficking venture." *Id.* Here, the SAC adequately alleges that Plaskett helped facilitate that venture.

Plaskett also makes the fleeting, one-sentence argument that plaintiffs "fail to allege any injury within the two-year statute of limitations for negligence." Dkt. 118 at 20. She never mentions it again. Such a "'single, conclusory, one-sentence argument' is insufficient to raise an issue." *SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014) (quoting *Cuoco v. Mortisugo*, 222 F.3d 99, 112 n.4 (2d Cir. 2000)); *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 651 (S.D.N.Y. 2021) ("[I]ssues adverted to in a perfunctory manner, unaccompanied

by some effort at developed argumentation, are deemed waived." (alteration in original) (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001))). Plaintiffs claim that equitable estoppel overcomes any limitations issue here, and there is some question of what law applies—New York's or the USVI's. To the extent that Plaskett believes the negligence claim is plainly time-barred, she may file a renewed application for dismissal of that claim, hopefully devoting more than a sentence to the issue.

Finally, the Court notes that in a supplemental letter sent to the Court after her motion to dismiss was fully briefed and the Court heard argument, Plaskett for the first time attempted to "join[] in the relevant motions of other defendants." Dkt. 175 at 5. The key question is whether allowing Plaskett to join will "raise any new issues of law or fact that would prejudice [p]laintiffs." *Perez v. City of New York*, 2024 WL 898943, at *5 (S.D.N.Y. Feb. 29, 2024); *see also Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 426 n.10 (S.D.N.Y. 2019) (allowing a defendant who had not otherwise responded to a complaint to join another defendant's motion to dismiss because "there [would be] no prejudice" to the plaintiff). Here, Plaskett identifies two arguments that she would like to adopt: improper venue and sovereign immunity. Dkt. 175 at 5.

The Court rejects Plaskett's attempt to join other defendants' arguments after two rounds of briefing and argument in this case. Of course, if Plaskett has meritorious arguments that she wished to adopt, but failed to despite two rounds of briefing, she may raise them in a subsequent application. The Court will consider the timing of the application, the prejudice to plaintiffs, and the substance of Plaskett's arguments in deciding it.

## CONCLUSION

For the reasons above, the motions to dismiss filed by Cecile de Jongh, the USVI, John de Jongh, Kenneth Mapp, Vincent Frazer, Celestino White, and Carlton Dowe are GRANTED. All claims against them are dismissed, including those against Stacey Plaskett in her official capacity as an alleged USVI employee. Stacey Plaskett's motion to dismiss is GRANTED as to the RICO claim but DENIED as to all other claims.

If any party wishes to move for transfer to another district in light of the Court's decision, they should make the appropriate application to the Court within 14 days.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 117, 120, 121, 122, 124, and 130.

SO ORDERED.

Dated: March 21, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge